John T. Jasnoch (CA 281605)
Mollie E. Chadwick (CA 329524)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-233-0508
jjasnoch@scott-scott.com
mchadwick@scott-scott.com

*Counsel for Plaintiff Steven J. Buchanan*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| STEVEN J. BUCHANAN,<br><br>Plaintiff,<br><br>v.<br><br>GREGORY W. BECKER, DANIEL J. BECK, KAREN HON, ROGER F. DUNBAR, BEVERLY KAY MATTHEWS, ERIC A. BENHAMOU, JOHN S. CLENDENING, RICHARD D. DANIELS, ALISON DAVIS, JOEL P. FRIEDMAN, JEFFREY N. MAGGIONCALDA, MARY J. MILLER, KATE D. MITCHELL, GAREN K. STAGLIN, BofA SECURITIES, INC., GOLDMAN SACHS & CO. LLC, and KPMG LLP.<br><br>Defendants. | Case No. 5:24-cv-02684<br><br>**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Steven J. Buchanan ("Buchanan"), by and through counsel, brings this action against senior executives and Board members of SVB Financial Group ("SVB Financial" or the "Company"), the underwriters of certain of SVB Financial's securities offerings, and its auditor (collectively, the "Defendants"). Buchanan alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters.[1]

## I. INTRODUCTION

1.      Plaintiff Buchanan's claims arise from the financial collapse of Silicon Valley Bank (the "Bank"), the largest banking failure seen since 2008. SVB Financial was the parent company of the Bank, a California state-chartered bank founded in 1983. SVB Financial provided banking and financial services, primarily to clients in the technology and life science/health care industries, as well as to global private equity and venture capital companies. SVB Financial and its wholly owned subsidiary, the Bank, will be collectively referred to herein as "SVB."

2.      Throughout the relevant period, SVB's officers and directors repeatedly represented to the public that SVB maintained adequate risk management practices and was well-positioned to withstand, and even benefit from, a rising interest rate environment. In truth, Defendants knew that SVB's risk controls were grossly inadequate.

3.      Buchanan is an individual investor who purchased 7,345,000 shares of SVB Financial Group's 2.1% Senior Notes (the "Notes") on or about April 22, 2022. Buchanan's purchase of the Notes was traceable to a $500 million note offering in May 2021 (the "Offering"). The Offering was approved by top-level SVB executives and directors (the "Individual Defendants") and underwritten by Goldman Sachs & Co. LLC ("Goldman Sachs") and BofA

---

[1]      Matters alleged on information and belief are based on, among other things, a review of public filings, press releases, articles and reports, and investigation of counsel. Buchanan believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. SVB's collapse has been covered by sophisticated and reputable publications, such as *The New York Times*, *The Wall Street Journal*, *Bloomberg*, *Forbe*s, *The Financial Times*, and *Reuters*, which have investigated and reported the misconduct of SVB's officers and directors and KPMG. This reporting by reputable journalists and publications is reliable and therefore Buchanan relies upon it.

- 2 -

AMENDED COMPLAINT

Securities, Inc. ("BofA") (the "Underwriter Defendants").   The Offering also incorporated financial statements audited by KPMG, LLP ("KPMG"), the company's auditor.

4.    Buchanan brings this action holding all Defendants strictly liable under Sections 11 (15 U.S.C. §77k), 12(a)(2) (15 U.S.C. §77l(a)(2)), and 15 (15 U.S.C. §77o) of the Securities Act of 1933 ("Securities Act"), Cal. Corp. Code §§25401 and 25504, and Fla. Stat. §517.301(1)(a)(2) of the Florida Securities and Investor Protection Act for the materially false and misleading statements and omissions in the Offering Documents (*see infra* ¶6).  Further, each of them failed to conduct a reasonable investigation regarding the material misstatements and omissions in the Offering Documents.

5.    The Securities Act places clear obligations on the underwriters of securities offerings, the signatories of offering documents, the directors of the issuer, and the issuer's accountants.  Each is charged with ensuring that offering materials provided to investors are accurate, complete, and not misleading.  By law, these individuals must carefully review and verify the truthfulness of the statements contained in the offering documents.  The Securities Act establishes liability if an offering document includes an untrue statement of material fact or omits a material fact necessary to make the statements not misleading, regardless of whether the responsible parties acted with intent to defraud.  *See* 15 U.S.C. §77k.

6.    On May 13, 2021, the Defendants completed a $500 million offering of 2.10% Senior Notes.  This capital raise was achieved through filing "the Offering Documents" consisting of a Prospectus (Form 424B2) incorporating by reference a Registration Statement (Form S-3ASR), and annual financial statements (Form 10-K) that falsely and misleadingly presented the Bank's controls to manage its risks, including specifically to safeguard against changes in interest rates and liquidity draws and to hold its tens-of-billions of dollars of Held-to-Maturity ("HTM") securities through their maturity dates.

7.    The Offering Documents contained materially false and misleading statements concerning SVB's risk management and internal controls.  They claimed, for example, that SVB had implemented a "risk management framework to identify and manage [its] risk exposure,"

AMENDED COMPLAINT

relying on "financial, analytical, forecasting [and] other modeling methodologies."[2]  The Offering Documents further represented that SVB "review[ed] [its] interest rate risk position and sensitivity to market interest rates regularly" and employed "quantitative" and "qualitative" models to "estimate[] the effects of changing interest rates," including a "simulation model" designed to "provide[] a dynamic assessment of interest rate sensitivity."[3]  The Bank also asserted that its models were "periodically reviewed and recalibrated as needed to ensure that they are representative of [SVB's] understanding of existing behaviors."[4]  In addition, the Offering Documents emphasized that SVB "regularly assess[ed] the amount and likelihood of projected funding requirements" and "routinely conduct[ed] liquidity stress testing."[5]  Finally, they represented that SVB had the "positive intent and ability" to hold tens of billions of dollars in long-duration securities to maturity.[6]  These representations were materially false and misleading because SVB's risk controls were grossly inadequate, its models were not properly designed or tested, and the Bank lacked both the liquidity and the ability to withstand rising interest rates while holding such securities.

8.    These representations were materially significant considering the prevailing economic environment and regulatory scrutiny.  At the time, interest rates were expected to rise sharply, and SVB's rapid growth had, as one market analyst observed, "raise[d] the bar on risk controls, liquidity requirements, and subject[ed] [SVB] to annual supervisory stress testing."[7]  Regulators likewise underscored the critical importance of robust risk management.  The Federal Reserve has repeatedly cautioned that strong risk controls are "critical to the conduct of safe and sound banking activities," and that "[m]anaging risks is fundamental to the business of banking."[8]

---

[2]    SVB Fin. Grp., Annual Report (Form 10-K), at 33 (March 1, 2021).

[3]    *Id.* at 35, 95.

[4]    *Id.* at 95.

[5]    *Id.* at 92.

[6]    *Id.* at 108.

[7]    Bill Carcache & Yuman Lui, *Killing It In the Innovation Economy* , WOLFE RSCH. (July 2021).

[8]    *SR 95-51: Rating the Adequacy of Risk Management Processes and Internal Controls at State Member Banks and Bank Holding Companies*, BD. OF GOVERNORS OF THE FED. RSRV. SYS.

AMENDED COMPLAINT

The Federal Deposit Insurance Corporation ("FDIC") has likewise warned that banks must "effectively identify, measure, monitor, and control interest rate risk exposure."[9]  The Federal Reserve has further highlighted that risk models play a central role in this process, and that weak or ineffective models can result in "financial loss, poor business and strategic decision making," and reputational damage.[10]  Against this backdrop, Defendants' assurances regarding SVB's risk management framework were especially misleading.

9.      Unbeknownst to Plaintiff, the Offering Documents contained numerous false and misleading statements and omitted critical material facts.  At the time of the Offering and throughout the relevant period, SVB suffered from pervasive weaknesses in its risk management, liquidity, and interest rate controls.

10.      The Individual Defendants, the Underwriter Defendants, and KPMG who signed the Offering Documents acted as the gatekeepers of the Offering.  They bore a statutory and professional duty to ensure that investors received complete and accurate disclosures.  Yet, despite being paid millions of dollars in fees and other compensation, these gatekeepers abdicated their responsibility.  The Individual Defendants and KPMG were each in direct receipt of the Federal Reserve's supervisory reports identifying pervasive deficiencies in SVB's internal controls and highlighting numerous red flags.  Moreover, all Defendants had access to the same categories of information available to the Federal Reserve—including internal personnel and documents.  A reasonable investigation would have revealed, and in fact did reveal, the widespread misstatements and omissions in the Offering Documents, including the systemic failures in SVB's risk management and control framework.

---

(Nov. 14, 1995), https://www.federalreserve.gov/supervisionreg/srletters/SR9551.htm; Attachment to SR 16-11: Supervisory Guidance for Assessing Risk Management at Supervised Institutions with Total Consolidated Assets Less than $100 Billion, BD. OF GOVERNORS OF THE FED. RESERVE SYS. (Jun. 8, 2016), https://www.federalreserve.gov/supervisionreg/srletters/sr1611a1.pdf.

[9]    *Interest Rate Risk*, FDIC, https://www.fdic.gov/capital-markets/interest-rate-risk.

[10]    *SR 11-7: Guidance on Model Risk Management*, BD. OF GOVERNORS OF THE FED. RESERVE SYS.(Apr. 4, 2011), https://www.federalreserve.gov/supervisionreg/srletters/sr1107.htm.

- 5 -

AMENDED COMPLAINT

11.     Defendants, however, chose to benefit from the Offering.  They collectively reaped substantial financial rewards in the form of underwriting fees, equity distributions, and incentive compensation, none of which has been returned to investors.  The investors, by contrast, were left with devastating losses.

12.     Among other things, SVB's officers and directors publicly and repeatedly confirmed that SVB had appropriate risk controls in place to not only survive, but to thrive in a high-interest rate environment.  In fact, they knew SVB did not.

13.     On March 8, 2023, after trading closed, SVB announced that, due to short-term liquidity needs, the Bank had been forced to sell substantially all of its available for sale securities portfolio at a loss of $1.8 billion and would need to raise an additional $2.25 billion in funding. This prompted a run on the Bank as depositors sought to withdraw billions in deposits.

14.     Two days later, on March 10, 2023, the California Department of Financial Protection and Innovation ("DFPI") closed SVB and appointed the FDIC as the Bank's receiver. SVB has filed for bankruptcy, and Congress, the U.S. Department of Justice ("DOJ"), the U.S. Securities and Exchange Commission ("SEC"), and multiple other government regulators have commenced investigations into the Bank's collapse and its management's insider trading.

15.     In the wake of the collapse, Buchanan was forced to sell the Notes at a substantial loss on March 10 and March 13, 2023.

16.     On March 17, 2023, SVB Financial filed Chapter 11 bankruptcy, which is currently pending in the United States District Court for the Southern District of New York.[11]

17.     Following the collapse, the Board of Governors for the Federal Reserve System (the "Board") conducted a review of the failure of SVB and summarized its findings in a report dated April 28, 2023 ("Fed Report").[12]  The Board determined that SVB had: (a) a deficient risk management program; (b) "failed its own internal liquidity stress tests"; (c) "did not have

---

[11]     *In re: SVB Financial Group*, No. 1:23-bk-10367, ECF No. 1 (S.D.N.Y. Mar. 17, 2023).

[12]     *Review of the Federal Reserve's Supervision and Regulation of Silicon Valley*, BD. OF GOVERNORS OF THE FED. RESERVE SYS. (Apr. 28, 2023), https://www.federalreserve.gov/ publications/2023-April-SVB-Key-Takeaways.htm.

AMENDED COMPLAINT

workable plans to access liquidity in times of stress"; (d) "managed interest rate risks with a focus on short-run profits and protection from potential rate decreases"; (e) "removed interest rate hedges, rather than managing long-run risks and the risk of rising rates"; and (f) "changed [the Bank's] own risk-management assumptions to reduce how these risks were measured" rather than addressing "the underlying risks."[13]

18.     SVB management concealed the lack of controls from investors and depositors and implemented increasingly risky strategies to boost their own compensation by locking billions into long-dated debt securities they classed as HTM, when in fact SVB had no positive intent or ability to hold these investments to maturity.[14]

19.     There is also evidence the Bank did not have a Chief Risk Officer from 2022 to 2023, a critical period of rising interest rates and slowed venture capital activity.[15]  Unbeknownst to investors, regulators "repeatedly warned the bank that it had problems" and would not "have enough easy-to-tap cash on hand in the event of trouble,"[16] while "[l]oans to officers [and] directors" of SVB "more than tripled" in "the final three months of 2022."[17]  The Federal Reserve reportedly indicated it planned to initiate a private enforcement action against the Bank.  Yet without warning investors, SVB's executive officers sold millions in shares shortly before the Bank collapsed.[18]

---

[13]     *Id.*

[14]     *Id.*

[15]     Andrea Guzman, *How a surge of panicked withdrawals killed Silicon Valley's favorite bank*, FORTUNE, Mar. 10, 2023, https://fortune.com/2023/03/10/photos-crowds-outside-silicon-valley-bank-shutdown/.

[16]     Jeanna Smialek, *Before Collapse of Silicon Valley Bank, the Fed Spotted Big Problems*, N.Y. TIMES, Mar. 19, 2023, https://www.nytimes.com/2023/03/19/business/economy/fed-silicon-valley-bank.html.

[17]     Silla Brush et al., *SVB's Loans to Insiders Tripled to $219 Million Before It Failed*, BLOOMBERG, Mar. 21, 2023, https://www.bloomberg.com/news/articles/2023-03-21/svb-s-loans-to-insiders-tripled-to-219-million-before-it-failed.

[18]     Nick Timiraos, *Collapse of Silicon Valley Bank, Signature Bank Calls Fed Interest Rate Path Into Question*, THE WALL STREET J., Mar. 13, 2023, https://www.wsj.com/articles/fed-interest-rates-inflation-svb-collapse-3495de76.

- 7 -

AMENDED COMPLAINT

20.     Buchanan brings this action under Sections 11 (15 U.S.C. §77k), 12(a)(2) (15 U.S.C. §77l(a)(2)), and 15 (15 U.S.C. §77o) of the Securities Act of 1933, Cal. Corp. Code §§25401 and 25504, and Fla. Stat. §517.301(1)(a)(2) of the Florida Securities and Investor Protection Act.

## II.  PARTIES

### A.     Plaintiff

21.     Plaintiff Buchanan is an individual resident of the State of Florida.  On or about April 22, 2022, Buchanan purchased the Notes, which were sold in the State of California and were traceable to the Offering.  Buchanan suffered damages as a result of the violations of the federal and state securities laws alleged in this Complaint.

### B.     Defendants

#### 1.     Individual Defendants

22.     Defendant Gregory W. Becker ("Becker") was SVB's President and Chief Executive Officer and a member of SVB's Board of Directors at all relevant times until he resigned in April 2023.  Defendant Becker signed the registration statement for the Notes (the "Registration Statement").

23.     Defendant Daniel J. Beck ("Beck") was SVB's Chief Financial Officer from 2017 until he resigned in April 2023.  Defendant Beck signed the Registration Statement for the Notes.

24.     Defendant Karen Hon ("Hon") was SVB's Chief Accounting Officer.  Defendant Hon signed the Registration Statement for the Notes.

25.     Defendant Roger F. Dunbar ("Dunbar") was a member of SVB's Board of Directors from 2004 until April 21, 2022.  He was Chairman of the Board of Directors from 2012 until April 21, 2022.  During his time on SVB's Board of Directors, Defendant Dunbar was SVB's Risk Committee Chair, as well as a member of the Governance and Finance Committees.  Defendant Dunbar signed the Registration Statement for the Notes.

26.     Defendant Eric A. Benhamou ("Benhamou") was a member of SVB's Board of Directors beginning in 2005 and at the time of the Offering.  During his time on SVB's Board of

- 8 -

AMENDED COMPLAINT

Directors, Defendant Benhamou was Chair of SVB's Governance & Corporate Responsibility Committee, and a member of the Finance Committee and the Risk Committee. Defendant Benhamou signed the Registration Statement for the Notes.

27. Defendant John S. Clendening ("Clendening") was a member of SVB's Board of Directors from 2017 until April 21, 2022, and at the time of the Offering. During his time on SVB's Board of Directors, Defendant Clendening was a member of the Compensation & Human Capital and the Credit Committees. Defendant Clendening signed the Registration Statement for the Notes.

28. Defendant Richard D. Daniels ("Daniels") was a member of SVB's Board of Directors beginning in 2020 and at the time of the Offering. During his time on SVB's Board of Directors, Defendant Daniels was Chair of SVB's Technology Committee, and a member of the Audit, Compensation & Human Capital, and Risk Committees.

29. Defendant Alison Davis ("Davis") was a member of SVB's Board of Directors beginning in 2020 and at the time of the Offering. During her time on SVB's Board of Directors, Defendant Davis was a member of the Audit, Compensation & Human Capital, and Technology Committees.

30. Defendant Joel P. Friedman ("Friedman") was a member of SVB's Board of Directors beginning in 2005 and at the time of the Offering. During his time on SVB's Board of Directors, Defendant Friedman was the Chair of SVB's Finance Committee, and a member of the Governance & Corporate Responsibility and Risk Committees. Defendant Friedman signed the Registration Statement for the Notes.

31. Defendant Jeffrey N. Maggioncalda ("Maggioncalda") was a member of SVB's Board of Directors beginning in 2012 and at the time of the Offering. During his time on SVB's Board of Directors, Defendant Maggioncalda was a member of the Compensation & Human Capital and the Technology Committees. Defendant Maggioncalda signed the Registration Statement for the Notes.

- 9 -

AMENDED COMPLAINT

32.     Defendant Beverly Kay Matthews ("Matthews") was a member of SVB's Board of Directors beginning in 2019 and at the time of the Offering.  On April 21, 2022, Defendant Matthews became Chair of the Board of Directors.  During her time on SVB's Board of Directors, Defendant Matthews was a member of SVB's Audit, Governance & Corporate Responsibility, and Risk Committees.  Defendant Matthews signed the Registration Statement for the Notes.

33.     Defendant Mary J. Miller ("Miller") was a member of SVB's Board of Directors beginning in 2015 and at the time of the Offering.  During her time on SVB's Board of Directors, Defendant Miller was Chair of SVB's Audit Committee and a member of the Finance and the Risk Committees.  Defendant Miller signed the Registration Statement for the Notes.

34.     Defendant Kate D. Mitchell ("Mitchell") was a member of SVB's Board of Directors beginning in 2010 and at the time of the Offering.  During her time on SVB's Board of Directors, Defendant Mitchell was the Chair of SVB's Risk Committee and a member of the Finance Committee.  Defendant Mitchell signed the Registration Statement for the Notes.

35.     Defendant Garen K. Staglin ("Staglin") was a member of SVB's Board of Directors beginning in 2011 and at the time of the Offering.  During his time on SVB's Board of Directors, Defendant Staglin was the Chair of SVB's Compensation & Human Capital Committee, and a member of the Governance & Corporate Responsibility and the Risk Committees.  Defendant Staglin signed the Registration Statement for the Notes.

36.     The officer and director Defendants identified in this Section II.B.1 are collectively referred to herein as the "Individual Defendants."

**2.      Underwriter Defendants**

37.     Defendant Goldman Sachs is a financial services company incorporated in the State of Delaware, with its principal executive offices in New York, New York.  Goldman Sachs was an underwriter for the Offering.

- 10 -

38.    Defendant BofA is a financial services company incorporated in the State of Delaware, with its principal offices in New York, New York.  BofA was an underwriter for the Offering.

39.    Goldman Sachs and BofA identified in this Section II.B.2 are collectively referred to herein as the "Underwriter Defendants."

### 3.    KPMG

40.    Defendant KPMG is an international accounting firm organized under the laws of the State of Delaware, with its principal executive offices in New York, New York.

41.    At all relevant times, KPMG was SVB's registered auditor was responsible for auditing the Bank's financial statements and internal controls.

42.    KPMG issued unqualified audit reports in connection with SVB's Annual Reports filed on Form 10-K for the year ending December 31, 2020 (filed March 1, 2021) and consented to the incorporation by reference of that report into the Offering Documents.

43.    KPMG signed off on SVB's 2022 Annual Report less than two weeks before its collapse.

### III.  JURISDICTION AND VENUE

44.    The claims asserted herein arise under Sections 11 (15 U.S.C. §77k), 12(a)(2) (15 U.S.C. §77l(a)(2)), and 15 (15 U.S.C. §77o) of the Securities Act of 1933, Cal. Corp. Code §§25401 and 25504, and Fla. Stat. §517.301(1)(a)(2) of the Florida Securities and Investor Protection Act.

45.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 22 of the Securities Act, 15 U.S.C. §77v, and supplemental jurisdiction over all other claims under 28 U.S.C. §1367(a), which are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy.

- 11 -

46.    Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. §77v, and 28 U.S.C. §1391(b).    The acts and conduct complained of herein occurred in substantial part in this District.

47.    In connection with the acts and conduct alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mail, telephonic communications, and the facilities of the national securities market.

## IV.  SUBSTANTIVE ALLEGATIONS

### A.    Background

48.    On November 15, 2019, SVB Financial filed the Registration Statement authorizing SVB to "offer and sell from time to time any combination of the securities described in . . . one or more offerings."[19]    The Registration Statement authorized the sale of SVB securities, including senior debt securities, subordinated debt securities and was signed by Individual Defendants Becker, Beck, Hon, Dunbar, Benhamou, Clendening, Friedman, Maggioncalda, Matthews, Miller, Mitchell, and Staglin.[20]    Defendant KPMG also explicitly blessed the Registration Statement in an exhibit stating: "We consent to the use of our report with respect to the consolidated financial statements and the effectiveness of internal control over financial reporting incorporated by reference herein and to the reference to our firm under the heading 'Experts' in the Registration Statement on Form S-3."[21]

49.    SVB thereafter issued a prospectus in connection with the Offering, which incorporated as the Offering Documents: (a) the Registration Statement, and, by reference, SVB's Annual Report on Form 10-K for the year ended December 31, 2020; (b) information specifically incorporated by reference into SVB's Annual Report on Form 10-K for the year ended December 31, 2020 from SVB's Definitive Proxy Statement on Schedule 14A filed March 4, 2021; and (c) nine Current Reports filed on Form 8-K throughout 2021.

---

[19]    SVB Fin. Grp., Registration Statement (Form S-3), at 1 (Nov. 15, 2019).

[20]    *Id.*

[21]    *Id.* at Ex. 23.1.

- 12 -

50.    On May 6, 2021, SVB filed the prospectus with the SEC in connection with the Registration Statement on Form 424B2, which prospectuses were also incorporated therein. The filing was approved by the Underwriter Defendants. Furthermore, the prospectus specifically identified KPMG as "EXPERTS" when incorporating the Company's reliance on their unqualified audit opinion for the years ending December 31, 2018, 2019, and 2020.[22]

51.    On January 21, 2021, SVB issued a press release and filed a Current Report on Form 8-K with the SEC. In a letter accompanying the press release, Defendant Becker highlighted SVB's "outstanding balance sheet growth driven by robust client liquidity and strong loan growth, with net interest income above [the Company's] guidance" and assured investors that the Company "maintain[s] strong capital and liquidity, supported by a high-quality balance sheet and robust earnings power that position us well for long-term growth."[23]

**B.    2020 Audited Financial Statements (Form 10-K)**

52.    On March 1, 2021, SVB filed its 2020 audited financial statements on Form 10-K with the SEC.[24] The 2020 Annual Report, signed by Individual Defendants Becker, Beck, and Hon, Dunbar, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Matthews, Miller, Mitchell, and Staglin, reported that, as of December 31, 2020, SVB had total assets of $115.5 billion and total deposits of $102.0 billion.

53.    The 2020 Annual Report explained that "[n]et interest income accounts for the major portion of [SVB's] earnings" and "is comprised primarily of income generated from interest rate spread differences between the interest rates received on interest-earning assets, such as loans extended to clients and securities held in [SVB's] fixed income securities portfolio, and the interest rates paid by [SVB] on interest-bearing liabilities, such as deposits and borrowings."[25] The 2020 Annual Report specifically highlighted the Company's "focus[] on . . . capital and

---

[22]    SVB Fin. Grp., Prospectus (Form 424B2) (May 6, 2021).

[23]    SVB Fin. Grp., Current Report (Form 8-K), at Ex. 99.2 (Jan. 21, 2021).

[24]     Form 10-K, *supra* note 2.

[25]    *Id.* at 8.

- 13 -

AMENDED COMPLAINT

liquidity," with "a liquid and high-quality balance sheet" and "access to other funding sources, as necessary."[26]

54.     Critically, the 2020 Annual Report understated the risks posed to the Company by potential increases in interest rates and any related reduction in client merger and acquisition activity.   The 2020 Annual Report affirmatively represented that SVB had robust risk management controls to monitor and manage the impact of interest rates:

> **We rely on quantitative models to measure risks and to estimate certain financial values**.  Quantitative models may be used to help manage certain aspects of our business and *to assist with certain business decisions*, including estimating credit losses, measuring the fair value of financial instruments when reliable market prices are unavailable, *estimating the effects of changing interest rates* and other market measures on our financial condition and results of operations, and managing risk.
>
> . . .
>
> **Interest Rate Risk Management.**  *Interest rate risk is managed by our ALCO*. ALCO reviews the sensitivity of the market valuation on earning assets and funding liabilities and *the modeled 12-month projections of net interest income from changes in interest rates*, structural changes in investment and funding portfolios, loan and deposit activity and market conditions.  *Relevant metrics and guidelines, which are approved by the Finance Committee of our Board of Directors and are included in our Interest Rate Risk Policy, are monitored on an ongoing basis.*
>
> . . .
>
> *Interest rate risk is managed* primarily through strategies involving our fixed income securities portfolio, available funding channels, and capital market activities.  In addition, our policies permit the use of off-balance sheet derivatives, such as interest rate swaps, to assist with managing interest rate risk.
>
> . . .
>
> *We utilize a simulation model to perform sensitivity analysis on the economic value of equity and net interest income under a variety of interest rate scenarios, balance sheet forecasts, and business strategies.  The simulation model provides a dynamic assessment of interest rate sensitivity* which is embedded within our balance sheet.  Rate sensitivity measures the potential variability in economic value and net interest income relating solely to changes in market interest rates over time.  *We review our interest rate risk position and sensitivity to market interest rates regularly.*[27]

---

[26]     *Id.* at 41.

[27]     *Id.* at 35, 95 [emphasis added].

- 14 -

AMENDED COMPLAINT

55.    As required by the Sarbanes-Oxley Act of 2002 ("SOX"), Defendants Becker and Beck certified that they had reviewed the 2020 Annual Report and that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this report."[28]

56.    The 2020 Annual Report included an audit report signed by the Company's auditor, KPMG, reflecting the results of its audit of SVB's 2019 and 2020 financials.  KPMG certified that "the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2020, inconformity with U.S. generally accepted accounting principles."[29]

**C.    Q1 2021 Form 10-Q**

57.    On May 10, 2021, SVB filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial results for the first quarter of 2021 (the "Q1 2021 Report").[30] The Q1 2021 Report, which was signed by Individual Defendants Beck and Hon, understated the significant financial and liquidity risks facing the Company, instead stating, in pertinent part that "[t]here are no material changes to the risk factors set forth in our 2020 Annual Report on Form 10-K."[31]

58.    The Q1 2021 Report reclassified $41.2 billion in securities as HTM.[32]  In making these reclassifications, Defendants represented to investors that "[o]ur decision to re-designate the securities was *based on our ability and intent to hold these securities to maturity*.  Factors used in

---

[28]    *Id*. at Ex. 31.1, 31.2.

[29]    *Id*. at 98-100.

[30]    SVB Fin. Grp., Quarterly Report (Form 10-Q) (May 10, 2021).

[31]    *Id*. at 105.

[32]    *Id*. at 17 ("[d]uring the first quarter of 2021, we re-designated certain securities from the classification of 'available-for-sale' to 'held-to-maturity.'").

assessing the ability to hold these securities to maturity were *future liquidity needs and sources of funding.*"[33]

59.    The Q1 2021 Report again affirmatively represented SVB had strong internal controls and interest rate risk management program:

> [SVB's interest rate risk] models were developed internally and are *based on historical balance and rate observations . . . .* As part of our ongoing governance structure, each of these models and assumptions are *periodically reviewed and recalibrated as needed to ensure that they are representative of our understanding of existing behaviors.*[34]

60.    Defendants also represented to investors the strength of SVB's liquidity position and oversight:

> ***Liquidity*** The objective of liquidity management is to ensure that funds are available in a timely manner to meet our financial obligations, including, as necessary, paying creditors, meeting depositors' needs, accommodating loan demand and growth, funding investments, repurchasing securities and other operating or capital needs, without incurring undue cost or risk, or causing a disruption to normal operating conditions.
>
> *We regularly assess the amount and likelihood of projected funding requirements* through a review of factors such as historical deposit volatility and funding patterns, *present and forecasted market and economic conditions,* individual client funding needs, and existing and planned business activities. *Our Asset/Liability Committee ("ALCO") . . . provides oversight to the liquidity management process . . . .* Additionally, <u>we routinely conduct liquidity stress testing</u> as part of our liquidity management practices.[35]

61.    As required by SOX, Individual Defendants Becker and Beck certified that they had reviewed the Q1 2021 Report and that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this report."[36]

---

[33]    *Id.* at 17 [emphasis added].

[34]    *Id.* at 102 [emphasis added].

[35]    *Id.* at 100 [emphasis added].

[36]    SVB Fin. Grp., Annual Report (Form 10-K), at Ex. 31.1, 31.2 (Mar. 1, 2021).

- 16 -

**D.      The May 2021 Offering**

62.      On or about May 6, 2021, SVB issued a preliminary prospectus supplement on Form 424B2 (the "Prospectus Supplement").[37]  The Prospectus Supplement provided: "We are offering by this prospectus supplement $500,000,000 principal amount of our 2.100% Senior Notes due 2028 . . . . We will pay interest on the Notes at an annual rate equal to 2.100% and will pay interest on May 15 and November 15 of each year beginning on November 15, 2021.  The Notes will mature on May 15, 2028."[38]

63.      The Prospectus Supplement incorporated by reference the Registration Statement, the 2020 Annual Report, information specifically incorporated by reference into the 2020 Annual Report, certain other SEC filings including Current Reports on Form 8-K, "any future filings [SVB] make[s] with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 . . . until [SVB] sell[s] all the Notes offered by this prospectus supplement," and previous SEC filings, including SVB's Annual Reports filed on Form 10-K.[39]

64.      The Prospectus Supplement stated "[o]ur affiliates may use this prospectus supplement and the accompanying prospectus in connection with offers and sales of the Notes in the secondary market.  These affiliates may act as principal or agent in those transactions. Secondary market sales will be made at prices related to market prices at the time of sale."[40]

65.      On May 13, 2021, Defendants issued the Notes known as the Offering.

66.      The Offering was underwritten by the Underwriter Defendants Goldman and BofA as Joint Book-Running Managers.[41]

**E.      Q2 2021 Form 10-Q**

67.      On July 22, 2021, the Company announced its second quarter 2021 financial results by issuing a press release and filing a Current Report on Form 8-K with the SEC.[42]  In his

---

[37]      SVB Fin. Grp., Prospectus Supplement (Form 424B2) (May 6, 2021).

[38]      *Id*. at Cover Page.

[39]      *Id*. at S-iii.

[40]      *Id.* at Cover Page.

[41]      *Id.* at Cover Page.

[42]      SVB Fin. Grp., Current Report (Form 8-K) (July 22, 2021).

- 17 -

July 22, 2021 letter to the stakeholders ("July 22 Letter"), Individual Defendant Becker addressed expected interest rate increases, assuring investors that the Company "remain[ed] *well-positioned for rising rates*, with an asset-sensitive balance sheet, robust growth in [SVB's] [Net Interest Income]-generating base, and substantial client liquidity off the balance sheet that will generate higher fee margins as short-term rates increase."[43]  Becker also specifically emphasized that the Company "actively positioned [its] securities portfolio to create flexibility and mitigate the risk of rising long-term term rates through hedges, duration targeting and shifting the mix toward held-to-maturity investments."[44]

68.    On information and belief, during the Company's earnings conference call the same day, Defendant Becker further explained that the Company would actually "*benefit significantly from increasing rates*" through increases in Net Interest Income ("NII") and fee-based income.

69.    On August 6, 2021, SVB filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "Q2 2021 Report").[45]  Attached to the Q2 2021 Report were certifications pursuant to SOX signed by Individual Defendants Becker and Beck certifying "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this report."[46]  Defendants certified, among other things that "[t]here are no material changes to the risk factors set forth in our 2020 Annual Report on Form 10-K."[47]

70.    On information and belief, during the Company's October 21, 2021 third quarter 2021 earnings conference call, Individual Defendant Becker continued to signal a positive

---

[43]    *Id.* at Ex. 99.2 at 3 [emphasis added].

[44]    *Id*. at 4.

[45]    SVB Fin. Grp., Quarterly Report (Form 10-Q) (Aug. 6, 2021).

[46]    *Id*. at Ex. 31.1, 31.2.

[47]    *Id*. at 110.

- 18 -

AMENDED COMPLAINT

outlook, explaining "we're happy that we can grow NII in a low-rate environment, but we're even more bullish when we do start to see some rate increases."

**F.    Q3 2021 Form 10-Q**

71.    On November 8, 2021, SVB filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "Q3 2021 Report").[48]

72.    As required by SOX, Individual Defendants Becker and Beck certified that they had reviewed the Q3 2021 Report and that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this report."[49]

73.    The Q3 2021 Report did not disclose the risk that future interest rate hikes posed to the Company's business, despite the Fed signaling that it might raise interest rates in the future and was certainly prepared to do so in the event of rising inflation.  The Q3 2021 Report stated, in pertinent part that "[t]here are no material changes to the risk factors set forth in our 2020 Annual Report on Form 10-K."[50]  Defendants represented "[t]o manage interest rate risk on our interest rate sensitive assets, we have entered into interest rate swap contracts to hedge against future changes in interest rates."[51]

**G.    Q4 2021 Financial Results and Form 8-K**

74.    On January 20, 2022, the Company announced its fourth quarter 2021 financial results by issuing a press release and filing its Form 8-K, which represented rising interest rates would "significantly add to our earnings on top of our already positive 2022 outlook, while opening up additional investment opportunities."[52]  On the same day, Individual Defendant Becker issued a letter to the stakeholders, representing "the potential impact of future short-term

---

[48]    SVB Fin. Grp., Quarterly Report (Form 10-Q) (Nov. 8, 2021).

[49]    *Id.* at Ex. 31.1, 31.2.

[50]    *Id*. at 111.

[51]    *Id*. at 37.

[52]    SVB Fin. Grp., Current Report (Form 8-K/Ex. 99.1) (Jan. 20, 2022).

- 19 -

interest rate increases, from which [SVB] would expect to see *significant benefits*," including "approximately $100 to $130 million in incremental pre-tax net interest income annually for each 25-basis point increase in short-term rates" from the Company's "asset sensitive balance sheet," as well as the expectation that "[c]lient investment fees would increase by between $205 and $235 million on an annualized, pre-tax basis, with the first 25-basis point rate increase and by $20 to $50 million with each subsequent 25-basis point increase."[53]

75.    On information and belief, during the Company's January 20, 2022 Fourth Quarter 2021 earnings conference call, Individual Defendant Beck reiterated that the Company was "still bullish on liquidity."

**H.    2021 Audited Financial Statements (Form 10-K)**

76.    On March 1, 2022, SVB filed with the SEC its audited financial statements on Form 10-K for the period ended December 31, 2021 (the "2021 Annual Report").[54]

77.    The 2021 Annual Report was signed by Individual Defendants Becker, Beck, Hon, Dunbar, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Matthews, Miller, Mitchell, and Staglin, and reported that, as of December 31, 2021, SVB had total assets of $211.5 billion and total deposits of $189.2 billion.[55]

78.    Defendants Becker and Beck certified that they had reviewed the 2021 Annual Report and that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this report."[56]

79.    The 2021 Annual Report reiterated that "NII accounts for the major portion of [SVB's] earnings" and "is comprised primarily of income generated from interest rate spread differences between the interest rates received on interest-earning assets, such as loans extended

---

[53]    *Id.* at Ex. 99.2 [emphasis added].
[54]    SVB Fin. Grp., Annual Report (Form 10-K) (Mar. 1, 2022).
[55]    *Id.* at 6.
[56]    *Id.* at Ex. 31.1, 31.2.

- 20 -

AMENDED COMPLAINT

to clients and securities held in [SVB's] fixed income securities portfolio, and the interest rates paid by [SVB] on interest-bearing liabilities, such as deposits and borrowings."[57]

80.    The 2021 Annual Report explained that "[w]hen needed, [SVB's] liquidity is supplemented by wholesale borrowing capacity in the form of short- and long-term borrowings secured by [SVB's] portfolio of high-quality investment securities, long-term capital market debt issuances and unsecured overnight funding channels available to [SVB] in the Federal Funds market."[58]

81.    The 2021 Annual Report included an audit report signed by the Company's auditor, KPMG, reflecting the results of its audit of SVB's 2020 and 2021 financials.  KPMG certified that "the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2021 and 2020, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2021, in conformity with U.S. generally accepted accounting principles."[59]

**I.    Q1 2022 Financial Results and Form 8-K**

82.    On April 21, 2022, the Company announced its First Quarter 2022 financial results by issuing a press release and filing a Current Report on Form 8-K with the SEC.  Defendant Becker explained that the Company had "exceptional balance sheet growth, earnings and profitability against a backdrop of continued robust liquidity" and had "raised [its] 2022 revenue outlook, as the March Fed Funds increase and higher interest rates overall accelerated net interest income and core fee income growth."[60]

83.    On information and belief, during the accompanying first quarter 2022 earnings conference call, Defendant Beck specifically highlighted that SVB had "lots of levers and good flexibility to be able to manage" the changing interest rate environment and "help from a liquidity perspective."

---

[57]    *Id*. at 8.

[58]    *Id*. at 22.

[59]    *Id*. at 95-97.

[60]    SVB Fin. Grp., Current Report (Form 8-K/Ex. 99.1 & 99.2)  (Apr. 21, 2022).

- 21 -

AMENDED COMPLAINT

**J.      Buchanan Purchases the Notes**

84.      On April 22, 2022, Buchanan purchased the Notes. In doing so, Buchanan relied on the Offering Documents and the Company's subsequent financials and SEC filings.

**K.      Defendants Continue Assurances to Investors**

85.      On May 6, 2022, SVB filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2022 (the "Q1 2022 Report").[61] Attached to the Q1 2022 Report were certifications pursuant to SOX signed by Defendants Becker and Beck attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.[62] The Q1 2022 Report stated, in pertinent part, that "[t]here are no material changes to the risk factors set forth in our 2021 Annual Report on Form 10-K."[63] Defendants represented "higher rates drove robust earnings and profitability in the first quarter of 2022 even as market volatility slowed client liquidity growth."[64]

86.      On August 8, 2022, SVB filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2022 (the "Q2 2022 Report").[65] Attached to the Q2 2022 Report were certifications pursuant to SOX signed by Defendants Becker and Beck attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.[66] The Q2 2022 Report stated, in pertinent part, "[t]here are no material changes to the risk factors set forth in our 2021 Annual Report on Form 10-K."[67]

87.      On November 7, 2022, SVB filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2022 (the "Q3 2022 Report").[68] Attached to the Q3 2022

---

[61]      SVB Fin. Grp., Quarterly Report (Form 10-Q) (May 6, 2022).

[62]      *Id.* at Ex. 31.1, 32.1.

[63]      *Id*. at 91.

[64]      *Id*. at 54.

[65]      SVB Fin. Grp., Quarterly Report (Form 10-Q) (Aug. 8, 2022).

[66]      *Id.* at Ex. 31.1, 31.2.

[67]      *Id.* at 96.

[68]      SVB Fin. Grp., Quarterly Report (Form 10-Q) (Nov. 7, 2022).

- 22 -

AMENDED COMPLAINT

Report were certifications pursuant to SOX signed by Defendants Becker and Beck attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.[69] The Q3 2022 Report stated, in pertinent part, "[t]here are no material changes to the risk factors set forth in our 2021 Annual Report on Form 10-K."[70]

88.    On January 19, 2023, SVB announced its fourth quarter 2022 financial results in a press release and filed its Form 8-K stating that the Company was "well positioned with a strong balance sheet and the resources and expertise to manage successfully through the current environment."[71] The press release stated, in greater part:

> In the fourth quarter, *client cash burn, and the pace of [venture capital] investment decline both moderated . . . . [W]e believe we remain well positioned with a strong balance sheet and the resources and expertise to manage successfully through the current environment.*[72]

**L.    The Truth Begins to Surface**

89.    On March 3, 2023, SVB filed a Proxy Statement with the SEC assuring investors that the Company "effectively leveraged [its] flexible liquidity strategy to sustain overall healthy client fund levels, despite balance sheet pressures from declining deposits, elevated client cash burn, and overall market environment challenges."[73]

90.    After the market closed on March 8, 2023, however, SVB stunned investors when it issued a press release and filed a Current Report on Form 8-K with the SEC, announcing that, due to "continued higher interest rates, pressured public and private markets, and elevated cash burn levels from [SVB's] clients," SVB was seeking to raise approximately $2.25 billion in capital (consisting of a $1.25 billion common stock public offering, a $500 million preferred stock public offering, and a $500 million private offering).[74] In the same press release, SVB also

---

[69]    *Id.* at Ex. 31.1, 31.2.

[70]    *Id.* at 97.

[71]    SVB Fin. Grp., Current Report (Form 8-K), at Ex. 99.1 (Jan. 19, 2023).

[72]    *Id.* [emphasis added].

[73]    SVB Fin. Grp., Proxy Statement (Schedule 14A), at 2 (Mar. 3, 2023).

[74]    SVB Fin. Grp., Current Report (Form 8-K), at Ex. 99.3 at 1 (Mar. 8, 2023).

- 23 -

revealed that it had sold "substantially all of [its] Available For Sale (AFS) securities portfolio," taking an approximately $1.8 billion loss on the sale, in order to reinvest the assets to deliver higher returns.[75]

91.     On this news, the price of SVB common stock plummeted.

92.     On March 9, 2023, panicked investors sought to pull money from the Bank due to concerns about the Company's financial stability, leading to a bank run.  Depositors withdrew nearly $40 billion in deposits on March 9, 2023.  SVB informed regulators that it expected to lose an equivalent amount the next day.  In response, on March 10, 2023, Nasdaq halted trading in the Company's stock and the DFPI closed the Bank and appointed the FDIC as the Bank's receiver.

93.     Following the halt of trading, various revelations about SVB's deficient risk controls began to come to light.  For example, on March 10, 2023, *Fortune* reported that the Bank did not have a Chief Risk Officer during an eight-month period from 2022 to 2023—a period of "difficult transition in the venture capital market" due to rising interest rates and slowed venture capital activity.[76]

94.     On March 14, 2023, *The Wall Street Journal* reported that the DOJ and the SEC had each opened investigations into the Bank's collapse.  According to the report, the investigations were also looking into stock sales that SVB's executive officers made mere days before the Bank collapsed—with Defendant Becker selling approximately $3 million worth of shares on February 27, 2023, and Defendant Beck selling approximately $575,000 worth of shares on February 27, 2023.[77]

95.     On March 19, 2023, *The New York Times* revealed that the Federal Reserve Bank of San Francisco had been aware of SVB's risky practices for more than a year and had

---

[75]     *Id.*

[76]     Prarthana Prakash, *Silicon Valley Bank had no official chief risk officer for 8 months while the VC market was spiraling*, FORTUNE, Mar. 10, 2023, https://fortune.com/2023/03/10/silicon-valley-bank-chief-risk-officer/.

[77]     Dave Michaels, *Justice Department, SEC Investigating Silicon Valley Bank's Collapse*, THE WALL STREET J., Mar. 14, 2023, https://www.wsj.com/articles/justice-department-sec-investigating-silicon-valley-banks-collapse-c192c2b2.

- 24 -

"*repeatedly warned* the bank that it had problems."[78]  Specifically, *The New York Times* reported that the Federal Reserve of San Francisco issued six citations to the Bank in 2021, "flagg[ing] that the firm was doing a bad job of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble" and eventually concluding after a July 2022 full supervisory review that the Bank's governance and controls were deficient.[79]  According to *The New York Times*, the Federal Reserve of San Francisco had met with senior leaders at the Bank to discuss the Bank's "ability to gain access to enough cash in a crisis and possible exposure to losses as interest rates rose."[80]  *The New York Times* further reported that "[i]t became clear to the Fed that the [Bank] was using bad models to determine how its business would fare as the central bank raised rates: Its leaders were assuming that higher interest revenue would substantially help their financial situation as rates went up, but that was out of step with reality."[81]

96.    On March 21, 2023, *Bloomberg* reported that "[l]oans to officers, directors and principal shareholders [of SVB], and their related interests, more than tripled from the third quarter last year to $219 million in the final three months of 2022."[82]  According to *Bloomberg*, the volume of lending to insiders was "a record dollar amount . . . going back at least two decades" and "[t]he surge in loans to high-up figures may draw scrutiny as the Federal Reserve and Congress investigate the breakdown of Silicon Valley Bank."[83]

97.    On April 2, 2023, *The Washington Post* reported that SVB executives were personally aware, as early as 2020, that SVB's investment strategies violated its own risk metrics and exposed the Bank to substantial issues in the event of higher interest rates, yet disregarded these concerns in order to continue reporting more substantial growth.  Specifically, according to *The Washington Post*, SVB had "fallen out of compliance with a key risk metric" by "buying

---

[78]    Smialek, *supra* note 13 [emphasis added].

[79]    *Id.*

[80]    *Id.*

[81]    *Id.*

[82]    Brush, *supra* note 14.

[83]    *Id.*

AMENDED COMPLAINT

longer-term investments that paid more interest," as an "internal model showed that higher interest rates could have a devastating impact on the bank's future earnings."[84]

## M. THE FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

98. The materials provided to investors in the Offering Documents included untrue statements of material fact or failed to include material facts necessary to ensure the statements were not misleading. Specifically, these documents contained the following false and misleading statements and omissions by the Defendants.

99. *First*, SVB's Annual Reports filed on Form 10-K and incorporated by reference into the Offering Documents stated:

> *We have implemented a risk management framework to <u>identify and manage our risk exposure</u>. This framework is comprised of various processes, systems, and strategies, and is <u>designed to manage the types of risk to which we are subject</u>,* including, among others, credit, market, liquidity, operational, capital, compliance, strategic and reputational risks. Our framework also includes financial, analytical, forecasting, or other modeling methodologies, which involve management assumptions and judgment.[85]

100. The statements concerning SVB's risk management within the Offering Documents, as specified in ¶99, were materially false, misleading, and omitted material facts. SVB's "risk management framework" did not "identify and manage [SVB's] risk exposure" and was not "designed to manage the types of risk to which [SVB] are subject." In fact, SVB's risk management framework "lack[ed] needed traction," and its risk management program was "not effective" and "missing several elements of a sound . . . risk management program," with "material financial weaknesses in practices or capabilities" that presented a "significant risk" and threatened "the Firm's prospects for remaining safe and sound."[86]

---

[84] Daniel Gilbert et al., *Silicon Valley Bank's risk model flashed red. So its executives changed it*, THE WASH. POST, Apr. 2, 2023, https://www.washingtonpost.com/business/2023/04/02/svb-collapse-risk-model/.

[85] Form 10-K, *supra* note 2 at 33.

[86] Report of Holding Company Inspection from the Federal Reserve to SVB, including the Board of Directors (Jul. 9, 2021) (concerning SVB's financial data as a of the start of the Relevant Period), https://www.federalreserve.gov/supervisionreg/files/svbfg-2020-report-of-holding-company-inspection-20210709.pdf; Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (May 31, 2022) (SVBFG and SVB Governance and Risk Management Target Supervisory Letter, concerning an examination earlier that year of

101. By choosing to affirmatively state that SVB "implemented a risk management framework to identify and manage our risk exposure" that was "designed to manage the types of risk to which we are subject," the Defendants incurred an obligation to disclose, but failed to do so, that: (a) each of the three lines of defense in SVB's "risk management framework" to identify and manage its risk exposure was ineffective and suffered from "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting"[87]; (b) SVB lacked adequate personnel and leadership over its risk management, including that SVB's Board of Directors suffered from "fundamental weaknesses" in its risk management oversight and that, as the Federal Reserve communicated in 2021, the Bank's Chief Risk Officer lacked the experience necessary for a large financial institution like SVB and consequentially Executive Defendant Becker informed the Federal Reserve in February 2022 that the Bank would terminate the Chief Risk Officer[88]; (c) SVB failed to incorporate appropriate risk appetite metrics and set appropriate risk limits; (d) SVB failed to maintain risk management controls consistent with its growth and size; and (e) SVB's model risk management suffered from weaknesses that made SVB's models used to manage risks not reliable and raised a "safety and soundness concern."[89]

102. By promoting the Bank's risk management without revealing its significant shortcomings and other issues that rendered it ineffective, the Offering Documents created the false and misleading impression that the Bank's risk management controls and processes were

---

SVB's risk management practices throughout 2020-2021); Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (Aug. 17, 2022) (SVBFG and SVB 2021 Supervisory Ratings Letter).

[87] Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (Aug. 17, 2022) (SVBFG and SVB 2021 Supervisory Ratings Letter), https://www.federalreserve.gov/supervisionreg/files/svbfg-and-svb-2021-supervisory-ratings-letter-20230817.pdf.

[88] Fed. Rep., *supra* note 86 at 47-48.

[89] Letter from the Federal Reserve to SVB, including Defendant Beck (Aug. 19, 2022) (SVBFG 2022 Large and Foreign Banking Organization (LFBO) Horizontal Capital Review Supervisory Letter), https://www.federalreserve.gov/supervisionreg/files/svbfg-2022-lfbo-horizontal-capital-review-supervisory-letter-20220819.pdf.

- 27 -

AMENDED COMPLAINT

capable of managing the risks to which the Bank was exposed, when in reality they were incapable of doing so.

103.    **Second**, SVB's Annual Reports filed on Form 10-K and incorporated by reference into the Offering Documents identified as a mere contingent and future "risk" that SVB "could" become subject to regulatory action "if" its risk management were ineffective.  Specifically, the Annual Reports stated as follows:

> *If* our risk management framework is not effective, we *could* suffer unexpected losses and become subject to regulatory consequences, as a result of which our business, financial condition, results of operations or prospects could be materially adversely affected.

104.    The statements in the Offering Documents identified in ¶103 were materially false, misleading, and omitted material facts.  The claim to investors that SVB "could" face regulatory consequences "if" its risk management proved ineffective was misleading and inaccurate.  In actuality, SVB's risk management was already "not effective," and the bank was already subject to "regulatory consequences," including numerous Matters Requiring Attention ("MRAs") and Matters Requiring Immediate Attention ("MRIAs") stemming from weaknesses in its risk management.  These statements were also deceptive and untrue because, in reality: (a) SVB's risk management was ineffective, notably because each of the "three lines of defense" in SVB's "risk management program" to identify and manage its risk exposure was ineffective and suffered from "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting"[90]; (b) SVB lacked sufficient personnel and leadership in its risk management, including that SVB's Board of Directors exhibited "fundamental weaknesses" in its risk management oversight and that, as the Federal Reserve communicated in 2021, the Bank's Chief Risk Officer lacked the experience necessary for a large financial institution like SVB and consequentially Executive Defendant

[90]    Letter from Federal Reserve to SVB, including the Board of Directors and Defendant Becker (May 31, 2022) (SVBFG and SVB Governance and Risk Management Target Supervisory Letter), https://www.federalreserve.gov/supervisionreg/files/svbfg-and-svb-governance-and-risk-management-target-supervisory-letter-20220531.pdf ; Letter from Fed. Rsrv., *supra* note 87.

- 28 -

Becker informed the Federal Reserve in February 2022 that the Bank would terminate the Chief Risk Officer[91]; (c) SVB failed to incorporate appropriate risk appetite metrics and set appropriate risk limits; (d) SVB failed to maintain risk management controls consistent with its growth and size; and (e) SVB's model risk management suffered from weaknesses that made SVB's models used to manage risks not reliable and raised a "safety and soundness concern."[92] It was false and misleading to tell investors that SVB "could" become subject to regulatory consequences "if" its risk management were ineffective when in reality, SVB's risk management was already "not effective" and SVB was already  subject to "regulatory consequences," including numerous MRAs and MRIAs concerning weaknesses in SVB's risk management.  These statements were also false and misleading because, in truth: (a) SVB's risk management was ineffective, including because each of the "three lines of defense" in SVB's "risk management framework" to identify and manage its risk exposure was ineffective and suffered from "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting"[93]; (b) SVB lacked adequate personnel and leadership over its risk management, including because SVB's Board of Directors suffered from "fundamental weaknesses" in its risk management oversight and that, as the Federal Reserve communicated in 2021, the Bank's Chief Risk Officer lacked the experience necessary for a large financial institution like SVB and consequentially Executive Defendant Becker informed the Federal Reserve in February 2022 that the Bank would terminate the Chief Risk Officer[94]; (c) SVB failed to incorporate appropriate risk appetite metrics and set appropriate risk limits; (d) SVB failed to maintain risk management controls consistent with its growth and size; and (e)

---

[91]     Fed. Rep., *supra* note 86 at 47-48.

[92]     Letter from the Fed. Rsrv., *supra* note 89.

[93]     Letter from the Fed. Rsrv., *supra* note 90; Letter from the Fed. Rsrv., *supra* note 87.

[94]     Fed. Rep., *supra* note 86 at 47-48.

AMENDED COMPLAINT

SVB's model risk management suffered from weaknesses that made SVB's models used to manage risks not reliable and raised a "safety and soundness concern."[95]

105.    Third, SVB's Proxy Statements filed on Schedule 14A and incorporated by reference into the Offering Documents stated that:

> *Oversight of the Company's risk management* is one of the Board's key priorities and *is carried out by the Board as a whole* . . . . Under the Board and committee oversight outlined above, *we are focused on, and continually invest in, our risk management and control environment.*

106.    The statements in the Offering Documents identified in ¶105 were materially false, misleading, and omitted material facts.  Contrary to the claims in the Offering Documents SVB's Board of Directors neither "carried out" "risk management" nor was it "focused on, and continually invest[ing] in, [SVB's] risk management and control environment." Instead, SVB's Board of Directors was plagued by "fundamental weaknesses" in its risk management oversight and demonstrably did "not meet supervisory expectations."[96] These statements were additionally false and misleading because, in truth, the absence of "effective board oversight" resulted in SVB "missing several elements of a sound three lines of defense risk management program."[97]  Having highlighted the risk management oversight without revealing the significant shortcomings and other issues that rendered the framework ineffective, the Offering Documents presented a false and misleading picture that the Bank's risk management controls and processes could manage the risks to which the Bank was exposed, when, in actuality, they were not effective at doing so.

107.    **Fourth**, SVB's Proxy Statements incorporated by reference into the Offering Documents stated that:

> Our business teams, supported by our risk, compliance, legal, finance and *internal audit functions*, work together to *identify and manage risks applicable to our business, as well as to enhance our control environment.*

108.    The statements in the Offering Documents identified in ¶107 were materially false, misleading, and omitted material facts.  Contrary to representations, SVB's "risk" and "internal

---

[95]    Letter from the Fed. Rsrv., *supra* note 89.

[96]    Fed. Rep., *supra* note 86 at 47-48; Letter from the Fed. Rsrv., *supra* note 90.

[97]    Letter from the Fed. Rsrv., *supra* note 90.

AMENDED COMPLAINT

audit functions" did not effectively "identify and manage risks applicable to our business" or "enhance our control environment." In fact, SVB Internal Audit's "processes and reporting" suffered from serious "deficiencies" that "negatively affected its ability to provide timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively."[98] It was further disingenuous and inaccurate to inform investors that SVB's "risk" and "internal audit functions" worked to "identify and manage risks applicable to our business, as well as to enhance our control environment," when the reality revealed that: (a) each of the three lines of defense in SVB's "risk management framework" to identify and manage its risk exposure was ineffective and suffered from "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting"[99]; (b) SVB lacked adequate personnel and leadership over its risk management, including that SVB's Board of Directors suffered from "fundamental weaknesses" in its risk management oversight and that, as the Federal Reserve communicated in 2021, the Bank's Chief Risk Officer lacked the experience necessary for a large financial institution like SVB and consequentially Executive Defendant Becker informed the Federal Reserve in February 2022 that the Bank would terminate the Chief Risk Officer[100]; (c) SVB failed to incorporate appropriate risk appetite metrics and set appropriate risk limits; (d) SVB lacked adequate personnel and leadership over its internal audit function, including because SVB's Internal Audit's "processes and reporting" suffered from serious "deficiencies" that "negatively affected its ability to provide timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively"[101]; (e) SVB failed to maintain risk management controls consistent with its growth and size; (f) SVB's model risk management suffered from weaknesses that made SVB's models used to manage risks not reliable and raised a

---

[98]     *Id.*

[99]     Letter from Fed. Rsrv., *supra* note 87.

[100]    Fed. Rep., *supra* note 86 at 47-48.

[101]    Letter from Fed. Rsrv., *supra* note 90.

AMENDED COMPLAINT

"safety and soundness concern"[102]; and (g) as a result of existing and known weaknesses in SVB's risk management and internal audit, SVB was subject to regulatory consequences, including numerous MRAs and MRIAs concerning weaknesses in SVB's risk management that remained unresolved when the Bank collapsed.

109.    **Fifth**, SVB's Annual Reports filed on Form 10-K and incorporated by reference into the Offering Documents stated that:

> **We rely on quantitative models to measure risks and to estimate certain financial values.** Quantitative models may be used to help manage certain aspects of our business and to *assist with certain business decisions*, including estimating credit losses, measuring the fair value of financial instruments when reliable market prices are unavailable, *estimating the effects of changing interest rates* and other market measures on our financial condition and results of operations, and managing risk.

The Annual Reports filed on Form 10-K and incorporated by reference into the Offering Documents further identified as a mere contingent and future "risk" that SVB's models "may" not be effective or fully reliable.  Specifically, the Annual Reports stated as follows: "Although we employ strategies to manage and govern the risks associated with our use of models, they *may* not be effective or fully reliable."

110.    The statements in the Offering Documents identified in ¶109 were materially false, misleading, and omitted material facts.  SVB's models were unable to reliably "assist with certain business decisions," could not "estimat[e] the effects of changing interest rates," and were not considered "effective or fully reliable." Instead, they suffered from weaknesses that generated a "safety and soundness concern" and posed the risk of "inaccurate capital projections," thereby "prevent[ing] firm management and the board of directors from making informed capital planning decisions."[103]  The Defendants, by affirmatively stating that SVB "rel[ies] on quantitative models to measure risk and to estimate certain financial values," including to "estimat[e] the effects of changing interest rates," were obligated but failed to reveal that: (i) SVB's models exhibited weaknesses, and SVB lacked effective quantitative models and internal controls to "estimat[e] the

---

[102]    Letter from Fed. Rsrv., *supra* note 89.

[103]    *Id.*

effects of changing interest rates"; (ii) SVB lacked "effective ongoing performance monitoring programs for each model used,"[104] and relied on assumptions that were "not appropriately identified"[105]; (iii) when SVB breached its models' risk limits, SVB executives made unfounded changes to the models that minimized the impact of increased interest rates on SVB; and (iv) as a result of existing and known weaknesses pertaining to its risk modeling, SVB was subject to regulatory consequences, including critical supervisory findings and the issuance of MRIAs and MRAs concerning these existing weaknesses in the Bank's model risk management. The Offering Documents, by promoting the Bank's use of models without disclosing the significant deficiencies and other issues that rendered those models ineffective, created the false and misleading impression that the Bank's models could reliably manage the risks to which the Bank was subject, when, in truth, they were ineffective at doing so.

111.    *Sixth*, SVB's Annual Reports filed on Form 10-K and Quarterly Reports filed on Form 10-Q and incorporated by reference into the Offering Documents stated that:

> **Interest Rate Risk Management** . . . *Interest rate risk is managed by our ALCO*. ALCO reviews the sensitivity of the market valuation on earning assets and funding liabilities and *the modeled 12-month projections of net interest income from changes in interest rates*, structural changes in investment and funding portfolios, loan and deposit activity and market conditions. *Relevant metrics and guidelines, which are approved by the Finance Committee of our Board of Directors and are included in our Interest Rate Risk Policy, <u>are monitored on an ongoing basis</u>.*
>
> <u>*Interest rate risk is managed*</u> primarily through strategies involving our fixed income securities portfolio, available funding channels, and capital market activities.  In addition, our policies permit the use of off-balance sheet derivatives, such as interest rate swaps, to assist with managing interest rate risk.

112.    The statements in the Offering Documents identified in ¶111 were materially false, misleading, and omitted material facts.  SVB did not effectively "manage" its interest rate risk nor accurately assess how its investment portfolio would respond to increased interest rates; rather,

---

[104]    Cal. Dep't. of Bus. Oversight., *SVB 2018 CAMELS Examination Repor*t (March 6, 2019).

[105]    Letter from the Federal Reserve to SVB, including the Board of Directors (Nov. 19, 2019) (SVBFG Target Corporate Governance/Global Risk Management Supervisory Letter), https://www.federalreserve.gov/supervisionreg/files/svbfg-target-corporate-governance-global-risk-management-supervisory-letter-20191119.pdf.

- 33 -

SVB's efforts in interest rate risk management "exhibited many weaknesses."[106]  Having chosen to describe SVB's "Interest Rate Risk Management" and affirmatively state that "[i]nterest rate risk is managed" at SVB, the Defendants had a duty, which they failed to fulfill, to disclose that SVB's interest rate risk management, particularly concerning its investment securities portfolio: (i) was hindered by weaknesses in its internal controls and internal audit related to interest rate risk management, including that SVB lacked the necessary controls to ascertain how SVB's portfolio would react to increased interest rates; (ii) relied on interest rate risk simulations and models that were "not reliable" and were "directionally inconsistent" with SVB's financial performance[107]; (iii) utilized ineffective models that lacked fundamental components of a sound interest rate risk model; were unable to perform adequate sensitivity analysis as they only captured parallel interest rate curve changes; and employed only "the most basic" interest rate risk measurement, severely limiting the models' usefulness[108]; (iv) was compromised by SVB executives' decisions to make unfounded changes to the models that minimized the impact of increased interest rates on SVB when SVB breached its models' risk limits; and (v) had not reviewed for potential recalibration SVB's interest rate risk model limits since 2018.

113.    **Seventh**, SVB's Annual Reports filed on Form 10-K and Quarterly Reports filed on Form 10-Q incorporated by reference into the Offering Documents specifically highlighted to investors how SVB utilized a "simulation model" that "provides a dynamic assessment of interest rate sensitivity embedded within our balance." Specifically, the Defendants stated:

> *We utilize a simulation model to perform sensitivity analysis on the economic value of equity and net interest income under a variety of interest rate scenarios, balance sheet forecasts, and business strategies. The simulation model provides a dynamic assessment of interest rate sensitivity which is embedded within our balance sheet. Rate sensitivity measures the potential variability in economic value and net interest income relating solely to changes in market interest rates*

[106]    Fed. Rep., *supra* note 86 at 62.

[107]    Letter from Federal Reserve to SVB, including the Board of Directors, Defendant Becker, and Defendant Beck (Nov. 15, 2022) (SVB 2022 CAMELS Examination Supervisory Letter), https://www.federalreserve.gov/supervisionreg/files/svb-2022-camels-examination-supervisory-letter-20221115.pdf.

[108]    Fed. Rep., *supra* note 86 at 62.

- 34 -

AMENDED COMPLAINT

over time. *We review our interest rate risk position and sensitivity to market interest rates regularly.*

114. The statements in the Offering Documents identified in ¶113 were materially false, misleading, and omitted material facts. SVB's simulation model was incapable of reliably "provid[ing] a dynamic assessment of interest rate sensitivity," and SVB did not "regularly" review its sensitivity to market interest rates. These statements were false and misleading because, in truth: (i) SVB suffered from weaknesses in its internal controls and internal audit related to interest rate risk management, including that SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates; (ii) SVB used interest rate risk simulations and models that were "not reliable," and were "directionally inconsistent" with SVB's financial performance[109]; (iii) SVB used ineffective models that lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only "the most basic" interest rate risk measurement, which severely limited the models' utility[110]; (iv) SVB was compromised by SVB executives' decisions to make unfounded changes to the models that minimized the impact of increased interest rates on SVB when SVB breached its models' risk limits; and (v) SVB had not reviewed for potential recalibration SVB's interest rate risk model limits since 2018.

115. ***Eighth***, SVB's Annual Reports filed on Form 10-K and Quarterly Reports filed on Form 10-Q and incorporated by reference into the Offering Documents represented that:

> [SVB's interest rate risk] models were developed internally and are *based on historical balance and rate observations* . . . . As part of our ongoing governance structure, each of these models and assumptions are *periodically reviewed and recalibrated as needed to ensure that they are representative of our understanding of existing behaviors.*

116. The statements in the Offering Documents identified in ¶115 were materially false, misleading, and omitted material facts. SVB's interest rate risk models were not "based on historical balance and rate observations" and recalibrated "to ensure that they are representative

_____

[109]   Letter from Fed. Rsrv., *supra* note 107.

[110]   Fed. Rep., *supra* note 86 at 62.

AMENDED COMPLAINT

of our understanding of existing behaviors." In fact, SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration. Additionally, contrary to the representations in the Offering Documents, SVB neglected to "ensure" that its models and assumptions were "representative of [its] understanding of existing behaviors." Instead, the Bank's models were doctored and made "counterintuitive modeling assumptions . . . rather than managing the actual risks."[111]

117.    *Ninth*, SVB's Annual Reports filed on Form 10-K and Quarterly Reports filed on Form 10-Q and incorporated by reference into the Offering Documents stated that:

> **Liquidity.** The objective of liquidity management is to ensure that funds are available in a timely manner to meet our financial obligations, including, as necessary, paying creditors, meeting depositors' needs, accommodating loan demand and growth, funding investments, repurchasing securities and other operating or capital needs, without incurring undue cost or risk, or causing a disruption to normal operating conditions.
>
> *We regularly assess the amount and likelihood of projected funding requirements* through a review of factors such as historical deposit volatility and funding patterns, *present and forecasted market and economic conditions*, individual client funding needs, and existing and planned business activities. *Our Asset/Liability Committee ("ALCO") . . . provides oversight to the liquidity management process . . .* Additionally, *we routinely conduct liquidity stress testing as part of our liquidity management practices.*

118.    The statements in the Offering Documents identified in ¶117 were materially false, misleading, and omitted material facts. Contrary to its representations, SVB did not reliably "assess the amount and likelihood of projected funding requirements" and did not "routinely conduct liquidity stress testing as part of our liquidity management practices." In fact, SVB's liquidity and liquidity risk management practices were plagued by fundamental shortcomings in the "key elements" necessary for SVB's "longer term financial resiliency."[112] Moreover, SVB's governance and oversight of liquidity risk suffered from shortcomings and failed to evolve in pace with SVB's liquidity risk profile.

---

[111]    Fed. Rep., *supra* note 86 at 3.

[112]    Letter from the Federal Reserve to SVB, including Defendant Becker and Defendant Beck (November 2, 2021) (SVBFG Liquidity Planning Target Supervisory Letter), https://www.federalreserve.gov/supervisionreg/files/svbfg-liquidity-planning-target-supervisory-letter-20231102.pdf.

119.    Furthermore, these statements proved false and misleading because, in truth: (a) SVB failed to effectively identify, measure, and monitor liquidity risk; (b) SVB lacked an adequate liquidity limits framework and its liquidity risk models lacked sensitivity; (c) SVB's internal liquidity "stress testing" failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, improperly assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days; (d) SVB's "contingency funding plan"—part of its liquidity risk management—failed to adequately include a projection and evaluation of expected funding needs during a stress event, purported to identify types of contingent funding without accounting for SVB's active contracts or firm limits, and failed to tailor Early Warning Indicators to SVB's liquidity risk profile; and (e) SVB's governance and oversight of liquidity risk suffered from shortcomings including in its Second and Third Lines of Defense and failed to keep pace with SVB's liquidity risk profile.

120.    *Tenth*, SVB's Annual Reports filed on Form 10-K and incorporated by reference into the Offering Documents stated that SVB had the "positive intent and ability to hold [each HTM security] to its maturity" billions of dollars in investment securities classified as "HTM" and that SVB properly accounted for those investment securities pursuant to GAAP.

121.    Further, in each of the Annual Reports filed on Form 10-K and Quarterly Reports filed on Form 10-Q incorporated by reference into the Offering Documents, the Defendants classified billions of dollars of securities as HTM securities.  Specifically, in the 2020 Form 10-K filed on March 1, 2021, they classified $16.6 billion as HTM securities.  By classifying these securities as HTM securities, the Offering Documents represented that SVB could reliably establish it had the positive intent and ability to hold the securities to maturity as required by GAAP.[113]

122.    The statements in the Offering Documents identified in ¶¶120-121 were materially

---

[113]    *3.2    Scope    of    ASC    320*, PWC VIEWPOINT (Sept. 30, 2024), https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/loans_and_investment/loans_and_investment_US/chapter_3_accounting__1_US/32_scope_of_asc_320_US.html#pwc-topic.dita_1643305210048915

- 37 -

AMENDED COMPLAINT

false, misleading, and omitted material facts.  Despite their representations, SVB could not—and did not—reliably establish under GAAP the requisite "positive intent and ability to hold to maturity" SVB's tens-of-billions of dollars of debt securities classified as HTM.  Among other issues, SVB's future liquidity needs could not reliably and sufficiently be assessed, including because: (a) SVB did not possess internal controls to assess SVB's ability to hold its HTM Securities to maturity; (b) SVB could not sufficiently demonstrate SVB's "positive intent and ability" to hold those securities to maturity because SVB could not reliably and sufficiently assess SVB's "need for liquidity," including because: (i) SVB lacked an adequate liquidity limits framework that failed to effectively identify, measure, and monitor liquidity risk; (ii) SVB's internal liquidity stress testing failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days; (iii) SVB's contingency funding plan failed to adequately include a projection and evaluation of expected funding needs during a stress event; only identified types of contingent funding by source, without accounting for SVB's active contracts or firm limits; and failed to tailor Early Warning Indicators to SVB's liquidity risk profile; and (iv) SVB's liquidity risk models lacked sensitivity; (c) SVB could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity because the Defendants could not reliably and sufficiently assess SVB's needs "in response to changes in market interest rates," including because: (i) SVB suffered from weaknesses in its internal controls related to interest rate risk; (ii) SVB suffered from weaknesses in its internal audit related to interest rate risk; (iii) SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates; (iv) SVB's interest rate risk simulations and models were "not reliable" and instead were "directionally inconsistent" with SVB's financial performance; (v) SVB's models lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only net interest income, "the most basic" interest rate risk measurement, which severely limited the models' utility; (vi) SVB's interest rate risk model

limits had not been reviewed after 2018 for potential recalibration; and (vii) SVB was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates, and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio".

123.    *Eleventh*, SVB's Quarterly Reports filed on Form 10-Q on May 10, 2021, and August 6, 2021, and Annual Report filed on Form 10-K on March 1, 2022, and incorporated by reference into the Offering Documents re-classified securities to HTM securities.  In making these reclassifications, the Defendants represented to investors that "Our decision to re-designate the securities was based on our ability and intent to hold these securities to maturity.  Factors used in assessing the ability to hold these securities to maturity were future liquidity needs and sources of funding."[114]

124.    The statements in the Offering Documents identified in ¶123 were materially false, misleading, and omitted material facts.  SVB could not—and did not—reliably establish under GAAP the requisite "ability and intent to hold to maturity" the securities re-classified as HTM, nor could SVB reliably "assess[] . . . future liquidity needs and sources of funding," including because: (a) SVB did not possess internal controls to assess SVB's ability to hold its HTM securities to maturity; (b) the Defendants could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity because the Defendants could not reliably and sufficiently assess SVB's "need for liquidity," including because: (i) SVB lacked an adequate liquidity limits framework that failed to effectively identify, measure, and monitor liquidity risk; (ii) SVB's internal liquidity stress testing failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days; (iii) SVB's contingency funding plan failed to adequately include a projection and evaluation of expected funding needs during a stress event; only identified types of contingent funding by source,

_____

[114]    SVB Fin. Grp., Quarterly Report (Form 10-Q), at 17 (May 10, 2021); SVB Fin. Grp., Quarterly Report (Form 10-Q), at 12 (August 6, 2021); *see also* Form 10-K, *supra* note 2 at 21 (SVB reclassified its securities to HTM securities in its Quarterly Reports).

- 39 -

without accounting for SVB's active contracts or firm limits; and failed to tailor Early Warning Indicators to SVB's liquidity risk profile; and (iv) SVB's liquidity risk models lacked sensitivity: (c) the Defendants could not sufficiently establish SVB's "positive intent and ability" to hold those securities to maturity because the Defendants could not reliably and sufficiently assess SVB's needs "in response to changes in market interest rates," including because: (i) SVB suffered from weaknesses in its internal controls related to interest rate risk; (ii) SVB suffered from weaknesses in its internal audit related to interest rate risk; (iii) SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates; (iv) SVB's interest rate risk simulations and models were "not reliable" and instead were "directionally inconsistent" with SVB's financial performance; (v) SVB's models lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only net interest income, "the most basic" interest rate risk measurement, which severely limited the models' utility; (vi) SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration; and (vii) SVB was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio".[115]

125.   *Twelfth*, SVB's Annual Report filed on Form 10-K[116] and incorporated by reference into the Offering Documents included representations concerning SVB's disclosure controls and internal controls over financial reporting.  Specifically, they stated that:

> The Company carried out an evaluation, under the supervision and with the participation of management, including the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of [year end], pursuant to Exchange Act Rule 13a-15(b). Based on this evaluation, ***the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective*** as of [year end].

[115]    Antoine Gara & Brooke Masters, SVB Was Warned by BlackRock That Risk Controls Were Weak: FT, Financial Times (March 18, 2023), https://www.ft.com/content/fbd9e3d4-2df5-4a65-adbd-01e5de2c5053.

[116]    Form 10-K, *supra* note 2 at 186.

AMENDED COMPLAINT

126.    SVB's Annual Reports filed on Form 10-K[117] incorporated by reference into the Offering Documents further stated that:

> As of [the year-end], the Company carried out an assessment, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's internal control over financial reporting pursuant to Rule 13a-15(c), as adopted by the SEC under the Exchange Act. In evaluating the effectiveness of the Company's internal control over financial reporting, management used the framework established in "Internal Control-Integrated Framework (2013)," issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on this assessment, management has concluded that, as of [the year-end], the Company's internal control over financial reporting was effective.

127.    In Exhibits 31.1, 31.2, and 32.1 of each Annual Report on Form 10-K and each Quarterly Report on Form 10-Q (the "SOX Certifications") incorporated by reference into the Offering Documents, Defendants Becker and Beck further certified under §§ 302 and 906 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") that the Annual and Quarterly reports were accurate and complete, and that they had established appropriate internal controls, stating that they: (i) were responsible for establishing and maintaining internal control over financial reporting, and (ii) had designed such internal controls over financial reporting to provide reasonable assurance regarding the reliability of SVB's financial reporting and the preparation of SVB's financial statements incorporated by reference into the Offering Documents. Moreover, Defendants Becker and Beck represented that: (i) they had reviewed the Bank's filings; (ii) the filings did not contain any "untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading";[118] (iii) SVB's financial statements "fairly present[ed] in all material respects the financial condition, results of operations and cash flows"[119] of SVB, as required by Rule 13a-14(a) / 15(d)-15(a); and (iv) SVB's financial statements "fairly present[ed], in all material respects, the financial condition [and] results of operations of"[120] SVB, as required by 18

---

[117]    *Id.*

[118]    *Id.* at Ex. 31.1, 31.2.

[119]    *Id.* at Ex. 31.2 ¶2.

[120]    *Id.* ¶3.

- 41 -

AMENDED COMPLAINT

U.S.C. § 1350. Finally, in each of the SOX Certifications, Defendants Becker and Beck further made positive representations to investors that they had: (i) evaluated the "effectiveness of [SVB]'s disclosure controls and procedures"[121]; and (ii) designed "disclosure controls and procedures" to "ensure" that material information about SVB was made known to them.

128.    The statements in the Offering Documents identified in ¶¶126-127 were materially false, misleading, and omitted material facts.  It was demonstrably false and misleading to claim and attest that SVB possessed effective internal controls and procedures.  In contrast to these assertions, SVB's internal controls were not effective; instead, they were severely deficient and failed to provide reasonable assurance that the information required for SVB's SEC filings was collected, communicated, and reported correctly.  As the Federal Reserve conveyed to SVB, "deficiencies in [SVB's] processes and reporting negatively affected its ability to provide timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively."[122] Furthermore, SVB—and many of the Defendants directly—received (and/or had access to) a consistent flow of adverse supervisory findings, MRIAs and MRAs, and other warnings from the Federal Reserve that clearly indicated SVB's internal controls were, in fact, ineffective.

129.    The statements in the Offering Documents identified in ¶¶126-127 were further materially false and misleading because SVB's financial statements violated GAAP and misstated SVB's true financial health given, as discussed above, SVB improperly classified securities as HTM when in fact SVB could not sufficiently establish SVB's "positive intent and ability"[123] to hold those securities to maturity.  Among other things: (a) SVB lacked an adequate liquidity limits framework that failed to effectively identify, measure, and monitor liquidity risk; (b) SVB's internal liquidity stress testing failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, assumed all deposits would behave similarly in stress, and

---

[121]     *Id.* ¶4(c).

[122]     *Review of the Federal Reserve's Supervision and Regulation of Silicon Valley Bank*, BD. OF GOVERNORS OF THE FED. RSRV. SYS. at 48 (April 28, 2023).

[123]     Form 10-K, *supra* note 2 at 108.

- 42 -

AMENDED COMPLAINT

failed to provide guidance into time periods of less than 30 days; (c) SVB's contingency funding plan failed to adequately include a projection and evaluation of expected funding needs during a stress event; only identified types of contingent funding by source, without accounting for SVB's active contracts or firm limits; and failed to tailor Early Warning Indicators to SVB's liquidity risk profile; and (d) SVB's liquidity risk models lacked sensitivity. Further, SVB could not sufficiently establish its "positive intent and ability"[124] to hold those securities to maturity because the Defendants could not reliably and sufficiently assess SVB's needs "in response to changes in market interest rates,"[125] including because: (a) SVB suffered from weaknesses in its internal controls related to interest rate risk; (b) SVB suffered from weaknesses in its internal audit related to interest rate risk; (c) SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates; (d) SVB's interest rate risk simulations and models were "not reliable"[126] and instead were "directionally inconsistent" with SVB's financial performance; (e) SVB's models lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only net interest income, "the most basic" interest rate risk measurement, which severely limited the models' utility; (f) SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration; and (g) SVB was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio".[127]

130.    The statements in the Offering Documents identified in ¶¶126-127 were further false and misleading because, contrary to these assertions, SVB did not maintain effective "internal controls over financial reporting;"[128] indeed, the financial information in SVB's Annual

---

[124]    *Id.*

[125]    Double Line ETF Trust, Registration Statement (Form N-1A) (February 1, 2024); Double Line ETF Trust, Registration Statement (Form N-1A) (February 3, 2025).

[126]    Form 10-K, *supra* note 2 at 35.

[127]    Gara & Masters, *supra* note 115.

[128]    Form 10-K, *supra* note 2 at 17.

- 43 -

AMENDED COMPLAINT

Reports and Quarterly Reports did not "fairly present in all material respects"[129] SVB's "financial condition"[130] for the periods presented.  Among other things, SVB improperly classified billions of dollars' worth of securities as HTM, breaching GAAP, due to, among other reasons, their inability to substantiate the necessary evidential support required for HTM classification.  Adding to this, SVB did not possess the internal controls needed to assess their own determination that they could hold their HTM securities to maturity.  Furthermore, SVB lacked the controls vital for reliable "liquidity projections" and assessments of its "need for liquidity", which in turn prevented them from supplying the adequate evidence mandated by GAAP for HTM classification.[131]  As a result, SVB's reported financial figures were not in compliance with GAAP and therefore did not accurately reflect, in all material respects, SVB's financial results.

131.    The statements in the Offering Documents identified in ¶¶126-127 were further false and misleading because, contrary to Defendant Becker and Beck's statements in the SOX Certifications that SVB's Annual and Quarterly Reports above did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading",[132] the Defendants misrepresented the effectiveness of SVB's risk controls, risk models, interest rate risk controls, liquidity controls, and internal controls over financial reporting, as well as the ability of SVB to hold its HTM securities to maturity.  Moreover, SVB's stated financial results did not comply with GAAP and therefore contained untrue statements of material fact and omitted to state material facts necessary to make those statements not misleading, including

---

[129]    *Id.* at 27.

[130]    *Id.* at 40.

[131]    *3.3 Classification of debt securities*, PWC VIEWPOINT (Sep. 30, 2024), https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/loans_and_investment/loans_and_investment_US/chapter_3_accounting__1_US/33_classification_of_US.html#pwc-topic.dita_1652305210048888.

[132]    SVB Financial Group, Management Certification of Annual or Quarterly Disclosure (Form 10-K/Exhibit 31.1) (March 1, 2021).

- 44 -

AMENDED COMPLAINT

because SVB could not sufficiently establish SVB's "positive intent and ability"[133] to hold those securities to maturity.

132. Moreover, the Defendants' statements in the SOX Certifications that SVB's Annual and Quarterly Reports did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"[134] were further false and misleading because SVB failed to disclose material information required to be disclosed by Regulation S-K, 17 C.F.R. §§ 229 et seq. Among other failings, SVB's Annual Reports and Quarterly Reports violated Item 303 of Regulation S-K (17 C.F.R. § 229.303), which mandated disclosure of "material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition,"[135] including "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."[136] Specifically, contrary to the SOX Certifications, SVB's filings omitted critical facts that posed a threat to SVB's liquidity, such as: (a) SVB's lack of a functional liquidity limits framework; (b) SVB's inadequate internal liquidity stress testing; (c) SVB's lack of an effective contingency funding plan for stress scenarios; and (d) SVB's lack of effective controls surrounding its liquidity risk management.

133. The SOX Certifications in SVB's Annual and Quarterly Reports identified above were further false and misleading because those periodic reports failed to disclose material information required to be disclosed by Item 305 of SEC Regulation S-K (17 C.F.R. § 229.305), which requires "[q]uantitative and qualitative disclosures about market risk."[137] Specifically, the

---

[133] Form 10-K, *supra* note 89, at 101; Form 10-K, *supra* note 90, at 104.
[134] Form 10-K/Exhibit 31.1, *supra* note 106.
[135] 17 C.F.R. § 229.303(a) (2021).
[136] 17 C.F.R. § 229.303(b)(1)(i) (2021).
[137] 17 C.F.R. § 229.305(a) (2021).

- 45 -

AMENDED COMPLAINT

qualitative disclosure requirements of Item 305 require a registrant to describe "[t]he registrant's primary market risk exposures";[138] "[h]ow those exposures are managed";[139] and "[c]hanges in either the registrant's primary market risk exposures or how those exposures are managed, when compared to what was in effect during the most recently completed fiscal year and what is known or expected to be in effect in future reporting periods."[140] The instructions to Item 305 explain that "primary market risk exposures"[141] includes interest rate risk. Under Item 305, "if a registrant has a material exposure to interest rate risk and, within this category of market risk, is most vulnerable to changes in short-term U.S. prime interest rates, it should disclose the existence of that exposure."[142] However, SVB's periodic filings omitted material facts concerning SVB's management of its primary market risk, interest rate risk, including that SVB (a) suffered from weaknesses in its internal controls related to interest rate risk management; (b) suffered from weaknesses in its internal audit related to interest rate risk management; (c) lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates; (d) used interest rate risk simulations and models that were "not reliable"[143] and instead were "directionally inconsistent"[144] with SVB's financial performance; (e) used ineffective models that lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only "the most basic"[145] interest rate risk measurement, which severely limited the models' utility; (f) had not reviewed for potential recalibration SVB's interest rate risk model limits since 2018; and (g) was not able to accurately assess how SVB's investment portfolio would respond to

---

[138]     *Id*. at § 229.305(b)(1)(i).

[139]     *Id*. at § 229.305(b)(1)(ii).

[140]     *Id*. at § 229.305(b)(1)(iii).

[141]     § 229.305(b)(1)(ii).

[142]     *Id*. at § 229.305(b)(2).

[143]     Letter from Fed. Rsrv., *supra* note 107.

[144]     *Id*.

[145]     Fed Report at 62.

- 46 -

AMENDED COMPLAINT

increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio".[146]

134.    **Thirteenth**, SVB's Annual Reports and Quarterly Reports incorporated by reference into the Offering Documents failed to disclose material information required to be disclosed by Regulation S-K, 17 C.F.R. §§ 229 et seq.  The Annual Reports and Quarterly Reports violated the requirements of Item 303 of Regulation S-K (17 C.F.R. § 229.303) that SVB disclose "material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition,"[147] including "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."[148] Specifically, SVB's Annual Reports and Quarterly Reports omitted material facts threatening SVB's liquidity, such as: (a) SVB's lack of a functional liquidity limits framework; (b) SVB's inadequate internal liquidity stress testing; (c) SVB's lack of an effective contingency funding plan for stress scenarios; and (d) SVB's lack of effective controls surrounding its liquidity risk management.

135.    SVB's Annual and Quarterly Reports incorporated by reference into the Offering Documents further failed to disclose material information required to be disclosed by Item 305 of SEC Regulation S-K (17 C.F.R. § 229.305), which requires "[q]uantitative and qualitative disclosures about market risk."[149] Specifically, the qualitative disclosure requirements of Item 305 require a registrant to describe "[t]he registrant's primary market risk exposures";[150] "[h]ow those exposures are managed";[151] and "[c]hanges in either the registrant's primary market risk exposures or how those exposures are managed, when compared to what was in effect during the

---

[146]    Gara & Masters, *supra* note 115.

[147]    § 229.303(a).

[148]    § 229.303(b)(1)(i).

[149]    § 229.305(a).

[150]    § 229.305(b)(1)(i).

[151]    § 229.305(b)(1)(ii).

- 47 -

AMENDED COMPLAINT

most recently completed fiscal year and what is known or expected to be in effect in future reporting periods."[152] The instructions to Item 305 explain that "primary market risk exposures"[153] includes interest rate risk. Under Item 305, "if a registrant has a material exposure to interest rate risk and, within this category of market risk, is most vulnerable to changes in short-term U.S. prime interest rates, it should disclose the existence of that exposure."[154] However, SVB's periodic filings failed to disclose material facts concerning SVB's management of its primary market risk, interest rate risk, including that SVB (a) suffered from weaknesses in its internal controls related to interest rate risk management; (b) suffered from weaknesses in its internal audit related to interest rate risk management; (c) lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates; (d) used interest rate risk simulations and models that were "not reliable"[155] and instead were "directionally inconsistent"[156] with SVB's financial performance; (e) used ineffective models that lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only "the most basic"[157] interest rate risk measurement, which severely limited the models' utility; (f) had not reviewed for potential recalibration SVB's interest rate risk model limits since 2018; and (g) was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio".[158]

136.    *Fourteenth*, in the Annual Report filed on Form 10-K incorporated by reference into the Offering Documents, the Defendants described purported "risk" warnings concerning SVB's internal controls over financial reporting. In the Annual Report, the Defendants identified

---

[152]    § 229.305(b)(1)(iii).
[153]    § 229.305(b)(1)(i).
[154]    § 229.305(b)(2).
[155]    Letter from Fed. Rsrv., *supra* note 107.
[156]    *Id*.
[157]    Fed Report at 62.
[158]    Gara & Masters, *supra* note 115.

- 48 -

AMENDED COMPLAINT

as a mere contingent and future "risk" that SVB "may" not "maintain an effective system of internal control over financial reporting."[159] Specifically, the Defendants stated as follows: "If we fail to maintain an effective system of internal control over financial reporting, we may not be able to accurately report our financial results."[160]

137.    The statements in the Offering Documents identified in ¶136 were materially false, misleading, and omitted material facts.  The possibility that SVB would "fail to maintain an effective system of internal control over financial reporting"[161] or that SVB "may not be able to accurately report our financial results"[162] was not merely hypothetical.  In reality, as the Federal Reserve informed SVB, "deficiencies in [SVB's] processes and reporting negatively affected its ability to provide timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively."[163] It was also false and misleading to represent that SVB "may" not be able to accurately report our financial results "if" it failed to maintain effective risk management over financial reporting when, in truth, (a) SVB's internal controls over financial reporting in fact suffered from numerous weaknesses; (b) its reported financial results, including its HTM securities classifications, were not accurate and violated GAAP; and (c) SVB had failed to implement appropriate internal controls concerning the classification of securities as HTM.[164] In addition, it was false and misleading to represent in SVB's quarterly reports that there had been "no material changes" to the risk factors identified in SVB's annual reports.[165]  In truth, SVB received a steady stream of adverse supervisory findings, MRIAs and MRAs, and other warnings from the Federal Reserve that demonstrated to SVB that its internal controls were, in fact, ineffective.

---

[159]    Form 10-K, *supra* note 2 at 24.

[160]    Bd. of Governors of the Fed. Rsvr. Sys., *supra* note 124.

[161]    Form 10-K, *supra* note 2 at 34.

[162]    *Id.*

[163]    Bd. of Governors of the Fed. Rsvr. Sys., *supra* note 124 at 48.

[164]    Form 10-K, *supra* note 2 at 34.

[165]    Form 10-Q, *supra* note 30 at 105.

- 49 -

AMENDED COMPLAINT

138.   *Fifteenth*, in the Annual Report filed by SVB on Form 10-K and incorporated by reference into the Offering Documents, KPMG issued a clean audit report concerning SVB, including specifically that (i) "the consolidated financial statements"[166] issued by SVB "present[ed] fairly, in all material respects, the financial position of the Company"[167] in accordance with GAAP; (ii) SVB "maintained, in all material respects, effective internal control over financial reporting"[168] as of year-end; (iii) KPMG had conducted its "audits in accordance with the standards of the PCAOB,"[169] the Public Company Accounting Oversight Board; and (iv) KPMG had disclosed each Critical Audit Matter as required by PCAOB standards.

139.   KPMG's statements identified in ¶138 were materially false, misleading, and omitted material facts.  Despite KPMG's representations, SVB suffered from significant and ongoing deficiencies in internal controls concerning the Bank's liquidity, interest rate risk, and ability to hold its HTM securities to maturity.  Specifically, these statements omitted material facts threatening SVB's liquidity, including that SVB (a) lacked a functional liquidity limits framework; (b) lacked adequate internal liquidity stress testing; (c) lacked an effective contingency funding plan for stress scenarios; and (d) lacked effective controls around its liquidity risk management.

140.   Further, contrary to KPMG's representations, SVB's interest rate risk management, including as to its investment securities portfolio: (a) suffered from weaknesses in its internal controls related to interest rate risk management; (b) suffered from weaknesses in its internal audit related to interest rate risk management; (c) lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates; (d) used interest rate risk simulations and models that were "not reliable" and instead were "directionally inconsistent" with SVB's financial performance; (e) used ineffective models that lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity

---

[166]   Form 10-K, *supra* note 2.

[167]   *Id*. at 98.

[168]   *Id.*

[169]   *Id.*

AMENDED COMPLAINT

analysis because they only captured parallel interest rate curve changes; and used only "the most basic" interest rate risk measurement, which severely limited the models' utility; (f) had not reviewed for potential recalibration SVB's interest rate risk model limits since 2018; and (g) was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio".[170]  In truth, SVB received a steady stream of adverse supervisory findings, MRIAs and MRAs, and other warnings from the Federal Reserve that demonstrated to SVB that its internal controls were, in fact, ineffective.

141.    Moreover, also contrary to KPMG's representations, SVB could not sufficiently establish in accordance with GAAP the Bank's "positive intent and ability"[171] to hold those securities to maturity, including because: (a) SVB lacked an adequate liquidity limits framework that failed to effectively identify, measure, and monitor liquidity risk; (b) SVB's internal liquidity stress testing failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days; (c) SVB's contingency funding plan failed to adequately include a projection and evaluation of expected funding needs during a stress event; only identified types of contingent funding by source, without accounting for SVB's active contracts or firm limits; and failed to tailor Early Warning Indicators to SVB's liquidity risk profile; and (d) SVB's liquidity risk models lacked sensitivity.  SVB further could not sufficiently establish SVB's "positive intent and ability"[172] to hold those securities to maturity as required by GAAP because the Bank could not reliably and sufficiently assess SVB's needs "in response to changes in market interest rates,"[173] including because: (a) SVB suffered from weaknesses in its internal controls related to interest rate risk; (b) SVB suffered from weaknesses in its internal

---

[170]    Gara & Masters, *supra* note 115.

[171]    Form 10-K, *supra* note 2 at 108.

[172]    *Id.*

[173]    Double Line ETF Trust, Registration Statement (Form N-1A) (February 1, 2024); Double Line ETF Trust, Registration Statement (Form N-1A) (February 3, 2025).

- 51 -

audit related to interest rate risk; (c) SVB lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates; (d) SVB's interest rate risk simulations and models were "not reliable" and instead were "directionally inconsistent" with SVB's financial performance; (e) SVB's models lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only net interest income, "the most basic" interest rate risk measurement, which severely limited the models' utility; (f) SVB's interest rate risk model limits had not been reviewed after 2018 for potential recalibration; and (g) SVB was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio".[174]

142.    Finally, contrary to KPMG's representations, KPMG had not conducted its "audit[s] in accordance with the standards of the PCAOB,"[175] and had further not disclosed each Critical Audit Matter as required by PCAOB standards, including because (a) KPMG was required to take the Federal Reserve's supervisory findings into consideration when conducting its audits (see ¶¶581, 589); (b) the supervisory findings detailed at length the significant deficiencies at SVB, including specifically as to SVB's governance and risk management, liquidity, and interest rate risk management (see ¶¶590-92); (c) these deficiencies identified by the Federal Reserve, and the supervisory reports available to KPMG, indicated material GAAP violations and internal control weaknesses.  Proper adherence to PCAOB standards during KPMG's audits would have led to the conclusion that the Bank's classifications of its HTM investment securities portfolio were in violation of GAAP, and that this misclassification materially affected the Bank's reported financial metrics.  Furthermore, it would have been revealed that SVB lacked sufficient internal controls, precluding KPMG from issuing an unqualified opinion in its audit reports, had PCAOB standards been followed.  Lastly, KPMG neglected to disclose all Critical Audit Matters as required by PCAOB standards, including, but

---

[174]    Gara & Masters, *supra* note 115.

[175]    Form 10-K, *supra* note 2 at 98.

AMENDED COMPLAINT

not limited to, the absence of any disclosure concerning the accounting around the Bank's HTM investment securities, which constituted a critical audit matter under PCAOB standards.

**N.    THE MATERIAL INFORMATION MISSTATED AND/OR OMITTED BY THE OFFERING DOCUMENTS**

143.    Facts demonstrating that the Offering Documents contained untrue statements and omitted material facts are set forth below.

**A.  Statements Concerning SVB's Risk Controls and Their Effectiveness**

144.    As discussed above, the Defendants represented in the Offering Documents that SVB "ha[d] implemented a risk management framework … to manage the types of risk to which we are subject, including, among others, credit, market, liquidity, operational, capital, compliance, strategic and reputational risks."[176] In particular, the Defendants specifically highlighted SVB's "financial, analytical, forecasting or other modeling methodologies" and "risk appetite statement."[177] Analysts particularly focused on SVB's risk controls. For example, market analysts at Wolfe Research flagged that SVB's growth "raise[d] the bar on risk controls, liquidity requirements, and subject[ed] [SVB] to annual supervisory stress testing."[178]

145.    The Federal Reserve has stressed that "[m]anaging risks is fundamental to the business of banking" and "[a]n institution's failure to establish a management structure that adequately identifies, measures, monitors, and controls the risks of its activities has long been considered unsafe-and-unsound conduct."[179] The Federal Reserve has further stressed that "properly managing risks has always been critical to the conduct of safe and sound banking activities and has become even more important as new technologies, product innovation, and the size and speed of financial transactions have changed the nature of banking markets."[180]

---

[176]    *Id.* at 33.

[177]    *Id.*

[178]    Carcache & Lui, *supra* note 7.

[179]    *Supervisory Guidance for Assessing Risk Management at Supervised Institutions with Total Consolidated Assets Less than $100 Billion,* BD. OF GOVERNORS OF THE FED. RSRV. SYS. (February 17, 2021), https://www.federalreserve.gov/supervisionreg/srletters/SR1611a1.pdf.

[180]    *SR 95-51 (SUP): Rating the Adequacy of Risk Management Processes and Internal Controls at the State Member Banks and Bank Holding Companies*, BD. OF GOVERNORS OF THE

146.     Unknown to investors at the time, SVB had neither adequate risk management controls nor a sufficient risk management framework.  To the contrary, as the Federal Reserve repeatedly told SVB privately, SVB's "risk management program [was] not effective," with "weaknesses [that] impact[ed] the effectiveness of the independent risk management functions and the execution of the risk management programs,"[181] and further SVB's risk management framework "lack[ed] needed traction"[182] and was "missing several elements of a sound . . . risk management program."[183] These "deficiencies in practices or capabilities" were so significant that, as the Federal Reserve emphasized, they raised "material financial weaknesses in practices or capabilities," presented a "significant risk," and threatened "the Firm's prospects for remaining safe and sound."[184] Further, these risk management deficiencies had a direct impact on SVB's ability to manage its liquidity and interest rate risk, and the Federal Reserve later concluded that SVB's eventual collapse was "linked directly" to these "risk-management deficiencies."[185]

### 1.   Each of SVB's "Three Lines of Defense" Was Ineffective

147.     As the Federal Reserve frequently told SVB, the Bank's risk management framework "lack[ed] needed traction"[186] and was "missing several elements of a sound . . . risk management program."[187] SVB's "risk management program [was] not effective," with "weaknesses [that] impact the effectiveness of the independent risk management functions and the execution of the risk management programs."[188] These "deficiencies in practices or capabilities"[189] raised "material financial weaknesses in [SVB's] practices or capabilities,"

FED. RSRV. SYS. (February 26, 2021), https://www.federalreserve.gov/boarddocs/srletters/1995/sr9551.htm.

[181]   Letter from the Fed. Rsrv., *supra* note 90.

[182]   Fed. Rep., *supra* note 86.

[183]   Letter from the Fed. Rsrv., *supra* note 90.

[184]   Letter from the Fed. Rsrv., *supra* note 87.

[185]   Fed. Rep., *supra* note 86 at 3.

[186]   *Id.*

[187]   Letter from the Fed. Rsrv., *supra* note 90.

[188]   *Id.*

[189]   Letter from the Fed. Rsrv., *supra* note 87.

- 54 -

presented a "significant risk," and threatened "the Firm's prospects for remaining safe and sound."[190]

148.    In banking, a standard risk management framework includes the following, basic "three lines of defense"[191]:

- *First Line of Defense.*  A bank's "first line of defense" is responsible for designing and implementing the bank's risk controls.  A bank's management team is responsible for the bank's first line of defense.

- *Second Line of Defense.*  A bank's "second line of defense" is responsible for independently evaluating SVB's risk controls.  A bank's chief risk officer is responsible for the bank's second line of defense.

- *Third Line of Defense.*  A bank's "third line of defense" is responsible for providing objective and independent assessment of the first and second lines of defenses, as well as reporting its findings to the bank's board of directors.  A bank's internal audit department is responsible for the bank's third line of defense.

- *Board Oversight*: A bank's board of directors is engaged in the risk management framework by providing oversight of all three lines of defense.

149.    The Federal Reserve consistently reported to SVB that, at the time of the Offering, all three of the Bank's lines of defense, alongside the Board's oversight, suffered from critical weaknesses.  The Federal Reserve's reports to the Bank specifically addressed each of the Bank's "lines of defense" and further identified SVB's "thematic, root cause deficiencies related to ineffective board oversight, the lack of effective challenge by the second line independent risk function, insufficient third line internal audit coverage of the independent risk management function, and ineffective risk reporting."[192] As repeatedly emphasized by the Federal Reserve, SVB's "risk management program is not effective," it is "not comprehensive, does not

---

[190]    *Id.*

[191]    Letter from the Fed. Rsrv., *supra* note 90.
[192]    Letter from the Fed. Rsrv., *supra* note 87.

AMENDED COMPLAINT

incorporate coverage for all risk [categories], and does not address foundational enterprise level risk management matters."[193]

150.   ***SVB's Ineffective "First Line of Defense."*** SVB's First Line of Defense was responsible for designing and implementing the Bank's risk controls.  However, as the Federal Reserve found and specifically told the Executive and Director Defendants, including in a July 9, 2021 Inspection Report concerning SVB's practices as of year-end 2020, SVB's "First Line of Defense" was "insufficient" and its "controls programs" were "inconsistent."[194] The Federal Reserve found that these weaknesses persisted throughout the relevant period.

151.   ***SVB's Ineffective "Second Line of Defense."*** SVB's "Second Line of Defense" was responsible for independently evaluating SVB's risk controls.  However, as the Federal Reserve found and explicitly communicated to SVB, including in its May 31, 2022 Supervisory Letter concerning an examination of SVB's practices throughout 2020 and 2021, SVB's Second Line of Defense "lack[ed] or ha[d] not effectively used its authority and stature," with "no clear mechanism for second line independent risk management to provide effective challenge."[195]  SVB suffered from an "underdevelop[ed] . . . second line independent risk function," including because SVB's Chief Risk Officer was ineffective and failed to "h[o]ld executive sessions" with its Risk Committee.[196]

152.   ***SVB's Ineffective Third "Line of Defense."*** SVB's "Third Line of Defense"—the Bank's Internal Audit group—also suffered from substantial deficiencies, which prevented it from fulfilling its basic function of "assessing the effectiveness of the internal control system."[197] "When properly structured and conducted, internal audit provides directors and senior

---

[193]   Letter from the Fed. Rsrv., *supra* note 87.

[194]   Fed. Rep., *supra* note 86.

[195]   Letter from the Fed. Rsrv., *supra* note 87.

[196]   *Id.*

[197]   Supervisory Letter, *Interagency Policy Statement on the Internal Audit Function and Its Outsourcing*, Fed. Rsrv. at 1 (March 17, 2003), https://www.federalreserve.gov/boarddocs/srletters/2003/sr0305a1.pdf.

AMENDED COMPLAINT

management with vital information about weaknesses in the system of internal control so that management can take prompt, remedial action."[198]

153.    As the Federal Reserve found and specifically told SVB's Board of Directors, including in a Supervisory Letter concerning SVB's practices throughout 2020 and 2021, SVB's Internal Audit's "processes and reporting" suffered from serious "deficiencies" that "negatively affected its ability to provide timely, independent assurance that the Firm's risk management, governance and internal controls were operating effectively."[199]

154.    These deficiencies in the Bank's Internal Audit Group—and the threat posed to SVB from not having an effective independent audit function—were so serious that the Federal Reserve privately issued on May 31, 2022 an MRIA to SVB regarding its deficient Internal Audit Group, which warned the Bank that these deficiencies, which existed throughout the relevant period, were "matters requiring [the] immediate attention" of the Bank.[200]

155.    The Federal Reserve has explained that MRIAs are "matters of significant importance and urgency that the Federal Reserve requires banking organizations to address immediately and include: (1) matters that have the potential to pose significant risk to the safety and soundness of the banking organization; (2) matters that represent significant noncompliance with applicable laws or regulations; [and] (3) repeat criticisms that have escalated in importance due to insufficient attention or inaction by the banking organization"[201] When issued, MRIAs direct that the "board of directors (or executive-level committee of the board), or banking organization is required to immediately" take the actions specified by the Federal Reserve necessary to ameliorate the conditions that led to the MRIA.[202] Likewise, MRAs concern "important" matters that pose a "threat to safety and soundness," and are also directed to the

---

[198]    *Id*.

[199]    Letter from the Fed. Rsrv., *supra* note 87.

[200]    *Id*.

[201]    Federal Reserve, *Supervisory Considerations for the Communication of Supervisory Findings* (June 17, 2013), https://www.federalreserve.gov/supervisionreg/srletters/sr1313a1.pdf.

[202]    *Id*.

- 57 -

AMENDED COMPLAINT

board of directors and executive-level committee of the board, who in turn are required to direct the organization's management to take corrective action.[203]

156.    The Federal Reserve's MRIA regarding SVB's deficient Internal Audit required SVB to "immediately" remediate its Third Line of Defense.[204] Nevertheless, SVB failed to remediate the deficiencies recognized by the Federal Reserve, causing the Bank's regulator to issue yet another report on December 27, 2022, which emphasized again the numerous "material weaknesses" with SVB's Internal Audit function that had existed during the May 2021 Offering and that had continued even after the Federal Reserve's earlier warnings.[205] These and other critical weaknesses in SVB's Internal Audit that existed at the time of the Offering are described below.

157.    *First*, SVB's Internal Audit "did not conduct comprehensive monitoring or project audits to challenge the Firm's overall progress with respect to risk management," including with respect to the specific workstreams "centered on risk management."[206]

158.    *Second*, SVB's Internal Audit likewise failed to "include coverage" (i.e., to execute audit procedures) related to the "Second Line of Defense" in SVB's risk management framework.[207] Under the three lines of defense framework, Internal Audit was required to oversee SVB's Second Line of Defense.  Yet, Internal Audit failed to fulfill its responsibilities.  Among other things, "[d]espite the indicators of weaknesses in the second line independent risk management," SVB's Chief Auditor "did not include coverage of this area in the 2020 or 2021 audit plans."[208]

159.    *Third*, Internal Audit lacked appropriate "risk assessment methodology and

---

[203]    *Id.*

[204]    Letter from the Fed. Rsrv., *supra* note 87.

[205]    Letter from the Federal Reserve to SVB, including the Board of Directors and Defendant Becker (December 27, 2022) (SVBFG and SVB Internal Audit Target Supervisory Letter), https://www.federalreserve.gov/supervisionreg/files/svbfg-and-svb-internal-audit-target-supervisory-letter-20221227.pdf.

[206]    Fed. Rsrv., *supra* note 87.

[207]    *Id.*

[208]    *Id.*

AMENDED COMPLAINT

oversight processes".[209] The Federal Reserve has instructed that a risk assessment methodology must document "the internal auditor's understanding of the institution's significant business activities and their associated risks."[210] These assessments "typically analyze the risks inherent in a given business line, the mitigating control processes, and the resulting residual risk exposure of the institution."[211]

160.    But SVB's Internal Audit function did not possess an effective means of documenting any of SVB's business activities and their associated risks, and even "areas with known weaknesses [at SVB] were not subject to audit despite their ineffective state."[212]

161.    Moreover, as the Federal Reserve found and told the Board of Directors, including in a December 27, 2022 Supervisory Letter discussing "material weaknesses" that existed at the Bank since 2020 without remediation, SVB's Internal Audit's monitoring process was "ineffective."[213] As part of the risk assessment process, an internal audit group must employ a monitoring process that identifies and escalates deficiencies in risk controls. The Federal Reserve has explained that such monitoring processes are needed to "support adjustments to the audit plan or [audit] universe as they occur" and include communicating adverse audit findings to the Bank's audit committee.[214] SVB's monitoring processes, however, "[did] not effectively escalate emerging internal controls issues, nor [did] it adequately cover cross-business line processes or shared services."[215] Even more, SVB was unable to timely identify factors that would "prompt updates" to SVB's audit plan, and its Internal Audit risk assessment processes failed to "effectively analyze the Firm's key risks and risk management functions."[216]

---

[209]    *Id*.

[210]    Letter from the Fed. Rsrv., *supra* note 188 at 5.

[211]    *Id*.

[212]    Letter from the Fed. Rsrv., *supra* note 87.

[213]    Letter from the Fed. Rsrv., *supra* note 196.

[214]    Fed. Rsrv., Supplemental Policy Statement on the Internal Audit Function and Its Outsourcing (January 23, 2013), https://www.federalreserve.gov/supervisionreg/srletters/sr1301a1.pdf.

[215]    Letter from the Fed. Rsrv., *supra* note 203.

[216]    *Id*.

- 59 -

AMENDED COMPLAINT

162. **Fourth**, as the Federal Reserve found, SVB's Internal Audit's execution of its "audit plan" was "not effective."[217] A bank's internal audit group must prepare an "audit plan," which "typically includes a summary of key internal controls within each significant business activity, the timing and frequency of planned internal audit work, and a resource budget."[218]

163. But SVB's Internal Audit's "planning and scoping processes d[id] not provide sufficient oversight."[219] Notably, SVB's "Risk and Control Matrices were not approved by an [Internal Audit] Director or Manager," "end-to-end walkthroughs of the auditable entity were not performed," "internal controls maps or process narratives were not developed," and there were "ineffective mechanisms to check the completeness of the audit scope prior to fieldwork."[220]

164. **Fifth**, as the Federal Reserve further found and told the Board of Directors, including in its May 31, 2022 Supervisory Letter concerning an examination earlier that year of SVB's practices throughout 2020 and 2021, SVB's Internal Audit failed to "hold SVB senior management accountable despite indicators of an ineffective risk management program."[221]

165. **Sixth**, SVB's Internal Audit also failed to "provide sufficient information to allow the Audit Committee to fulfill its oversight responsibilities" or otherwise provide "reporting consistent with other large complex institutions."[222] Among other things, SVB's Internal Audit failed to "provide the Audit Committee with sufficient and timely reporting, or ensure the timely analysis of critical risk management functions and the overall risk management program."[223] These documented failures—specifically identified by the Federal Reserve as "fundamental"— included the following:

- Internal Audit failed to discuss with the Audit Committee "adverse audit results and high-risk issues" and "management action plans;"[224]

---

[217]  *Id.*

[218]  Letter from the Fed. Rsrv., *supra* note 188 at 5.

[219]  *Id*.

[220]  *Id*.

[221]  Letter from the Fed. Rsrv., *supra* note 87.

[222]  *Id*.

[223]  *Id*.

[224]  *Id*.

AMENDED COMPLAINT

- Internal Audit failed to discuss with the Audit Committee any "[c]omprehensive analys[es]," including the "identification of thematic macro control issues and trends and their impact on [SVB's] risk assessment;"[225]
- Internal Audit failed to discuss with the Audit Committee any "[r]emediation plans to address past due audit issues;"[226] and
- Internal Audit failed to discuss with the Audit Committee any "[r]isk management self-assessments" or any "updates of the remediation of issues identified through these self-assessments."[227]

166.    These failures resulted in SVB's internal controls being deficient at the time of the Offering.  The Federal Reserve emphasizes that an audit committee must "ensur[e] that [the internal audit function] operates adequately and effectively" and "addresses the risks and meets the demands posed by the institution's current and planned activities."[228] An audit committee is expected to oversee internal audit staff, "review and approve internal audit's control risk assessment and the scope of the audit plan," and "assess whether management is expeditiously resolving internal control weaknesses and other exceptions."[229] However, as discovered and communicated to SVB by the Federal Reserve, including in its May 31, 2022 Supervisory Letter concerning an examination earlier that year of SVB's practices throughout 2020 and 2021, SVB's Audit Committee did not receive critical and necessary information from SVB's Internal Audit group.[230]

167.    ***SVB's Ineffective Board of Directors.***  A bank's board of directors is ultimately responsible for overseeing a bank's three lines of defense.  The Federal Reserve has explained that a bank's board "serves a critical role in maintaining the firm's safety and soundness and compliance with laws and regulations, as well as the continued financial and operational strength and resilience of a firm's consolidated operations."[231] Nonetheless, the Federal Reserve's findings, communicated to SVB and documented in the May 31, 2022 Supervisory Letter, SVB's

---

[225]    *Id.*

[226]    *Id.*

[227]    *Id.*

[228]    Letter from the Fed. Rsrv., *supra* note 205.

[229]    *Id.*

[230]    Letter from the Fed. Rsrv., *supra* note 87.

[231]    Letter from the Fed. Rsrv., *supra* note 171.

AMENDED COMPLAINT

Board of Directors suffered from "fundamental weaknesses" in its risk management oversight and did "not meet supervisory expectations."[232] The lack of "effective board oversight" resulted in SVB "missing several elements of a sound three lines of defense risk management program."[233]

168. The Federal Reserve's "Supervisory Guidance on Board of Directors' Effectiveness" provides that an effective board of directors must set clear, aligned, and consistent direction regarding a firm's strategy and risk appetite; direct senior management regarding the board's information needs; oversee and hold senior management accountable; support the independence and stature of independent risk management and internal audit; and maintain a capable board composition and governance structure.[234] However, as Federal Reserve concluded and told SVB in its May 31, 2022 Supervisory Letter, SVB's Board of Directors:

- failed to "ensure senior management implements risk management practices commensurate with the Firm's size and complexity;"[235]
- failed to "provide effective oversight of management's responsibility to implement the large financial institution (LFI) readiness initiatives or the foundational risk management program principles applicable for all banks, irrespective of size;"[236]
- failed to "maintain alignment of directors' skills with the Firm's size and complexity";
- failed to "hold senior management accountable to remediate" "risk management weaknesses . . . indicated by breaches of internal risk metrics, internal audits, and past regulatory examinations;"[237]
- failed to "h[o]ld senior management accountable for executing a sound risk management program, [o]r sufficiently challenge[] management on the content of the risk information reported to the board to achieve effective oversight,"[238]
- failed to "meaningfully consider[] in the Firm's incentive compensation program, SVB's "[r]isk management deficiencies, identified by independent risk functions or through regulatory examinations;"[239]
- failed to "adequately challenge management to provide substantive updates on the effectiveness of the Firm's risk management;"[240] and

---

[232] Fed. Rep*., supra* note 86 at 8; Letter from the Fed. Rsrv., *supra* note 87.

[233] Letter from the Fed. Rsrv., *supra* note 87.

[234] Letter from the Fed. Rsrv., *supra* note 171.

[235] Letter from the Fed. Rsrv., *supra* note 90.

[236] *Id*.

[237] *Id*.

[238] *Id*.

[239] *Id*.

[240] *Id*.

AMENDED COMPLAINT

- failed, through the Audit Committee, to "effectively challenge the [Chief Auditor] on the adequacy of [Internal Audit] coverage," including areas with "known weaknesses."[241]

169. The Federal Reserve also discovered and communicated SVB's Board of Directors that SVB's "board composition lack[ed] depth and experience," including because "the board lack[ed] members with relevant large financial institution risk management experience."[242] SVB's Board of Directors failed to conduct "effective oversight" and failed to "hold management accountable for the thematic root causes contributing to the supervisory findings related to . . . liquidity risk management and second line independent risk."[243]

### 2. SVB Failed to Incorporate Appropriate Risk Appetite Metrics and Set Risk Limits

170. Banks with total assets of $100 billion or more are required to prepare appropriate "risk appetite" metrics. These metrics measure "the aggregate level and types of risk" that the banking institution will assume to "achieve [its] strategic business objectives, consistent with applicable capital, liquidity, and other requirements and constraints."[244]

171. Principal risks facing SVB included "model risk," "third party-management" risk, and "human capital risk." "Model risk" is "the potential for adverse consequences from decisions based on incorrect or misused model outputs and reports."[245] "Third party management risk" concerns risks involved during the life cycle of third-party relationships, such as planning, due diligence and third-party selection, contract negotiation, ongoing monitoring, and termination.[246] And "human capital risk" is the gap between a firm's human capital requirements and its existing workforce.

---

[241]    *Id*.

[242]    *Id*.

[243]    Letter from the Fed. Rsrv., *supra* note 90; Letter from the Fed. Rsrv., *supra* note 87.

[244]    Large Financial Institution Rating    System, BD. OF GOVERNORS OF THE FED. RSRV. SYS. (February 28, 2019), https://www.federalreserve.gov/supervisionreg/srletters/sr1903.pdf.

[245]    Supervisory Guidance on Model Risk Management, BD. OF GOVERNORS OF THE FED. RSRV. SYS. (April 4, 2011), https://www.federalreserve.gov/supervisionreg/srletters/sr1107a1.pdf.

[246]    Proposed Interagency Guidance on Third-Party Relationships: Risk Management, FED. REG. (July 19, 2021), https://www.federalregister.gov/documents/2021/07/19/2021-15308/proposed-interagency-guidance-on-third-party-relationships-risk-management.

- 63 -

AMENDED COMPLAINT

172. As the Federal Reserve discovered and communicated to SVB, including in its May 31, 2022 Supervisory Letter concerning SVB's practices throughout 2020 and 2021, SVB's risk management "framework [did] not incorporate sufficient [risk appetite] metrics for model risk, third party management risk, and human capital risk."[247] SVB's failure to incorporate sufficient risk appetite metrics addressing these risks caused significant weaknesses in SVB's risk management.

173. SVB also failed to set appropriate "risk limits" at the time of the Offering. Risk limits are "thresholds that constrain risk-taking so that the level and type of risks assumed remains consistent with the firm-wide risk appetite."[248] As the Federal Reserve found and instructed SVB, SVB's "program framework poorly define[d] standards for setting/approving risk limits and reporting/escalating internal control exceptions."[249] SVB's failure to define standards for setting and approving risk limits weakened its risk management. The Bank's failure was so severe, in fact, that the Federal Reserve issued a MRIA in May 2022 concerning SVB's deficient risk management program, which remained unremedied at the time of the Bank's demise in March 2023.[250]

### 3. SVB Lacked Adequate Resources, Personnel, and Leadership for its Risk Management Function, Including an Effective Chief Risk Officer

174. SVB's risk management controls suffered from further fundamental weaknesses, including SVB's failure to maintain adequate risk management personnel and resources. The Federal Reserve has instructed that a bank's senior management must "ensure[] that its lines of business are managed and staffed by personnel with knowledge, experience, and expertise consistent with the nature and scope of the banking organization's activities."[251] SVB failed to meet these basic requirements at the time of the Offering.

---

[247]   Letter from the Fed. Rsrv., *supra* note 87.

[248]   Letter from the Fed. Rsrv., *supra* note 171.

[249]   Letter from the Fed. Rsrv., *supra* note 87.

[250]   *Id*.

[251]   Letter from the Fed. Rsrv., *supra* note 170; Letter from the Fed. Rsrv. 171.

- 64 -

175.   *First*, as the Federal Reserve found in an examination concerning SVB's risk management practices, SVB "lack[ed] qualified leadership and project management discipline" and neglected to allocate the necessary resources to "address[] the existing [risk management] deficiencies across all three lines of defense."[252] These failures, the Federal Reserve explained, "contribut[ed] to [SVB's] ineffective risk management program."[253]

176.   *Second*, at the time of the Offering, the weaknesses in SVB's risk management personnel extended directly to SVB's Chief Risk Officer, Laura Izurieta—an executive required by regulation and who was supposed to be personally responsible for SVB's "Second Line of Defense." However, as the Federal Reserve found, Izurieta lacked the experience necessary for the Chief Risk Officer role.[254] Izurieta failed to recognize the "weaknesses" in SVB's risk management, including weaknesses in SVB's third-party gap assessment from its growth in regulatory status, and further exacerbated the "underdevelopment" of SVB's second line of defense.[255]

177.   The Federal Reserve conveyed these findings to Executive Defendant Becker, leading to Executive Defendant Becker informing the Federal Reserve in February 2022 of their intent to terminate Izurieta.  In doing so, Executive Defendant Becker implicitly acknowledged that Izurieta was, and continued to be, an inadequate and ineffective Chief Risk Officer.  Despite this, SVB failed to rectify its weaknesses in risk management; indeed, after notifying the Federal Reserve by no later than February 2022 of their plan to fire the Chief Risk Officer, SVB nonetheless failed to appoint any replacement Chief Risk Officer until the beginning of 2023. This entire period—from April 2022 until January 4, 2023—saw SVB operating without a Chief Risk Officer, in direct violation of federal regulations requiring that it "must appoint a chief risk

---

[252]   Letter from the Fed. Rsrv., *supra* note 87.

[253]   *Id.*

[254]   Fed. Rep*., supra* note 86 at 48-49.

[255]   Letter from the Fed. Rsrv., *supra* note 87.

AMENDED COMPLAINT

officer with experience in identifying, assessing, and managing risk exposures of large, complex financial firms."[256]

### 4. SVB Failed to Maintain Risk Management Controls Consistent With Its Growth and Size

178. By the time of the Offering, SVB had failed to implement the necessary risk management measures to accommodate its rapid growth and increased size. The Federal Reserve has articulated that "[t]he sophistication of risk monitoring and management information systems should be consistent with the complexity and diversity of the institution's operations." The Federal Reserve classifies supervised firms into 'portfolios' (i.e., groups), tailoring supervisory activities to a firm's risks, size, complexity, and business activities. After its rapid expansion between 2018 and 2020, SVB attained the status of a "Large Financial Institution" ('LFI') in February 2021. As an LFI, SVB was required to develop and execute an "LFI transition plan," as well as an enhanced prudential standards ("EPS") gap assessment. An LFI transition plan is developed by a bank when it transitions from being a Regional Financial Institution (with less than $100 billion in total assets) to a Large Financial Institution (with more than $100 billion in total assets) and requires a bank to assess its risk management abilities. Meanwhile, an "EPS gap assessment" is an assessment and remediation plan for gaps between a bank's current regulatory compliance and the heightened standards applicable to LFIs.

179. In August 2020, the Federal Reserve instructed SVB to perform an EPS gap assessment, recognizing its growth. SVB, however, outsourced this task to McKinsey & Co. instead of conducting it internally. The Federal Reserve subsequently found that McKinsey "failed to design an effective program" for assessing SVB's inadequate risk controls, producing a report deemed to have "weaknesses." The botched development and implementation of SVB's LFI transition plan and EPS gap assessment led the Federal Reserve to require SVB in August 2022 to "re-develop a Risk Transformation Project two years after their original LFI gap assessment and transition plan."[257] As the Federal Reserve further concluded and communicated

---

[256]     12 C.F.R. §252.33(b).

[257]     Letter from the Fed. Rsrv., *supra* note 90.

- 66 -

AMENDED COMPLAINT

to SVB, "[SVB] experienced significant growth but did not maintain a risk management function commensurate with the growing size and complexity of the firm."[258]

180.    SVB failed to address these critical deficiencies even after achieving LFI status in 2021.  As determined and communicated by the Federal Reserve to SVB, including in its May 31, 2022 Supervisory Letter concerning an examination earlier that year of SVB's practices throughout 2020 and 2021, SVB's risk management framework was not "commensurate to the [Bank's] size and complexity as required" under the rules governing LFIs.  The Federal Reserve consequently issued an MRIA to SVB, citing weaknesses in the Bank's "LFI readiness transition plan, risk management programs and functions, and integration of acquired entities," including the Internal Audit Group's failure to conduct "comprehensive monitoring [and] project audits to challenge the Firm's overall progress with respect to risk management and LFI readiness."[259] Notwithstanding these harsh criticisms, SVB never remedied these MRIAs prior to the Bank's failure in March 2023.

**B.  Statements Concerning SVB's Risk Models and Their Effectiveness**

181.    Banks, such as SVB, utilize models to identify and measure risks, value exposures, conduct stress tests, assess capital adequacy, measure compliance with internal limits, and meet financial or regulatory reporting requirements.[260]  The Federal Reserve has clarified, however, that a bank's use of models presents risks—specifically, "the potential for adverse consequences from decisions based on incorrect or misused model outputs and reports."[261]  This model risk can lead to "financial loss, poor business and strategic decision making," or reputational damage.[262]

182.    The Federal Reserve directs banks, like SVB, to manage model risk through "governance and control mechanisms such as board and senior management oversight, policies and procedures, controls and compliance, and an appropriate incentive and organizational

---

[258]    *Id.*

[259]    Letter from the Fed. Rsrv., *supra* note 87.

[260]    *Supervisory Guidance on Model Risk Management*, FED. RSRV. (April 4, 2011), https://www.federalreserve.gov/supervisionreg/srletters/sr1107a1.pdf.

[261]    *Id.*

[262]    *Id.*

AMENDED COMPLAINT

structure."[263]  "Rigorous model validation," "sound development, implementation, and use of models" all occupy critical roles in model risk management.[264]  Another "guiding principle for managing model risk" is the "effective challenge" of models—specifically, the "critical analysis by objective, informed parties who can identify model limitations and assumptions and produce appropriate changes."[265]

183.    SVB's management of its model risk suffered from critical limitations at the time of the Offering.  As the Federal Reserve found and told SVB, including in a March 2019 Examination Report, SVB lacked "effective ongoing performance monitoring programs for each model used" and had "no ongoing monitoring program" for all but one of its 30 models used.[266]

184.    Yet again, on November 19, 2019, the Federal Reserve chastised SVB for continuing to make "large  model  overlay/assumptions" that were "not  appropriately identified."[267]  The Federal Reserve issued new MRAs to the Bank at that time "to reflect the remaining work needed to address the underlying supervisory concerns," including specifically as to SVB's deficient models.[268]  As the Federal Reserve communicated to SVB in its November 19, 2019 Supervisory Report, SVB's models lacked a "transparent and repeatable process for setting capital limits and buffers."  This deficiency posed the risk that SVB's "board and senior management may rely on stress testing results that do not accurately reflect the risk appetite."[269]

185.    The deficiencies in SVB's model risk management persisted without remediation during the entire time of the Offering.  Federal Reserve reviews of SVB's model risk management revealed that the Bank's models "appl[ied] material qualitative adjustments with

---

[263]    *Id.*

[264]    *Id.*

[265]    *Id.*

[266]    Letter from the Federal Reserve to SVB, including the Board of Directors, Executive Director Becker and Director Defendants Dunbar, Benhamou, Clendening, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter, 2018 CAMELS Examination Report (March 6, 2019), https://www.federalreserve.gov/supervisionreg/files/svb-2018-camels-examination-report-20190306.pdf.

[267]    Letter from Fed. Rsrv., *supra* note 105.

[268]    *Id.*

[269]    *Id.*

AMENDED COMPLAINT

known conceptual soundness weaknesses and inadequate compensating controls."[270]   As the Federal Reserve determined, these weaknesses in model risk management presented a "safety and soundness concern," including the risk of "inaccurate capital projections," and "prevent[ed] firm management and the board of directors from making informed capital planning decisions."[271]

### C. Statements Concerning SVB's Interest Rate Risk Controls and Their Effectiveness

186.   Throughout the Offering period, both the Federal Reserve and market analysts maintained a sharp focus on SVB's exposure to interest rate risk and its corresponding management, including the effects of interest rate changes on SVB's substantial (and still-growing) portfolio of "held-to-maturity" securities.   Managing interest rate risk is particularly crucial for financial institutions like SVB because fluctuations in interest rates can exert significant pressure on a bank's capital and liquidity.   Throughout the Offering period, SVB's management of interest rate risk was particularly important to the health of the Bank because, among other things: (i) almost half of its assets consisted of tens-of-billions of dollars of long-term securities that faced increased exposure to changing interest rates due to their lengthy durations; and (ii) around the time of the Offering, increases in the Federal interest rate were widely understood to be imminent.   Indeed, SVB acknowledged in its SEC filings that interest rates were SVB's "primary market risk," which it supposedly guarded against through its extensive "interest rate management" framework.

187.   Unknown to investors at the time, however, SVB's interest rate risk management "exhibited many weaknesses" throughout the time of the Offering—a fact that the Federal Reserve told SVB, but that they did not disclose to investors.[272]

#### 1. The Models Used by SVB for Interest Rate Risk Management Were Unreliable and Ineffective

188.   As discussed above, SVB represented that it managed interest rate risk through the use of "modeling."   SVB specifically highlighted SVB's "simulation model," which purportedly

---

[270]   Letter from the Fed. Rsrv., *supra* note 89.

[271]   *Id*.

[272]   Fed. Rep*., supra* note 86 at 62.

- 69 -

applied "a variety of interest rate scenarios, balance sheet forecasts and business strategies" and provided "a dynamic assessment of interest rate sensitivity" that was "embedded" into SVB's balance sheet.[273]  However, investors were unaware at the time that the models SVB used for interest rate risk management suffered from fundamental weaknesses during the Offering.  As the Federal Reserve specifically determined and privately communicated to SVB, including in a November 15, 2022 Supervisory Letter based on its 2022 examination, SVB's interest rate risk simulations and models were "not reliable" and, even more concerningly, were "directionally inconsistent" with SVB's financial performance.[274] And as the Government Accountability Office explained in its own post-mortem report analyzing SVB's collapse (the "GAO Report"), SVB failed to manage its interest rate risk, which it became exposed to through its investments in longer-term debt securities. The GAO Report concluded that the Bank "did not effectively manage the interest rate risk of the securities or develop appropriate interest rate risk-management tools, models, or metrics."[275]

189.    *First*, SVB failed to properly design an interest rate risk model.  SVB's interest rate risk policy failed to "specify scenarios to be run, how assumptions should be analyzed, how to conduct sensitivity analysis, or articulate model back-testing requirements."[276]  SVB's models also failed to include necessary components.  For example, "an important piece in understanding [interest rate risk] sensitivity" is "the sensitivity of the portfolio to different movements in the shape of the yield curve."[277]  However, SVB just applied "limited sensitivity testing" that only modeled "parallel [interest] rate curve changes"—in other words, SVB only modeled economic conditions where the interest rate for all of its securities changed by the same number of basis points at the same time, as opposed to conditions where yields across different maturities shifted

---

[273]    Form 10-K, *supra* note 2 at 95.

[274]    Letter from Fed. Rsrv., *supra* note 107.

[275]    Preliminary Review of Agency Actions Related to March 2023 Bank Failures, U.S. Gov.'t Accountability Off. (April 2023) ("GAO Report") at 16-17.

[276]    Fed. Rep*., supra* note 86 at 62.

[277]    *Id*.

AMENDED COMPLAINT

by different amounts.[278] This unrealistic "testing" was inadequate to capture "the sensitivity of the portfolio to different movements in the shape of the yield curve."[279]

190. Further, SVB's interest rate risk modeling "only used the most basic [interest rate risk] measurement"—i.e., net interest income.[280] Consequently, SVB's interest rate risk modeling "ignored potential longer-term negative impacts to earnings highlighted by the EVE metric,"[281] which provided a longer-term view of interest rate risk by estimating the present value of balance sheet cashflows. SVB's approach of using only this "most basic measurement" for interest rate modeling ignored, among other things, that SVB's assets would decrease in value because of future interest rate increases.

191. Finally, a necessary and basic component of any interest rate risk modeling is "model limits." Model limits articulate and control for the amount of interest rate risk acceptable to a firm and take into account the size, complexity, and financial condition of the organization. However, as the Federal Reserve has explained, "since at least 2018," it was "not apparent that [SVB's model] limits had been reviewed for potential recalibration or that the current level of the limits had been supported."[282] In essence, SVB failed to reassess its model limits for at least five years preceding the Bank's collapse. This oversight was especially egregious, given SVB's substantial expansion between 2018 and 2023, encompassing the purchase of tens-of-billions of dollars in long-term investment securities, which materially affected its vulnerability to interest rate risk. Moreover, as the Federal Reserve explained, SVB's "policies" did not even define "how limits [for its interest rate risk models] were set and calibrated."[283]

192. **Second**, the Bank failed to properly address breaches of its models' interest

---

[278] *Id.*; *see also* Letter from Fed. Rsrv., *supra* note 107.

[279] Fed Rep*., supra* note 86 at 62.

[280] *Id.*

[281] *Id.* at 61.

[282] *Id.* at 62.

[283] *Id.*

- 71 -

rate thresholds—i.e., instances when its models showed that increases in interest rates would have negative impacts on SVB's balance sheet beyond thresholds previously determined to be acceptable.    As the Federal Reserve found, SVB failed to "specify the ongoing reporting requirements for threshold breaches [in their interest rate risk management models] over prolonged periods."[284]  In fact, SVB responded to such model breaches by "simply chang[ing] the model's assumptions," such that the model thereafter "predicted that rising interest rates would have minimal impact."[285]

193.    As SVB's deposit base grew, its EVE model showed during mid-2020 (i.e., just prior to the first Offering) that "higher interest rates could have a devastating impact on the bank's future earnings."[286]  However, "[i]nstead of heeding that warning—and over the concerns of some staffers—SVB executives simply changed the model's assumptions," so that the model showed that "rising interest rates would have minimal impact."[287]  SVB's CFO, Beck in particular "[p]ush[ed] for the change in assumptions," in order to "validate[] SVB's profit-driven strategy"—all without any basis in reality or fact.[288]

194.    SVB's interest rate models continued to show breaches in SVB's internal limits for years.[289] SVB continued to "[make] counterintuitive modeling assumptions about the duration of deposits to address the limit breach rather than managing the actual risk."[290]   Indeed, in the second quarter of 2022, SVB made EVE modeling changes that "gave the appearance of reduced [interest rate risk]," but "no risk [was] taken off the balance sheet."[291]  As the Federal Reserve has explained, these modeling changes again were unwarranted and baseless given SVB's "deposit

---

[284]    *Id*.

[285]    Daniel Gilbert, Todd C. Frankel, et al., *Silicon Valley Bank's risk model flashed red. So its executives changed it*, THE WASHINGTON POST, April 2, 2023, https://www.washingtonpost.com/business/2023/04/02/svb- collapse-risk-model/.

[286]    *Id*.

[287]    *Id*.

[288]    *Id*.

[289]    Fed. Rep*., supra* note 86 at 3, 62.

[290]    *Id*. at 3.

[291]    *Id*. at 63.

AMENDED COMPLAINT

growth, lack of historical data, rapid increases in rates that shorten[ed] deposit duration, and the uniqueness of [SVB]'s client base."[292]

195.    *Third*, SVB's Internal Audit—the supposed "Third Line of Defense" in SVB's risk management framework—had itself pinpointed serious deficiencies in the Bank's models. Specifically, SVB's Internal Audit Group made "findings related to incorrect data inputs, inadequate governance of [interest rate risk] models, and inaccurate [SVB's net interest income] position dating back to December 2020."[293]  Nevertheless, SVB withheld these crucial facts from investors, and Internal Audit failed to implement any corrective measures.  As the Federal Reserve observed, SVB's Internal Audit "did not have the internal stature to drive remediation."[294]

196.    *Finally*, SVB's internal liquidity stress testing also failed to properly assess the impact of changes in interest rates.  In fact, the Federal Reserve determined and told them, including in a November 2, 2021 Supervisory Letter following an examination of SVB's liquidity management practices earlier in 2021, that the Bank's internal liquidity stress testing was erroneously "based on historical simulation" alone, and did not include a "forward-looking assessment of the firm's risks."[295]  As the Federal Reserve determined, the Bank's stress testing failed to include necessary "scenario design elements" to address changes in interest rate.[296] Moreover, SVB failed to cure this substantial defect, despite admitting in its public filings that changes to interest rates were SVB's "primary market risk."

### 2.  Additional Weaknesses in SVB's Interest Rate Risk Management

197.    In addition to the above, SVB's interest rate risk management suffered from other significant deficiencies throughout the time of the Offering.

---

[292]    *Id.*

[293]    *Id.* at 64.

[294]    *Id.*

[295]    Letter from the Fed. Rsrv., *supra* note 112.

[296]    *Id.*

- 73 -

AMENDED COMPLAINT

198.    As SVB's third-party consultant, BlackRock Inc. ("BlackRock") determined and documented an analysis completed in June 2021 and subsequently communicated to SVB's senior management by no later than January 2022, that SVB's risk controls were "substantially below" its peers.  BlackRock further found—and privately informed the Bank's executives—that "SVB was unable to generate real time or even weekly updates about what was happening to its securities portfolio" and the response of its portfolio to "rising interest rates and broader macroeconomic conditions."  Despite these significant deficiencies in its risk controls, SVB declined BlackRock's offers to address them.[297]

**D.  Statements Concerning SVB's Liquidity Controls and Their Effectiveness**

199.    As described above, Defendants made repeated representations to investors concerning SVB's purported access to liquidity.  These representations were material, particularly given the rapid growth in SVB's deposits and accumulation of long-duration securities.

200.    Unknown to investors at the time, SVB's liquidity controls suffered from substantial weaknesses throughout the time of the Offering, which contributed to the Bank's failure in March 2023.  These widespread weaknesses directly impacted the accuracy of SVB's financial reporting, precluding the Bank from properly classifying their investment securities portfolio as "HTM."

201.    As the Federal Reserve explicitly told the Bank, including in a November 2, 2021 Supervisory Letter following an early-2021 examination of SVB's liquidity management practices, SVB's liquidity and liquidity risk management practices suffered from foundational shortcomings in the "key elements" necessary for SVB's "longer term financial resiliency."[298] Specifically, SVB: (i) lacked a functional liquidity limits framework; (ii) lacked adequate internal liquidity stress testing; (iii) lacked an effective contingency funding plan for stress scenarios; and (iv) lacked effective controls for liquidity risk management.[299]  The GAO Report further explained that SVB's failures existed for years before the Bank's collapse.  For example, in 2018,

---

[297]    Gara & Masters, *supra* note 115.

[298]    Letter from the Fed. Rsrv., *supra* note 112.

[299]    *Id.*

- 74 -

the Federal Reserve "found that despite liquidity levels appearing strong, funding sources were concentrated and potentially volatile on short notice."[300]  As the GAO Report summarized, "in 2018, 2019, and 2020," the Federal Reserve "also issued or had outstanding matters requiring attention related to risk management and liquidity."[301]

202.    Given the gravity of SVB's deficiencies, in a letter dated November 2, 2021, the Federal Reserve privately issued two MRIAs and four MRAs to the Exchange Act Defendants, demanding prompt remediation of these shortcomings in controls around liquidity risk management.[302]  SVB, however, failed to rectify these serious weaknesses, which prompted the Federal Reserve to again reprimand the Bank 10 months later for the "material financial weaknesses" caused by the "[k]ey liquidity risk management deficiencies, identified in the Liquidity Target Examination supervisory letter issued on November 2, 2021."[303]  These material financial weaknesses "place[d] the Firm's prospects for remaining safe and sound through a range of conditions at risk if not resolved in a timely manner."[304]

203.    These weaknesses were so substantial that in August 2022, the Federal Reserve formally advised SVB's top executives of its intention to institute an enforcement action "designed to hold [SVB's] board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management."[305]  Nevertheless, as further discussed below, SVB still failed to remediate these weaknesses before the Bank's demise in March 2023.

---

[300]    GAO Report at 19-20.

[301]    *Id.*

[302]    Letter from the Fed. Rsrv., *supra* note 112.

[303]    Letter from the Fed. Rsrv., *supra* note 90.

[304]    *Id.*

[305]    *Id. See also* GAO Report at 23 (the Federal Reserve began to initiate the enforcement action, "focused on correcting the management and liquidity risk issues . . . and were designed to hold the bank's board and executive management accountable for addressing the root cause deficiencies contributing to ineffective governance and risk management").

- 75 -

**1. SVB Lacked an Adequate Liquidity Limits Framework**

204.   A "liquidity limit" ensures that a bank maintains adequate liquidity.   SVB's outside consultant, McKinsey, has explained, banks "need to develop limits and early warning indicators on liquidity usage across different businesses, to ensure that tools are in place to limit liquidity usage."[306]

205.   While SVB, like other financial institutions, set an internal "liquidity limit," the Federal Reserve found that the Bank's approach to this was "inadequate for the purpose of measuring, monitoring, and controlling risks." This inadequacy stemmed partly from SVB's lack of proper systems and processes for liquidity risk identification, measurement, and monitoring.[307] Moreover, SVB's approach to setting its liquidity limit did not reflect the degree of liquidity risk acceptable for its business model.[308]  Thus, by 2021, the Federal Reserve had specifically told SVB that it "was doing a bad job of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble."[309]

206.   The Federal Reserve specifically identified the weaknesses in SVB's liquidity limit, which included the following:

- SVB "lack[ed] meaningful limits for [its] primary sources of liquidity risk, including funding concentrations and off-balance sheet exposures, such as those that come from committed and uncommitted loan facilities";[310]
- SVB set its liquidity limits based on "static metrics that neither reflect[ed] the interconnectedness of the firm's liquidity risks, nor account[ed] for liquidity stress testing outcomes";[311] and
- SVB failed to link any liquidity limits "to the firm's liquidity risk appetite."[312]

---

[306]   McKinsey Working Papers on Risk, Liquidity: Managing an Undervalued Resource in Banking After the Crisis of 2007-2008, MCKINSEY & CO. (September 2008), https://www.mckinsey.com/~/media/mckinsey/dotcom/client_service/risk/working%20papers/4_1 iquidity_managing_an_undervalued_resource_in_baning_after_the_crisis_of_20072008.pdf at 7.

[307]   Letter from the Fed. Rsrv., *supra* note 112.

[308]   *Id*.

[309]   Jeanna Smialek, *Before Collapse of Silicon Valley Bank, the Fed Spotted Big Problems*, THE NEW YORK TIMES (March 19, 2023), https://www.nytimes.com/2023/03/19/business/economy/fed-silicon-valley-bank.html.

[310]   Letter from the Fed. Rsrv., *supra* note 112.

[311]   *Id*.

[312]   *Id*.

- 76 -

AMENDED COMPLAINT

207.    The Federal Reserve specifically identified these deficiencies for SVB, including in a November 2, 2021 Supervisory Letter, and further warned that SVB's deficient approach to setting its liquidity limit meant that it would "underestimate the demands on available liquidity sources in stress."[313]   These significant financial weaknesses in its liquidity controls, which existed at the time of the Offering, exposed the Bank to a potential "run on the bank" if many customers began to withdraw their deposits in rapid succession. Indeed, as explained in the GAO Report, Federal Reserve staff noted that "SVB failed due to ineffective risk management, including the management of its deposits and assets."[314]

**2.    SVB's Internal Liquidity Stress Testing Suffered from Critical Material Financial Weaknesses**

208.    As a large financial institution with over $100 billion in assets, SVB was required to conduct "stress tests" in accordance with banking regulations.  "Stress tests" evaluate a bank's ability to address and withstand "institution-specific and market wide events across multiple time horizons."[315]   The results of stress tests are used to "identify and quantify sources of potential liquidity strain and to analyze possible impacts on the institution's cash flows, liquidity position, profitability, and solvency," and to "ensure that [the bank's] current exposures are consistent with [its] established liquidity risk tolerance."[316]

209.    One particular type of required stress test is "liquidity stress testing." Liquidity stress testing is used to "estimate future funding surpluses and shortfalls," including specifically an institution's ability to "fund expected asset growth projections or sustain an orderly liquidation of assets under various stress events."[317]

210.    SVB's liquidity "stress tests" were ineffectual and suffered from material weaknesses.  As the Federal Reserve found and privately told SVB, including in a May 3, 2021

---

[313]    *Id.*

[314]    GAO Report at 16.

[315]    *Interagency Policy Statement on Funding and Liquidity Risk Management*, BD. OF GOVERNORS    OF    THE    FED.    RSRV.    SYS.    (March    17,    2010), https://www.federalreserve.gov/boarddocs/srletters/2010/sr1006a1.pdf.

[316]    *Id.*

[317]    *Id.*

- 77 -

AMENDED COMPLAINT

Examination Report, SVB's "liquidity stress test time horizons do not currently provide short term insight into the interim of one to 30 days"—i.e., they did not provide information concerning periods 30 days or less.[318]

211.    The Federal Reserve further found and told SVB's executives, including in a November 2, 2021 Supervisory Letter, that SVB's internal liquidity stress testing did "not adequately address both market and idiosyncratic risks," did "not sufficiently stress [SVB]'s liquidity exposures," and did "not reflect a forward-looking assessment of the firm's risks."[319] Worse yet, the key assumptions underlying the stress tests were defective and deficient.  SVB's key assumptions underlying its "stress tests" were based on "incomparable peer benchmarks," consisting of retail deposit banks that (unlike SVB) were subject to FDIC insurance coverage.[320] Additionally, SVB's "stress tests" lacked "velocity and severity of stress factors" necessary to properly analyze liquidity stress "over the shorter time horizons of a defined liquidity event."[321] Finally, SVB's liquidity "stress tests" improperly assumed that all of the Bank's deposits would behave similarly under stress—an assumption that the Federal Reserve rightly found was "unrealistic" and "understate[d] outflows under stress," including because SVB's management itself "acknowledged the outflows of its commercial deposits would vary in stress."[322]

212.    As a result of these weaknesses in its liquidity stress testing, the Federal Reserve concluded and confidentially told SVB, including in its November 2, 2021 Supervisory Letter, that it had an "insufficient" liquidity "buffer"—i.e., insufficient liquid assets to meet its ongoing cash outflow needs.[323]

---

[318]    CAMELS Report from the Federal Reserve to SVB, including the Board of Directors, 2020 CAMELS Examination Report (May 3, 2021).  Director Defendants Dunbar, Matthews, Benhamou, Clendening, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell, and Staglin received this letter, https://www.federalreserve.gov/supervisionreg/files/svb-2020-camels-examination-report-20210503.pdf.

[319]    Letter from the Fed. Rsrv., *supra* note 112.

[320]    SVB's deposit base was largely commercial deposits without FDIC insurance coverage.

[321]    Letter from the Fed. Rsrv., *supra* note 112.

[322]    *Id*.

[323]    *Id*.

AMENDED COMPLAINT

213.   SVB also lacked at the time of the Offering an appropriate "contingency funding plan," which is another basic and fundamental aspect of liquidity management.   All banks are required to have a contingency funding plan that provides a framework for how they will evaluate and address liquidity shortfalls and monitor the accessibility of funding upon a stress event, such as, e.g., the bank run that occurred prior to the bankruptcy filing.

214.   As the Federal Reserve found and specifically told SVB, including in a November 2, 2021 Supervisory Letter, SVB's "contingency funding plan" suffered from weaknesses, including that SVB's contingency funding plan improperly:

- lacked a "projection and evaluation of expected funding needs and funding capacity" during a stress event;[324]
- "lack[ed] a realistic assessment" of how purported providers of contingency funds "would behave under stress";[325] and
- lacked an accurate identification of the amounts of contingent funding actually available, including by improperly assuming "far more" funding from certain sources than available.[326]

215.   Additionally, SVB improperly failed to modify "early warning indicators" for SVB's contingency funding plan to SVB's specific "liquidity risk profile."[327]   "Early warning indicators" are the alert mechanisms that activate a bank's contingency funding plan in stress scenarios.   The early warning indicators within SVB's contingency funding plan, however, were not tailored to SVB's "specific risk profile," including because they ignored SVB's billions of unfunded loan commitments—i.e., contractual obligations made by SVB to customers for future funding—and did not have "any specific metrics oriented towards private equity and venture capital despite [SVB's] business model centered on these types of clients."[328]   Consequently, SVB's early warning indicators were ineffective in initiating its contingency funding plan in stress scenarios.[329]

---

[324]   *Id.*

[325]   *Id.*

[326]   *Id.*

[327]   *Id.*

[328]   *Id.*

[329]   *Id.*

- 79 -

AMENDED COMPLAINT

216.    SVB's ineffective "contingency funding plan" posed significant risks to the Bank. The Federal Reserve detected and informed SVB, including in its November 2, 2021 Supervisory Letter, that the weaknesses in SVB's contingency funding plan "negatively affect[ed] management's ability to assess whether the firm is under liquidity stress, what funding is available in varying levels of stress, and its ability to respond quickly to a real stress event."[330]

### 3.    SVB Suffered from Material Financial Weaknesses in Its Controls for Liquidity Risk Management

217.    SVB also lacked successful risk management controls and planning around SVB's "liquidity risk management" at the time of the Offering.  As the Federal Reserve examiners concluded and privately told SVB, including in a November 2, 2021 Supervisory Letter SVB suffered from a host of weaknesses in liquidity risk management controls, including that:

- SVB's governance and controls did not "clearly link[]" to liquidity risk management;[331]
- SVB's did not prioritize model risk management for liquidity;[332]
- SVB's liquidity risk model used an "inappropriate" time horizon and other improper data sources and scenarios;[333] and
- SVB Internal Audit failed to review SVB's contingency funding plan since 2019, despite significant changes in SVB's liquidity risk profile.[334]

### E.    Statements Concerning SVB's Held-to-Maturity Securities

218.    As discussed above SVB classified tens-of-billions of dollars of its investment securities as HTM in its financial statements included in its SEC filings and in the Offering Documents.  SVB also reclassified billions-of-dollars more of investment debt securities that the Bank had previously accounted for as "available for sale" ("AFS") as HTM.  By the end of 2021, SVB's HTM securities made up 47% of its assets—almost eight times greater that of the average

---

[330]    *Id.*

[331]    *Id.*

[332]    *Id.*

[333]    *Id.*

[334]    *Id.*

- 80 -

AMENDED COMPLAINT

peer large financial institution. Furthermore, while loans typically comprise a greater proportion of a large banking organization's overall assets, around the time of the Offering, SVB's investment securities conversely comprised a far greater proportion of SVB's overall assets.

219. It was critical that SVB's classifications of its investment debt securities complied with GAAP. The value of SVB's assets—including in particular its massive debt security portfolio—were keenly at focus during the Offering given the Federal Reserve was expected to raise interest rates, and in fact began to do so in 2022. By classifying tens-of-billions of dollars of securities as "HTM," SVB represented that they had a reliable basis to determine that it had both the "positive intent and ability" to "hold" each security "to maturity." SVB, through this action, managed to avoid disclosing any declines in the fair value of the securities, which were a direct consequence of the Federal Reserve's interest rate hikes. In fact, by the time of the final Offering in April 2022, the fair value of SVB's HTM investment securities had plunged by nearly $7 billion, yet SVB refrained from recognizing these losses in its reported financial performance.

220. Accounting rules customarily require firms, such as SVB, to report assets at their "fair value" on their financial statements filed with the SEC, with any changes recognized in those financial reports. However, GAAP includes a "restrictive" exception for investment debt securities for which an entity has both the positive intent and ability to hold to maturity. On such a showing, "held-to-maturity" securities are not required to be reported at their fair market value but instead can be reported at cost, thereby allowing an entity to avoid recognizing market losses on its financial statements.

221. Unknown to investors at the time of the Offering, SVB's classifications of these assets as "HTM" violated GAAP.

### 1. Overview of Applicable GAAP

222. Generally Accepted Accounting Principles ("GAAP") are the official standards for accounting accepted by the SEC. GAAP is recognized by the accounting profession as promulgating the conventions, rules, and procedures constituting accepted accounting practices at a particular time. Under applicable federal regulations, financial statements "which are not

prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."[335]

223.    GAAP normally requires the recognition and reporting of assets at their present fair value—i.e., their current market value.  GAAP provides, however, a narrow exception for investment debt securities which the entity has the positive intent and ability to hold to maturity, i.e., "HTM" securities.  Investment debt securities classified as HTM may be recognized and reported at amortized cost, rather than fair value.[336]  Therefore, gains and losses in the fair value of HTM-classified investment debt securities are not recognized in a company's financial statements in a company's SEC filings.

224.    By classifying tens-of-billions of dollars of securities as HTM, SVB would be able to circumvent recognizing in the Bank's financial performance the substantial declines in the fair value of these securities that would be expected from those securities when the Federal Reserve increased interest rates (as had long been expected), and the market losses that did in fact occur when the Federal Reserve began to increase rates in 2022.  For example, "other comprehensive income" ("OCI") is a "crucial financial analysis metric" used and tracked by analysts in evaluating a bank's earnings and profitability.[337]  At around the time of the Offering, SVB (and analysts covering SVB) focused on this metric.[338]  However, while drops in the values of investment securities would ordinarily be recognized as losses in OCI, SVB's classification of its securities as HTM would allow them to avoid identifying such losses in their reported financial performance under GAAP.  Likewise, by classifying the bulk of SVB's securities as HTM, SVB

---

[335]    17 C.F.R. §210.4-01(a).

[336]    Accounting Standards Codification ("ASC") 320-10.

[337]    *Other Comprehensive Income*, CORPORATE FINANCE INSTITUTE, https://corporatefinanceinstitute.com/resources/accounting/other-comprehensive-income/.

[338]    *See, e.g.*, CEO Letter to Shareholders, SVB Fin. Group.  (April 22, 2021), https://s201.q4cdn.com/589201576/files/doc_financials/2021/q1/v2/SVB-Q1-2021-Financial-Highlights.CEO-Letter.FINAL2.pdf ("designating $3 billion in investment securities from available-for-sale (AFS) to held-to-maturity (HTM)" "has the benefit of protecting tangible book value against fluctuations in other comprehensive income and provides additional balance sheet flexibility").

- 82 -

would avoid the need to recognize significant declines in SVB's stockholders' equity, tangible book value, and tier 1 capital—additional metrics closely watched by securities analysts.[339]

225.    The HTM classification is restrictive under GAAP.[340]  To benefit from this favorable accounting treatment, the entity's HTM classification "must be justified for each investment in a debt security," and the entity must establish both the "positive intent and ability" to "hold" each of the HTM "security to maturity."[341]  This test "is distinct from [a] mere absence of an intent to sell," and a firm's basis for classifying its securities as HTM—i.e., its positive intent and ability to hold to maturity—must be assessed at acquisition and re-assessed each financial reporting period.[342]  Indeed, "if an entity no longer has the ability to hold debt securities to maturity, their continued classification as held-to-maturity would not be appropriate," and the reporting entity is specifically obligated to assess whether relevant facts and circumstances have changed since its last financial statement.[343]

226.    Therefore, GAAP permits entities like SVB to classify securities as HTM if—and only if—they have reliable evidentiary support that the entity is in fact able to hold the security for its full duration through maturity.  In so determining, GAAP provides that an entity must ensure that its classifications of securities as HTM "are consistent with its investment strategies, liquidity projections, capital adequacy, tax planning strategies, asset/liability management

---

[339]    *See, e.g.*, *id*. (transferring securities from AFS to HTM "also has the benefit of protecting tangible book value").

[340]    *3.3 Classification of debt securities*, PwC Guide, PwC (Sept. 30, 2024) at 3-9, https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/loans_and_investment/loans_and_investment_US/chapter_3_accounting__1_US/33_classification_of_US.html#pwc-topic.dita_1652305210048888 ("PwC Guide").

[341]    ASC 320-10; see also *Investments*, KPMG Handbook (Feb. 2024) at 109, https://kpmg.com/kpmg-us/content/dam/kpmg/frv/pdf/2024/handbook-investments-1.pdf ("KPMG Guide").

[342]    ASC 320-10.

[343]    *Id*. ("***At each reporting date***, the appropriateness of the classification of an entity's investments in debt securities shall be reassessed.  For example, if an entity no longer has the ability to hold debt securities to maturity, their continued classification as held-to-maturity would not be appropriate.  Because an entity is expected not to change its intent about a held-to-maturity security, ***the requirement to reassess the appropriateness of a security's classification focuses on the entity's ability to hold a security to maturity.***  The preceding paragraph ***acknowledges that facts and circumstances can change; for example, an entity can lose the ability to hold a debt security to maturity.***").

AMENDED COMPLAINT

strategies, etc."[344]  Properly making this determination requires the entity to evaluate several sources of information, including "board and investment committee resolutions," "regulatory capital requirements," and "operating and cash flow projections."[345]  As the accounting firm PricewaterhouseCoopers has explained, an entity's "intent and ability to hold a debt security to maturity is typically evidenced through . . . projections of liquidity and capital adequacy," among other things.[346]

227.    An entity is precluded from classifying its securities as "HTM" if it cannot reliably ascertain its ability to hold those securities until maturity.  The HTM classification is appropriate only when the financial institution can reliably establish that it will not need to make its HTM securities "available to be sold in response to": "[c]hanges in market interest rates and related changes in the security's prepayment risk," and "[n]eeds for liquidity."[347]  As the accounting firm Ernst & Young has articulated, one consequence of these demanding requirements is that "entities that use an active asset-liability management program to manage interest rate risk will find it difficult to classify securities as held to maturity if those securities are subject to sale to satisfy the objectives of the asset-liability program."[348]

228.    Thus, in classifying investment securities as HTM pursuant to GAAP, an entity makes representations as to its liquidity and interest rate risk management, including that the entity possesses effective liquidity risk management and controls to reliably determine that it has sufficient sources of liquidity over the full duration before these securities reached maturity.

---

[344]    KPMG Guide at 140.

[345]    *Id.* at 111.

[346]    PwC Guide at 3.3.1.

[347]    ASC 320-10-25-4.

[348]    *Financial Reporting Developments, A Comprehensive Guide: Certain Investments in Debt and Equity Securities*, ERNST & YOUNG, Sept. 26, 2024, at 22, https://www.ey.com/content/dam/ey-unified-site/ey-com/en-us/technical/accountinglink/documents/ey-frd03623-181us-09-26-2024.pdf.

AMENDED COMPLAINT

### 2. SVB Violated GAAP with Improper HTM Classifications

229.  As EY has explained, the "highly restrictive guidance" for HTM classification ordinarily "result[s] in relatively few debt securities being classified in this category."[349]  Yet, at the time of the Offering, SVB classified and re-classified tens-of-billions of dollars of securities as "HTM."  As noted above, doing so allowed SVB to avoid identifying billions of dollars in fair value losses and reporting consequential impacts to OCI, stockholders' equity, tangible book value, and other key financial metrics.  Moreover, SVB's classification of its securities as "HTM" constituted a declaration that SVB had sufficient alternative sources of liquidity over the full duration of those securities—which, was 5.2 years on average (as of March 31, 2022)—and that SVB's controls around liquidity risk and interest rate risk were adequate for SVB to reliably make the "HTM" classification.[350]

230.  *First*, contrary to GAAP requirements, SVB could not—and did not—at any relevant time, reliably demonstrate the necessary "positive intent and ability to hold to maturity" for its tens-of-billions of dollars of debt securities categorized as HTM.  This improper HTM classification led SVB to report its financial performance inaccurately, manifesting as an overstatement of the value of SVB's largest asset concentration (its HTM securities), an understatement of losses in SVB's OCI, and an artificial inflation of SVB's stockholder equity.

231.  *Second*, as noted above, an entity's "ability to hold a debt security to maturity is typically evidenced through . . . projections of liquidity and capital adequacy," and HTM classification is only appropriate if an entity can reliably determine with sufficient evidence that the investment security will not need to be "available to be sold in response to . . . [n]eeds for liquidity."[351]  However, SVB lacked the controls necessary for reliable "liquidity projections" and assessments of its "need for liquidity" and thus could not provide the sufficient evidence required by GAAP for HTM classification.[352]

---

[349]    *Id*. at 19.

[350]    Fed Report at 21.

[351]    ASC 320-10-24-4; *see also* PwC Guide at 3.3.1.

[352]    KPMG Guide at 112, 140.

AMENDED COMPLAINT

232.    As Federal Reserve examiners found, SVB suffered from numerous weaknesses in its liquidity risk management that "negatively impact[ed] the reliability of [SVB's] liquidity buffer" and meant that SVB's "liquidity buffer under stress may be insufficient."[353] Consequently, SVB was unable to accurately and reliably assess its "liquidity and capital adequacy" required for HTM classification.  Specifically:

a)  SVB lacked an operational "liquidity limits framework."  Its approach to settings its liquidity limit was "inadequate for the purpose of measuring, monitoring, and controlling risks," and could "underestimate the demands on available liquidity sources in stress."  Since SVB was unable to reliably access its sources of liquidity during times of stress, it could not establish their ability to hold their long-duration securities to maturity under GAAP.

b)  SVB lacked adequate internal liquidity stress testing.  The key assumptions underlying its stress testing were unreliable and deficient, and the Bank's liquidity buffer could not be determined to be sufficient.  Accordingly, SVB could not establish its ability to hold its investment securities to maturity under GAAP.

c)  SVB lacked an effective "contingency funding plan," which consequently prevented the bank from reliably assessing whether it was experiencing liquidity stress, determining the available funding under various stress levels, and responding promptly to a stress event.  SVB's inability to evaluate and address funding needs during liquidity shortfalls meant it could not establish its ability to hold its investment securities to maturity under GAAP.

d)  Finally, SVB lacked useful controls on liquidity risk management.  The lack of effective liquidity risk management controls further precluded SVB from establishing its ability to hold investment securities to maturity under GAAP.

233.    *Third*, as noted above, an HTM classification is appropriate only if an entity can reliably determine with sufficient evidence that the investment securities will not need to be

_____

[353]    Letter from Fed. Rsrv., *supra* note 112.

- 86 -

AMENDED COMPLAINT

"available to be sold in response to . . . [c]hanges in market interest rates."[354]   However, SVB lacked the controls necessary to reliably assess and manage its exposure to interest rate changes and thus could not provide the sufficient evidence required by GAAP for an HTM classification. SVB suffered from several weaknesses that made its interest rate risk management "not reliable."[355]   Among other things, SVB: (i) failed to appropriately design an interest rate risk model; (ii) failed to specify "ongoing reporting requirements for threshold breaches" and baselessly changed model's assumptions in response to such breaches; (iii) improperly changed the models used for interest rate risk management; (iv) failed to assess the impact of changes in interest rates on its liquidity stress testing; and (v) failed to implement an interest rate risk control, which would have assessed interest rate risk, stress testing, and hedges.   Additionally, as BlackRock found—and confidentially told the Bank's executives—"SVB was unable to generate real time or even weekly updates about what was happening to its securities portfolio" and the response of its portfolio to "rising interest rates and broader macroeconomic conditions."[356]   As a result of these fundamental weaknesses in SVB's interest rate risk controls, SVB could not reliably determine whether SVB's securities needed to be available-for-sale due to potential changes in interest rates; nor were they able to reliably assess the Bank's exposure to "changes in market interest rates," as required to classify its tens-of-billions of dollars of securities as HTM.

234.   Finally, the lengthy duration of SVB's HTM securities further compounded the known weaknesses in SVB's controls around liquidity and interest rate risk described above.   For example, SVB's total HTM portfolio had a weighted average duration of 5.2 years on average (as of March 31, 2022).   Moreover, almost half of SVB's HTM portfolio consisted of agency mortgage-backed securities with a maturity of 10 years or more.   These lengthy durations made it even more important for SVB to reliably establish its positive ability to hold its securities to

---

[354]   ASC 320-10-25-4, *see also* PwC Guide at 3.3.1.

[355]   Letter from Fed. Rsrv., *supra* note 107.

[356]   *Silicon Valley Bank was warned by BlackRock that risk controls were weak*, THE FINANCIAL TIMES, March 18, 2023, https://www.ft.com/content/fbd9e3d4-2df5-4a65-adbd-01e5de2c5053.

AMENDED COMPLAINT

maturity—and also intensified SVB's inability to do so given SVB's rampant control weaknesses described above and identified repeatedly by the Bank's regulator.

235.   In sum, SVB did not have both the positive intent and ability to hold the entirety of its HTM portfolio through maturity, and SVB's classification of those securities as HTM violated GAAP, causing SVB's financial statements in the Offering Documents to be misstated.

**F.   Omissions of Material Information Required by Regulation S-K**

236.   Regulation S-K required disclosure requirements on the Offering Documents and the materials incorporated therein.   Among others, Item 303 of Regulation S-K (17 C.F.R. §229.303) required that SVB disclose "material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition," including "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."[357] Likewise, Item 305 of SEC Regulation S-K required "[q]uantitative and qualitative disclosures about market risk."   Specifically, the qualitative disclosure requirements of Item 305 require a registrant to describe "[t]he registrant's primary market risk exposures"; "[h]ow those exposures are managed"; and "[c]hanges in either the registrant's primary market risk exposures or how those exposures are managed, when compared to what was in effect during the most recently completed fiscal year and what is known or expected to be in effect in future reporting periods."[358]   The instructions to Item 305 explain that "primary market risk exposures" includes interest rate risk.   Under Item 305, "if a registrant has a material exposure to interest rate risk and, within this category of market risk, is most vulnerable to changes in short-term U.S. prime interest rates, it should disclose the existence of that exposure."[359]

237.   In violation of these requirements under Regulation S-K, the Offering Documents omitted known uncertainties concerning SVB's liquidity, including that SVB: (a) did not

---

[357]    17 C.F.R. §229.303.
[358]    17 C.F.R. §229.305.
[359]    *Id.*

- 88 -

AMENDED COMPLAINT

"regularly assess the amount and likelihood of projected funding requirements"; (b) did not "provide[] oversight to the liquidity management process"; and (c) did not "routinely conduct liquidity stress testing as part of [their] liquidity management practices." In accordance with Item 303, the Defendants were obligated (but failed) to disclose that, in truth: (a) SVB failed to effectively identify, measure, and monitor liquidity risk; (b) SVB lacked an adequate liquidity limits framework; (c) SVB's internal liquidity "stress testing" failed to address market and idiosyncratic risks, lacked a forward-looking assessment of the Bank's risk, assumed all deposits would behave similarly in stress, and failed to provide "insight" into time periods of less than 30 days; (d) SVB's "contingency funding plan" failed to sufficiently include a projection and evaluation of expected funding needs during a stress event, only identified types of contingent funding by source, without accounting for SVB's active contracts or firm limits, and failed to tailor Early Warning Indicators to SVB's liquidity risk profile; (e) SVB's "liquidity risk models" lacked sensitivity; and (f) SVB's governance and oversight of liquidity risk suffered from "shortcomings" including in its Second and Third Lines of Defense and failed to keep pace with SVB's liquidity risk profile.

238. Further in violation of these requirements, SVB's periodic filings incorporated by reference into the Offering Documents violated Item 305 of Regulation S-K because they omitted material facts concerning SVB's management of its primary market risk—interest rate risk—including that SVB: (a) suffered from weaknesses in its internal controls related to interest rate risk management; (b) suffered from weaknesses in its internal audit related to interest rate risk management; (c) lacked the controls necessary to determine how SVB's portfolio would respond to increased interest rates; (d) used interest rate risk simulations and models that were "not reliable" and instead were "directionally inconsistent" with SVB's financial performance; (e) used ineffective models that lacked fundamental components of a reasonable interest rate risk model; could not perform adequate sensitivity analysis because they only captured parallel interest rate curve changes; and used only "the most basic" interest rate risk measurement, which severely limited the models' utility; (f) had not reviewed for potential recalibration SVB's interest

AMENDED COMPLAINT

rate risk model limits since 2018; and (g) was not able to accurately assess how SVB's investment portfolio would respond to increased interest rates and, as BlackRock found, "was unable to generate real time or even weekly updates about what was happening to its securities portfolio."

**O.    Defendants' Untrue Statements and Omissions of Material Fact**

239.    The statements identified above were untrue and omitted material facts necessary to prevent the statements from being false or misleading.    Specifically, Defendants' misrepresentations and omissions related to: (1) SVB's risk management and controls; (2) its liquidity; (3) the impact of rising interest on its position; and (4) SVB's intent and ability to hold its "HTM" securities to maturity as required by GAAP.

**1.    *Risk Management and Controls***

240.    Defendants made false and misleading statements regarding SVB's robust risk management controls and models to monitor, manage, and predict the impact of interest rates on an ongoing basis.[360]  In fact, SVB lacked effective risk management controls, and its officers and directors were aware of this fact.  The Federal Reserve determined SVB "failed its own internal liquidity stress tests and did not have workable plans to access liquidity in times of stress"; "managed interest rate risks with a focus on short-run profits and protection from potential rate decreases, and removed interest rate hedges, rather than managing long-run risks and the risk of rising rates"; and "changed [the Bank's] own risk-management assumptions to reduce how these risks were measured rather than fully addressing the underlying risks."  The Federal Reserve further determined the Bank's deficient risk management program posed a "significant risk" to "the Firm's prospects for remaining safe and sound."[361]

241.    Contrary to Defendants' representations, SVB's internal models provided warnings beginning in 2020 and continuing through 2022 that higher interest rates would have a devastating impact on future earnings and that SVB would be short billions of dollars in liquidity

---

[360]    *See, e.g.*, Form 10-K, *supra* note 2.

[361]    Fed Rep., *supra* note 86 at i, 49.

AMENDED COMPLAINT

in the event of a stress event. The Federal Reserve found SVB's "internal risk appetite metrics, which were set by its board, provided limited visibility into its vulnerabilities" and SVB "had breached its long-term IRR limits on and off since 2017 because of the structural mismatch between long-duration securities and short-duration deposits."[362]    As noted above, SVB executives were personally aware, as early as 2020, that SVB's investment strategies violated its own risk metrics and exposed the Bank to substantial issues in the event of higher interest rates, yet disregarded these concerns in order to continue reporting more substantial growth.

## 2. *Impact of Rising Interest*

242.    In the Offering Documents, Defendants made untrue statements and omissions of material fact about SVB's position with respect to expected interest rate increases, assuring investors that the Company "remain[ed] well-positioned for rising rates," "actively positioned [its] securities portfolio to create flexibility and mitigate the risk of rising long-term term rates through hedges" and would actually "benefit significantly from increasing rates" through increases in Net Interest Income and fee-based income.[363]    ("[W]e're even more bullish when we do start to see some rate increases.");[364] ("There are no material changes to the risk factors set forth in our 2020 Annual Report on Form 10-K.");[365] Q4 2021 8-K (represented SVB would "see significant benefits" from interest rate increases and "[c]lient investment fees would increase" with rising interest rates). The 2021 Annual Report and Q1 2022 Form 8-K falsely represented SVB had "raised [its] 2022 revenue outlook" as rates increased and that "[w]hile rising rates benefit [SVB] from a revenue perspective, they also highlight the effectiveness of [SVB's] proactive interest rate risk management." The Offering Materials and other statements by SVB's officers and directors did not disclose the risk that future interest rate hikes posed to the Company's business, despite the Federal Reserve signaling that it might raise interest rates in the future and was certainly prepared to do so in the event of rising inflation.

---

[362]    *Id.* at 3.

[363]    *See* SVB Fin Grp., Current Report (Form 8-K) and July 22 Letter.

[364]    *See* SVB Fin Grp., Q3 2021 Earnings Call.

[365]    SVB Fin Grp., Q3 Report (Form 10-Q) (Nov. 8, 2021).

AMENDED COMPLAINT

243.   Contrary to these representations, the Federal Reserve found that SVB was "acutely exposed to the specific combination of rising interest rates and slowing activity in the technology sector that materialized" and further that "in April 2022, SVB[] made counterintuitive modeling assumptions . . . rather than managing the actual risk" and "[o]ver the same period, . . . also removed interest rate hedges that would have protected against rising interest rates."[366] "[W]hen rising interest rates threatened profits and reduced the value of its securities," SVB "management took steps to maintain short-term profits rather than effectively manage the underlying balance sheet risks."[367]   SVB "changed its own risk-management assumptions to reduce how these risks were measured" rather than "addressing the underlying risks."   In fact, the Federal Reserve determined that SVB had "foundational and widespread managerial weaknesses, a highly concentrated business model, and a reliance on uninsured deposits" that left SVB "acutely exposed" to "rising interest rates and slowing activity in the technology sector," that SVB "failed its own internal liquidity stress tests" and that "rising interest rates threatened profits and reduced the value of its securities."[368]

### 3.   *Liquidity*

244.   In the Offering Documents, Defendants made untrue statements and omissions regarding SVB's liquidity.   The 2020 Annual Report specifically highlighted the Company's "focus[] on . . . capital and liquidity," with "a liquid and high-quality balance sheet" and "access to other funding sources, as necessary."[369]   The January 21, 2021 Current Report on Form 8-K and accompanying press release highlighted SVB's "robust client liquidity" and assured investors that the Company "maintain[s] strong capital and liquidity."   ("Our Asset/Liability Committee ('ALCO') . . . provides oversight to the liquidity management process . . . . Additionally, we routinely conduct liquidity stress testing as part of our liquidity management practices.");[370]

---

[366]   Fed Rep*., supra* note 86 at 2-3.

[367]   *Id*.

[368]   *Id.* at i, 4.

[369]   Form 10-K, *supra* note 2 at 41.

[370]   Q1 2021 Report 10-Q at 92.

AMENDED COMPLAINT

January 20, 2022 Q4 2021 Earnings Call ("still bullish on liquidity"); ("[w]hen needed, [SVB's] liquidity is supplemented by wholesale borrowing capacity");[371]

245.   Defendant Beck specifically represented SVB had "lots of levers and good flexibility to be able to manage" the changing interest rate environment and "help from a liquidity perspective."  Defendants continued to assure investors throughout 2022 and early 2023 via the Form 10-Qs, press releases, and other SEC filings and failed to disclose to investors that rising interest rates were negatively impacting the Company's investments, and that, because SVB's clients were highly concentrated in the areas of tech startups and venture capital-backed companies, SVB was facing unique liquidity risks in an environment with high interest rates.

246.   At the same time, the Bank's examiners had privately and repeatedly raised deficiencies in SVB's liquidity to management in a series of meetings and reports, which led to dozens of supervisory findings identifying deficiencies relating to SVB's governance requiring SVB's remediation.  SVB had interest rate models in place that were unrealistic and "not reliable" and had a liquidity risk management program that threatened the Bank by failing to ensure it would have "enough easy-to-tap cash on hand in the event of trouble."  The Federal Reserve ultimately concluded these deficiencies were "linked directly" to SVB's ultimate collapse.  Contrary to Defendants' representations, the Federal Reserve found SVB had "critical deficiencies in the firm's . . . liquidity"; SVB "failed its own internal liquidity stress tests"; SVB "did not have workable plans to access liquidity in times of stress"; "senior leadership failed to manage basic interest rate and liquidity risk"; and "the proximate cause of SVB's failure was a liquidity run[372]."  The Federal Reserve found SVB had "31 open supervisory findings when it failed in March 2023, about triple the number observed at peer firms."  The supervisory findings at SVB "included core areas, such as . . . liquidity."[373]  Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

---

[371]   SVB Fin Grp., Annual Report (Form 10-K) (March 1, 2021) at 22.
[372]   Fed Rep., *supra* note 86 at i-ii.
[373]   *Id.* at 6.

- 93 -

#### 4. *HTM Securities*

247. Defendants also made untrue statements and omissions of material fact regarding SVB's reclassification of tens of billions in securities as HTM based on its ability and intent to hold these securities to maturity, taking into account its future liquidity needs and sources of funding. ("During the first quarter of 2021, we re-designated certain securities from the classification of 'available-for-sale' to 'held-to-maturity.'").[374] In making these reclassifications, Defendants represented to investors that "Our decision to re-designate the securities was *based on our ability and intent to hold these securities to maturity*."[375]

248. The Officer and Director Defendants designated more than $90 billion of SVB's investment securities as "held-to-maturity," which comprised a remarkable 75% of its total investment securities portfolio and 46% of its total assets. While the heavy investments in HTM securities bolstered SVB's short-term reported earnings, SVB was not poised to benefit from increasing rates. Rather, SVB's massive HTM investments at low interest rates ensured that SVB would not be able to invest at more attractive rates as interest rates increased.

249. Although they were aware of the risk, Becker and Beck ignored these risks because their incentive compensation was tied to SVB's current return on equity. As *The Financial Times* explained in a March 23, 2023 investigative report following SVB's collapse, because SVB's purchase of longer-term securities generated short-term yields, it boosted Beck's and Becker's compensation.

250. The Officer and Director Defendants failed to disclose their classification of SVB's long-duration securities portfolio as held-to-maturity was improper and violated GAAP. By classifying SVB's investment securities as held-to-maturity, the Officer and Director Defendants inherently represented that SVB possessed effective and reliable liquidity risk management and controls that allowed them to reliably and accurately conclude that SVB had sufficient alternative liquidity sources such that it in fact had the positive intent and ability to hold over $90 billion in HTM securities until maturity. But as previously described, SVB did not

---

[374] *See, e.g.*, SVB Fin Grp., Annual Report (Form 10-K) (March 1, 2021) at 17.
[375] *Id.*

possess the requisite positive intent and ability to hold these investments to maturity. SVB did not have the ability or intent to hold these securities to maturity in the face of rising interest rates and liquidity problems. "In 2022, as interest rates began to rise, SVBFG saw a rapid increase in unrealized losses on . . . its HTM".[376]

251.    As a direct and proximate result of Defendants' untrue statements and omissions of material fact, Buchanan purchased the Notes at inflated prices. Had he known the truth of Defendants' statements and omissions, he would not have purchased the Notes or would have paid far less for them. Upon the disclosure of the misrepresentations and omissions in the Offering Documents for the Notes, the par price of the Notes plummeted, and Buchanan was forced to sell the Notes prior to maturity at a substantial loss.

**P.    ALLEGATIONS RELATED TO DEFENDANT KPMG**

252.    KPMG, SVB's outside auditor, authorized the incorporation by reference of its unqualified audit reports on the Bank's financial statements in the Offering Documents. These audit reports asserted that KPMG: (1) SVB's financial statements presented fairly, in all material respects, the financial position of the Bank, in conformity with GAAP;[377] (2) SVB maintained, in all material respects, effective internal controls over financial reporting;[378] (3) KPMG conducted its audits in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB");[379] and (4) KPMG appropriately disclosed each Critical Audit Matter ("CAM") as required by PCAOB standards. However, as further explained below, these unqualified reports were false and misleading due to a lack of reasonable basis and/or KPMG's awareness of undisclosed facts that significantly undermined the accuracy of its audit reports.

---

[376]    Fed. Rep, *supra* note 86 at 22.

[377]    SVB Fin Grp., Annual Report (Form 10-K) (March 1, 2021) at 98.

[378]    *Id*.

[379]    The PCAOB was established by the Sarbanes-Oxley Act of 2002 ("SOX") and is responsible for the establishment of auditing and related professional practice standards that must be followed by registered public accounting firms and by auditors when performing audits of the financial statements of public and registered filers.

AMENDED COMPLAINT

**1.    Applicable PCAOB Auditing Standards**

253.    PCAOB Auditing Standards, abbreviated as "AS," provide the essential framework for planning, performing, and reporting audits of public companies.  They serve as a benchmark for audit quality, and the objectives auditors must achieve.    Auditors are professionally obligated to adhere to these accepted standards.[380].

254.    As 1001.01 provides that the "objective of the ordinary audit of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles."  Through the auditor's report, the auditor conveys their findings or, if required by circumstances, disclaims an opinion.  In every case, the auditor must affirm that the audit was conducted according to PCAOB standards.  These standards obligate the auditor to state whether the financial statements are presented in conformity with generally accepted accounting principles and to identify situations where GAAP principles were not consistently observed in the preparation of the company's financial statements.

255.    An audit signifies the highest assurance an external auditor can offer to potential investors regarding the reliability of financial statements for informed investment decisions. Pursuant to AS 3101, The Auditor's Report on an Audit of Financial Statements When the Auditor Expresses an Unqualified Opinion ("AS 3101"), an auditor should only issue an "unqualified opinion" when the auditor has "conducted an audit in accordance with the standards of the [PCAOB] and concludes that the financial statements, taken as a whole, are presented fairly, in all material respects, in conformity with the applicable financial reporting framework."[381]  Therefore, an auditor may only express an unqualified audit opinion when the auditor has formed such an opinion on the basis of an audit performed in accordance with

---

[380]    *Auditing Standards of the Public Company Accounting Oversight Board*, PCAOB, https://pcaobus.org/standards/auditing/documents/auditing_standards_audits_fyb_after_june_16_2024_before_fyb_december-14-2024.pdf (last accessed on Aug. 23, 2025).    AS 1001, Responsibilities and Functions of the Independent Auditor.

[381]    AS 3101.02.

AMENDED COMPLAINT

generally accepted auditing standards. Consequently, when an auditor has failed to conduct its audit in accordance with the standards established by the PCAOB, it is limited to only expressing a qualified or adverse opinion, disclaiming its opinion, or issuing no opinion at all.[382]

256. PCAOB auditing standards state that "[i]f one or more material weaknesses exist, the company's internal control over financial reporting cannot be considered effective."[383] Internal control over financial reporting is deemed to have a "material weakness" when a deficiency, or a combination of deficiencies, leads to a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected in a timely manner. In accordance with PCAOB, auditing standards state that if a company's internal controls have "one or more material weaknesses, the auditor must express an adverse opinion on the company's internal control over financial reporting."[384] Significantly, auditors are also required to express an adverse opinion on a company's internal controls over financial reporting if material weaknesses are identified "subsequent to the date as of which internal control over financial reporting is being audited but before the date of the auditor's report."[385]

257. Throughout all stages of an audit, PCAOB auditing standards mandate the exercise of due professional care and professional skepticism.[386] This overarching obligation requires an auditor to adhere to these principles when performing procedures that underpin the expression of an audit opinion. Due professional care involves "what the independent auditor does and how well he or she does it."[387] An auditor must possess "the degree of skill commonly possessed" by other auditors and should exercise it with "reasonable care and diligence" and "professional skepticism."[388] This duty to exercise due care compelled KPMG to obtain reasonable assurances

---

[382] See AS 3101.

[383] AS 2201.02.

[384] AS 2201.90.

[385] AS 2201.93; AS 2201.96.

[386] See AS 1015.

[387] AS 1015.04.

[388] AS 1015.05; AS 1015.07.

- 97 -

AMENDED COMPLAINT

that the financial statements were free from material misstatement, whether caused by error or fraud.[389]    Accordingly, an auditor must investigate and obtain supporting evidentiary documentation for all assertions made by the audited company in its financial statements. Auditors are precluded from using management's representations as a substitute for the application of appropriate audit procedures necessary to afford a reasonable basis for an opinion regarding the financial statements.[390]  When management's representations are inconsistent with other audit evidence, auditors are obligated to investigate the circumstances and factor in the reliability of management's representations when reaching an audit opinion.[391]

258.    Accordingly, PCAOB auditing standards obliged KPMG to remain constantly vigilant for indicators of misstatements in SVB's financial statements, whether due to error or fraud.  This vigilance required the use of professional judgment to evaluate whether information gathered during the audit suggested the presence of events or conditions signaling risk factors related to misstatements in financial reporting.  Such risk factors include, for example: (i) the company's financial stability or profitability is threatened by economic, industry or entity operating conditions, as indicated by "[s]ignificant declines in customer demand and increasing business failures in either the industry or overall economy"; (ii) "[i]neffective communication, implementation, support, or enforcement of the entity's values or ethical standards by management or the communication of inappropriate values or ethical standards"; and (iii) "[m]anagement failing to correct known reportable conditions on a timely basis."[392] Additionally, AS 2401 provides that the risk of misstatement is heightened when a company fails to maintain an adequate system of internal controls.[393]

259.    Furthermore, professional standards mandated that KPMG be furnished with and duly consider the supervisory findings of bank examiners concerning SVB, including those from

---

[389]    AS 1015.10.

[390]    AS 2805.02.

[391]    AS 2805.04.

[392]    AS 2401.85 A.2.

[393]    *Id.*

AMENDED COMPLAINT

the Federal Reserve.[394]  Auditors are expected to exercise due care and maintain constant awareness of the risk of misstatements arising from fraud or error.  As these risks heighten or materialize, professional standards obligate auditors to adjust their audit procedures accordingly and to consistently apply professional skepticism.

260.  In circumstances involving heightened risk, such as with SVB—particularly due to its significant deficiencies in governance and risk management, liquidity, and interest rate risk management—an auditor is mandated to conduct more stringent and rigorous audit procedures than would otherwise be necessary.  An auditor "should determine whether it is necessary to make pervasive changes to the nature, timing, or extent of audit procedures to adequately address the assessed risks of material misstatement."[395]  This might require "[i]ncreas[ing] the substantive testing of the valuation of numerous significant accounts at year end because of significantly deteriorating market conditions" and "[o]btain[ing] more persuasive audit evidence from substantive procedures due to the identification of pervasive weaknesses in the company's control environment."[396]

261.  Beyond the PCAOB, auditors are also subject to the professional guidance provided by the American Institute of Certified Public Accountants ("AICPA").  The AICPA issues, among other publications, Audit and Accounting Guides ("AAGs"), which offer industry-specific guidance.  The AAG specifically dealing with banks and other financial institutions forewarns auditors of risks pertinent during KPMG's audits of SVB, including "rapid growth."[397]  The AAG also lists, as a specific risk factor, "[r]epeated criticisms or apparent violations cited in regulatory examination reports that management has ignored."[398]  The AAG  specifies certain matters "about which the auditor should request management to provide written representation,

---

[394]  *See, e.g.*, 12 U.S.C. §1831m; 12 C.F.R. §261.21.

[395]  AS 2301.06.

[396]  *Id*.

[397]  Depository and lending institutions: banks and savings institutions, credit unions, finance companies and mortgage companies, AICPA (July 1, 2019), at 140, 141 (5.267), https://egrove.olemiss.edu/cgi/viewcontent.cgi?article=2411&context=aicpa_indev.

[398]  *Id*. at 140, 144 (5.267).

- 99 -

AMENDED COMPLAINT

such as preparation and fair presentation of the financial statements."[399]  If the auditor establishes that "it is necessary to obtain one or more written representations to support other audit evidence relevant to the financial statements," the auditor "should request such other written representations," including "[a]ll regulatory examination reports, supervisory correspondence, and similar materials from applicable regulatory agencies (particularly communications concerning supervisory actions or noncompliance with or deficiencies in the rules and regulations or supervisory actions)."[400]  Indeed, the AICPA states that an auditor "should obtain knowledge about regulatory matters and developments as part of the understanding of an institution's business" and should also "consider the results of regulatory examinations."[401]  Further, the auditor may "request that management provide access to all reports of examination and related correspondence"; "review reports of examination and related correspondence between examiners and the institution during the period under audit and through the date of the auditor's opinion"; "communicate with the examiners if their examination is still in process"; and "consider attending . . . the exit conference between the examiner and the institution's board of directors, it executive officers, or both."[402]Additionally, the AICPA AAG also prescribes that auditors should specifically investigate that the "classification of securities between held-to-maturity, available-for-sale, or trading categories accurately reflects management's ability and intent"; and "[o]ther than temporary declines in the value of investment securities have been properly recognized in the financial statements."[403]

262.    Lastly, PCAOB standards required that KPMG communicate "Critical Audit Matters."[404]  The auditing standards define Critical Audit Matters as "any matter arising from the audit of the financial statements that was communicated or required to be communicated to the

---

[399]    *Id*. at 123 (5.194).

[400]    *Id*. at 123 (5.194, 5.195).

[401]    *Id*. at 123 (5.194), 134-35 (5.247).

[402]    *Id*. at 137-38 (5.261).

[403]    *Id*. at 124-25 (5.194, 5.195).

[404]    *See generally* AS 3101.17.

AMENDED COMPLAINT

audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved especially challenging, subjective, or complex auditor judgment."[405] The auditing standards further stipulate that, when making this determination, the auditor must consider the risks of material misstatement and the degree of estimation and judgment involved.[406]

### 2.   KPMG's Misstatements in the Offering Documents

#### a. SVB's Financial Statements Were Not Prepared in Accordance With GAAP

263.   The unqualified KPMG reports incorporated by reference into the Offering Documents certified that, after conducting an audit "in accordance with the standards of the PCAOB" KPMG "believe[d] that our audits provide a reasonable basis for our opinions" that SVB's "consolidated financial statements . . . present[ed] fairly, in all material respects, the financial position of the Company . . . in conformity with U.S. generally accepted accounting principles" (i.e., GAAP).[407]

264.   The unqualified auditor's reports from KPMG, included in the Bank's Forms 10-K and incorporated by reference (with KPMG's consent) into the Offering Documents, were false and misleading.  As previously explained, the Bank's consolidated financial statements did not accurately present the Bank's financial condition and failed to comply with GAAP.  As further detailed herein, SVB's HTM securities classification violated GAAP because SVB lacked a reliable and sufficient basis to confirm its ability to hold those securities to maturity, as mandated by GAAP.  As a result, the Bank's publicly reported financial statements did not fairly present the Bank's financial position and were therefore false.

265.   KPMG's issuance of an unqualified audit opinion on SVB's financial statements, despite these GAAP violations, represented a failure to comply with the professional standards mandated by the PCAOB, as outlined above.  These standards required KPMG to exercise due professional care during the audit, secure competent and sufficient evidentiary matter to support

---

[405]   AS 3101.11.

[406]   AS 3101.12.

[407]   *See, e.g.*, SVB Fin Grp., Annual Report (Form 10-K) (March 1, 2021) at 98.

AMENDED COMPLAINT

its opinion, and obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.[408]  Furthermore, KPMG failed to adhere to PCAOB auditing standards that require auditors to explicitly state whether a company's financial statements are presented in accordance with GAAP, including the disclosure of material matters.

266.    In conducting its audits, KPMG had unfettered access to the Bank's files and key employees at all relevant times.  As SVB's auditor, KPMG maintained continuous access to and knowledge of the Bank's confidential internal, corporate, financial, operating, and business information.  This afforded them the opportunity to observe and review the Bank's business and accounting practices, to test the Company's internal accounting information and publicly reported financial statements, and to assess the Bank's internal controls and structures.  Consequently, KPMG was aware of the significant deficiencies identified at SVB by the Bank's regulators, specifically concerning SVB's governance and risk management, liquidity, and interest rate risk management, which included, among others, "foundational shortcomings in key areas" related to SVB's liquidity risk management.[409]  These and the other supervisory findings documented how the Bank was unable to reliably and appropriately determine whether it could, in fact, hold the securities to maturity, as required by GAAP.  Therefore, had KPMG adhered to PCAOB standards, it would have concluded that there was no reasonable basis for its unqualified audit reports because, notably, KPMG was aware of undisclosed facts that significantly undermined the accuracy of its reports; furthermore, there was a material overstatement of the Bank's HTM investment securities portfolio, which also had material impacts on the Bank's reported financial metrics.

**b.  SVB Did Not Have Effective Internal Controls**

267.    KPMG's unqualified reports, incorporated by reference into the Offering Documents, also stated that KPMG had audited SVB's internal controls "as of [year-end]," and SVB "maintained, in all material respects, effective internal control over financial reporting as of

---

[408]    AS 1015.04.

[409]    Letter from Fed. Rsrv., *supra* note 112.

AMENDED COMPLAINT

[year-end]." KPMG further specified that, in reaching this conclusion, its "audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk."[410]

268. KPMG's unqualified reports were false because, as discussed above, the Bank's internal controls over financial reporting were ineffective. Among other deficiencies, the Bank's internal controls failed to ensure compliance with GAAP for the classification and reporting of its investment securities portfolio. SVB did not have internal controls in place to evaluate whether SVB could in fact hold its HTM securities to maturity. SVB further lacked the controls necessary for reliable "liquidity projections" and assessments of its "need for liquidity," and thus could not provide the sufficient evidence required by GAAP for HTM classification.[411] Furthermore, as has been noted, SVB was beset by numerous other control failures that negatively impacted its financial reporting.

269. In issuing unqualified audit opinions on SVB's internal controls, KPMG did not comply with the professional standards dictated by PCAOB, as explained above. These standards demanded KPMG to complete a careful examination regarding SVB's effective controls over financial reporting. PCAOB's rulemaking in connection with AS No. 5 makes clear that KPMG could not simply rely on any assessment of internal controls reached and communicated to it by SVB's management but was instead required to independently assess the internal controls before it could issue a "clean" opinion. Despite this, SVB's internal controls suffered from a host of deficiencies, as detailed earlier.

### c. KPMG Did Not Conduct Its Audits in Accordance with PCAOB Professional Standards

270. KPMG's unqualified audit reports also inaccurately asserted that its audits were conducted in accordance with PCAOB Auditing Standards. As explained above, KPMG's audits did not adhere to PCAOB requirements, and KPMG lacked a reasonable basis for its

---

[410]    SVB Fin Grp., Annual Report (Form 10-K) (March 1, 2021) at 98.
[411]    KPMG Guide at 140.

- 103 -

AMENDED COMPLAINT

certifications. Crucially, KPMG was obligated to factor in the supervisory findings detailing significant deficiencies at SVB, particularly concerning SVB's governance and risk management, liquidity, and interest rate risk management, which clearly indicated material GAAP violations and internal control weaknesses.

271. Significantly, KPMG's shortcomings persisted after the Offering, as they continued to disregard PCAOB standards that necessitate disclosure of substantial doubt regarding SVB's ability to continue as a going concern. In accordance with AS 2415, an auditor bears the responsibility to evaluate whether there is substantial doubt about the entity's ability to remain operational for a reasonable period, and if so, to disclose it. By the date of KPMG's audit report in SVB's Form 10-K on February 24, 2023, numerous facts demonstrated a clear and substantial doubt about SVB's viability as a going concern. These facts included: (a) that SVB suffered from significant and ongoing deficiencies in internal controls raised "safety and soundness concern[s]" concerning the Bank's capital and liquidity; (b) SVB's risk and internal control matrix did not include an internal control specifically related to going concern issues; (c) without the Bank's improper violations of GAAP in misclassifying tens-of-billions of dollars in investment securities as HTM, the losses from those securities would have wiped out 89% of the Bank's common equity tier 1 capital as of year-end 2022, threatening the Bank's required capitalization under regulatory requirements;[412] and (d) by this time (i.e., February 2023), there was a substantial likelihood of a bank run given these mounting losses and control weaknesses; indeed, that occurred when the public learned about these issues less than two weeks later, leading to the collapse of the Bank.[413]

272. Since SVB's collapse, numerous industry observers have focused on KPMG's audit failures. Reuters reported on March 14, 2023, criticizing KPMG for delivering "a clean audit opinion" for SVB "only a few weeks" before the Bank's collapse. The article quoted a

---

[412] GAO Report at 15.

[413] *See, e.g.*, *SVB Depositors, Investors Tried to Pull $42 Billion Thursday*, BLOOMBERG (March 10, 2023), https://www.bloomberg.com/news/articles/2023-03-11/svb-depositors-investors-tried-to-pull-42-billion-on-thursday.

former PCAOB chief auditor who commented, "I suspect that may cause some people to question the value of an audit."[414] *The Wall Street Journal* also reported on this, quoting a former SEC chief accountant who stated, "[c]ommon sense tells you that an auditor issuing a clean report, a clean bill of health, on the 16th-largest bank in the United States that within two weeks fails without any warning, is trouble for the auditor."[415] Finally, a professor from the University of Michigan's Ross School of Business described SVB's audit opinion as "spectacularly embarrassing for KPMG."[416]

### d. KPMG Did Not Communicate Critical Audit Matters in Accordance with PCAOB Standards

273. Finally, in its audit reports certifying SVB's 2020 financial statements, KPMG falsely represented it communicated Critical Audit Matters as required by PCAOB Auditing Standards, because KPMG's disclosures omitted included any discussion of the accounting for HTM securities.

274. Under the PCAOB standards, SVB's accounting for HTM securities qualified as a Critical Audit Matter, as discussed previously. Among other factors, the improper classification of these HTM securities presented a serious risk of material misstatement due to their significant role in SVB's assets and regulatory capital.[417] Additionally, as also described above, management's determination that SVB had both the positive intent and ability to hold each of these securities to maturity required a substantial evidentiary showing that involved consideration of SVB's liquidity needs and interest rate risk.[418] Consequently, KPMG's audit reports were false

---

[414] Soyoung Ho, *Recent Bank Failures May Indicate Problems with Going Concern Standards, Liquidity Risk Disclosure Rules*, REUTERS (March 14, 2023), https://tax.thomsonreuters.com/news/recent-bank-failures-may-indicate-problems-with-going-concern-standards-liquidity-risk-disclosure-rules/.

[415] Jonathan Weil & Jean Eaglesham, *KPMG Gave SVB, Signature Bank Clean Bill of Health Weeks Before Collapse*, THE WALL STREET JOURNAL (March 13, 2023). https://www.wsj.com/articles/kpmg-faces-scrutiny-for-audits-of-svb-and-signature-bank-42dc49dd.

[416] *Id.*

[417] See AS 3101.12.

[418] *Id.*

- 105 -

AMENDED COMPLAINT

and misleading for omitting the accounting of the Bank's HTM securities portfolio as a Critical Audit Matter.

### COUNT I – SECTION 11 OF THE SECURITIES ACT

275.   Buchanan repeats and realleges the allegations above in paragraphs 1 to 274 as if fully set forth herein.  This claim is brought against Defendants Goldman, BofA, KPMG, Becker, Beck, Hon, Dunbar, Benhamou, Clendening, Friedman, Maggioncalda, Matthews, Miller, Mitchell, and Staglin.

276.   This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Buchanan, who purchased or otherwise acquired the securities issued pursuant and/or traceable to the Registration Statement, including the Offering Documents, and was damaged thereby.

277.   The Registration Statement, including the Offering Documents, contained untrue statements of material fact and omissions of material facts necessary to make the statements in them not misleading.

278.   For purposes of this count, Buchanan affirmatively states that he does not allege Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.  This claim is based solely in strict liability and negligence.  Any allegations of fraud or fraudulent conduct or motive are specifically disclaimed and excluded.

279.   Defendants' liability under this count is predicated on the participation of each Defendant in conducting this Offering based on the Offering Documents, which contained untrue statements and omissions of material fact.  Specifically:

    a.   Individual Defendants Becker, Beck, Hon, Dunbar, Matthews, Benhamou, Clendening, Friedman, Maggioncalda, Miller, Mitchell, and Staglin each signed the Registration Statement as a senior officer and/or director of SVB within the meaning of Section 11 of the Securities Act or were directors at the time of the May 2021 Offering and therefore signed SVB's SEC filings incorporated by reference into the Registration Statement and were directly involved in or responsible for providing the untrue statements contained in

- 106 -

and/or omissions from the Offering Materials (and/or documents incorporated by reference therein) and/or certifying and approving that information.

b. Underwriter Defendants Goldman Sachs and BofA were underwriters of the May 2021 Offering.

c. Auditor Defendant KPMG consented to the incorporation of its unqualified auditor's reports regarding SVB's financial statements and internal controls into the Offering Documents.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, the Offering Documents included, but were not limited to, the fact that KPMG's audits, which it attested were conducted in accordance with PCAOB standards, were not conducted in accordance with those standards.

280.    The Defendants named in this count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and omissions to the investing public that were contained in the Registration Statement, including the Offering Documents, which misrepresented or failed to disclose the material adverse facts alleged in connection with Buchanan's claims, as set forth above.

281.    In connection with offering the registered securities to the public and the sale of those securities, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and a national securities exchange.

282.    None of the Defendants named in this count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

283.    Buchanan did not know, nor in the exercise of reasonable diligence could he have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when he purchased or acquired the registered securities.

- 107 -

AMENDED COMPLAINT

284. As a direct and proximate result of Defendants' acts and omissions in violation of the Securities Act, Buchanan suffered substantial damage in connection with his purchase of the Notes pursuant and/or traceable to the Offering Documents.

### COUNT II – SECTION 12(a)(2) OF THE SECURITIES ACT

285. Buchanan repeats and realleges the allegations above in paragraphs 1 to 284 as if fully set forth herein. This claim is brought against Defendants Goldman Sachs, BofA, KPMG, Becker, Beck, Hon, Dunbar, Benhamou, Clendening, Friedman, Maggioncalda, Matthews, Miller, Mitchell, and Staglin.

286. This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). For purposes of asserting this and their other claims under the Securities Act, Buchanan does not allege that the Individual or Underwriter Defendants acted with intentional, reckless, or otherwise fraudulent intent, which are not elements of a Section 12(a)(2) claim. This claim is based solely in strict liability and/or negligence.

287. The Individual and Underwriter Defendants' liability under this count is predicated on their statutory liability for making untrue and materially misleading statements or omissions in the Supplemental Prospectus and by oral means.

288. Underwriter Defendants Goldman Sachs and BofA were underwriters of the May 2021 Offering.

289. The Individual Defendants were statutory sellers and offerors and/or solicitors of purchases of the Notes registered in the Offering and sold by means of the Offering Documents, including the Supplemental Prospectus and related documents incorporated by reference therein. By means of the defective Offering Documents, including the Supplemental Prospectus, each Individual and Underwriter Defendant named promoted, solicited, and/or sold the Notes to Buchanan. The Individual and Underwriter Defendants were at all relevant times motivated by their own financial interests. In sum, the Individual and Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the Notes sold in the May 2021 Offering.

AMENDED COMPLAINT

290.   The Offering Documents, including the Supplemental Prospectus, contained untrue statements of material fact and all omitted facts necessary to make the statements in them not misleading.

291.   In connection with offering the registered securities to the public and the sale of the Notes, the Individual and Underwriter Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and a national securities exchange.

292.   Neither the Individual Defendants nor the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents, including the Supplemental Prospectus, were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

293.   Buchanan did not know, nor in the exercise of reasonable diligence could he have known, that the Offering Documents, including the Supplemental Prospectus, contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when he purchased or acquired the registered securities.

294.   As a direct and proximate result of the Individual and Underwriter Defendants' acts and omissions in violation of the Securities Act, Buchanan suffered substantial damage in connection with his purchase of securities pursuant to the Offering Documents.

295.   By reason of the foregoing, the Defendants named in this count are liable for violations of Section 12(a)(2) of the Securities Act to Buchanan, who purchased the Notes pursuant or traceable to the Offering Documents and was damaged thereby.

**COUNT III – SECTION 15 OF THE SECURITIES ACT**

296.   Buchanan repeats and realleges the allegations above in paragraphs 1 to 295 as if fully set forth herein.  This claim is brought against the Individual Defendants.

- 109 -

AMENDED COMPLAINT

297.    This count is based on the Individual Defendants' statutory liability for untrue and materially misleading statements or omissions in the Registration Statement, including the Offering Documents.  This count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the Registration Statement, including the Offering Documents, are excluded from this count.  For purposes of asserting this count, Buchanan does not allege that the Individual Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

298.    The Individual Defendants were at all relevant times controlling persons of SVB within the meaning of Section 15 of the Securities Act.  The Individual Defendants each served as the most senior executive officers and directors of SVB at the time of the May 2021 Offering.

299.    The Individual Defendants participated at all relevant times in the operation and management of SVB, and conducted and participated, directly and indirectly, in the conduct of SVB's business affairs.

300.    As directors and officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to SVB.  Because of their positions of control and authority as directors and officers of SVB, the Individual Defendants were able to, and did, control the contents of the Registration Statement, including the Offering Documents, which contained materially untrue financial information and omissions.

301.    By reason of the foregoing, the Individual Defendants are liable under Section 15 of the Securities Act to Buchanan, who acquired the Notes pursuant or traceable to the Offering.  No claims, however, are brought against SVB in this Complaint.

302.    As a direct and proximate result of the Individual Defendants' conduct, Buchanan suffered damages in connection with his purchase of the Notes.

### COUNT IV – CAL. CORP. CODE §25401 AND §25504

303.    Buchanan repeats and realleges the allegations above in paragraphs 1 to 302 as if fully set forth herein.  This claim is brought against all Defendants.

- 110 -

AMENDED COMPLAINT

304.    SVB and the Underwriter Defendants offered and/or sold the Notes in California by means of written and/or oral communications, including the Offering Documents, that included an untrue statement of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading as set forth above, and are therefore liable under Cal. Corp. Code. §25401.

305.    No claims are brought against SVB in this Complaint.  The Individual Defendants, however, directly, or indirectly controlled SVB, and/or materially aided in the act or transaction constituting the violation of Cal. Corp. Code. §25401 and are therefore liable jointly and severally with and to the same extent as SVB within the meaning of Cal. Corp. Code §25504.

306.    The Individual and Underwriter Defendants offered and/or sold the Notes in the State of California by means of written and/or oral communications that included an untrue statement of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

307.    As a direct and proximate result of Defendants' acts and omissions in violation of Cal. Corp. Code §25401 and §25504, Buchanan suffered substantial damage in connection with its purchase of the Notes pursuant to the Offering Documents.

308.    By reason of the foregoing, Defendants are liable for violations of Cal. Corp. Code §25401 to Buchanan, who purchased Notes pursuant and traceable to the Offering Documents and was damaged thereby and also for reasonable attorney's fees and costs pursuant to Cal. Corp. Code §25501.

**COUNT V – FLORIDA SECURITIES AND INVESTOR PROTECTION ACT**

**§517.301(1)(a)(2)**

309.    Buchanan repeats and realleges the allegations above in paragraphs 1 to 308 as if fully set forth herein.  This claim is brought against all Defendants.  Buchanan brings this claim as a citizen and resident of the State of Florida.

310.    SVB and the Underwriter Defendants offered and/or sold the Notes in Florida by means of written and/or oral communications, including the Offering Documents, that included

an untrue statement of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading as set forth above, and are therefore liable under §517.301(1)(a)(2) of the Florida Securities and Investor Protection Act.

311.   Defendants offered and/or sold the Notes in the State of Florida by means of written and/or oral communications that included an untrue statement of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.  All Defendants materially aided in the act or transaction constituting the violation of §517.301(1)(a)(2) of the Florida Securities and Investor Protection Act.

312.   As a direct and proximate result of Defendants' acts and omissions in violation of §517.301(1)(a)(2) of the Florida Securities and Investor Protection Act., Buchanan suffered substantial damage in connection with its purchase of the Notes pursuant to the Offering Documents.

313.   By reason of the foregoing, Defendants are liable for violations of §517.301(1)(a)(2) of the Florida Securities and Investor Protection Act to Buchanan, who purchased Notes pursuant and traceable to the Offering Documents and was damaged thereby and also for reasonable attorney's fees and costs.

### V.  PRAYER FOR RELIEF

WHEREFORE, Buchanan prays for relief and judgment as follows:

A.   awarding compensatory or rescissory damages in favor of Buchanan against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

B.   awarding Buchanan his reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

C.   awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

- 112 -

AMENDED COMPLAINT

DATED: August 25, 2025

/s/ *John T. Jasnoch*

John T. Jasnoch (CA 281605)
Mollie E. Chadwick (CA 329524)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-233-0508
jjasnoch@scott-scott.com
mchadwick@scott-scott.com

*Counsel for Plaintiff Steven J. Buchanan*

AMENDED COMPLAINT